STATE of Wisconsin, Plaintiff-Respondent,

v.

Aaron Antonio ALLEN,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP795. Decided February 11, 2010.*

2010 WI 10

(Also reported in 778 N.W.2d 863.)

¶ 1. PER CURIAM. The members of the court disagree as to the disposition of petitioner Aaron Antonio Allen's motions for the recusal of Justice Michael J. Gableman citing the Fourteenth Amendment of the United States Constitution; Article I, Sections 1 and 8 of the Wisconsin Constitution; and Wis. Stat. § 757.19(2)(g).

¶ 2. On February 4, 2010, Justice Michael J. Gableman informed the members of the court that he was withdrawing from participation in the court's consideration of Allen's recusal motions and was withdrawing his separate written opinion. Only six justices are therefore participating.

¶ 3. Three justices, Chief Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, and Justice N. Patrick Crooks, would order briefs and oral argument, as the parties have requested.

¶ 4. Three justices, Justice David T. Prosser, Justice Patience Drake Roggensack, and Justice Annette Kingsland Ziegler, would issue an order denying the motions.

¶ 5. Chief Justice Abrahamson and Justices Bradley and Crooks write in support of their proposed disposition.

¶ 6. Justice Roggensack, joined by Justices Prosser and Ziegler, writes in support of their proposed disposition.

¶ 7. Individual writings by Justices Crooks, Prosser, and Ziegler are also filed.

¶ 8. Because the members of the court disagree as to the disposition of Allen's motions as set forth above, the motions are not granted. No four justices have agreed to grant the motions.

¶ 9. SHIRLEY S. ABRAHAMSON, C.J.; ANN WALSH BRADLEY, J.; N. PATRICK CROOKS, J. Chief Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, and Justice N. Patrick Crooks join this opinion and proposed order regarding Allen's recusal motions.[1]

---

[1] The words "recusal" and "disqualification" are effectively synonymous and often used interchangeably, as we use them

¶ 10. When Allen's pro bono counsel first filed recusal motions on April 17, 2009, challenging Justice Gableman's participation, perhaps none would have foreseen the extent to which these motions would challenge this court, and have challenged all of us, in the months that have followed, even though recusal issues have been percolating under and above the surface for many years.[2]

---

here. Some do distinguish between the two words. "Whereas 'recusal' normally refers to a judge's decision to stand down voluntarily, 'disqualification' has typically been reserved for situations involving the statutorily or constitutionally mandated removal of a judge upon the request of a moving party or its counsel." Richard E. Flamm, *Judicial Disqualification: Recusal and Disqualification of Judges* § 1.1 at 3 (2d ed. 2007); *but see id.* at 4 n.4 (noting some dissonant use of the terms).

[2] Some of these issues, which the court needs to resolve, have been identified at least since 1990. It would have been better to address our recusal practice thoughtfully and prospectively rather than having to react when a particular motion challenges an individual justice. See Appendix A, which reprints the entire texts of dissents in *State ex rel. National Union Fire Insurance Co. v. Circuit Court for St. Croix County,* No. 90–0935–W, unpublished order (Wis. S. Ct. May 29, 1990) (Abrahamson, J., dissenting), and *Matter of Disciplinary Proceedings Against Crosetto,* 160 Wis. 2d 581, 466 N.W.2d 879 (1991) (Abrahamson, J., dissenting), relating to recusal.

In *Crosetto,* the recusal motion asked each justice individually to recuse himself or herself. The per curiam decision, which then-Justice Abrahamson did not join, reports that each justice individually responded. No motion sought court review of these individual decisions. Accordingly, because the question was not raised, neither the per curiam nor Justice Abrahamson's dissent addressed the issue of what a court should do when a motion asks the entire court to review an individual justice's recusal decision. Justice Abrahamson's dissent proposed actions the court should take for handling recusal motions.

¶ 11. On February 4, 2010, Justice Gableman withdrew from further participation in the court's consideration of Allen's recusal motions against Justice Gableman and withdrew his separate writing in this matter.

¶ 12. Justices Prosser, Roggensack, and Ziegler conclude that Justice Gableman need not have withdrawn from participating in deciding whether the court lacks jurisdiction (power) to consider Allen's recusal motions directed at Justice Gableman. *See* J. Roggensack, ¶¶ 196–197.

¶ 13. Justices Prosser, Roggensack, and Ziegler further determine (1) that this court cannot independently review a justice's decision to deny a recusal motion except to decide whether the individual justice made the determination that the motion required, although this court can and should independently review denials of recusal motions by elected judges of the circuit court and court of appeals; and (2) that Allen's recusal motions have no merit.

¶ 14. During the court's long, drawn-out consideration of Allen's motions for his disqualification, Justice Gableman has alternated between participating and not participating in the consideration of the recusal motions directed to the court, finally withdrawing from participation on February 4, 2010.[3]

---

[3] Supreme Court Internal Operating Procedure II.L. provides: "When a justice recuses or disqualifies himself or herself, the justice takes no further part in the court's consideration of the matter." In previous cases, a challenged justice has not participated in determining the court's response to a motion challenging the justice. *See State v. Am. TV & Appliance of Madison, Inc.*, 151 Wis. 2d 175, 443 N.W.2d 662 (1989); *City of Edgerton v. Gen. Cas. Co. of Wis.*, 190 Wis. 2d 510, 527 N.W.2d

¶ 15. Allen's motions to Justice Gableman individually and to the court (on due process grounds) were filed on April 17, 2009. Nearly five months later, on September 10, 2009, Justice Gableman denied the recusal motion directed to him individually in a one-sentence order that contained no explanation.[4] Thus, the recusal motion directed to the court on due process grounds was not really ripe for the court's consideration until Justice Gableman's September 10, 2009 denial of Allen's motion.

¶ 16. On September 21, 2009, Allen filed a supplemental motion addressed to the court, requesting the court to review whether Justice Gableman had considered, as required by Wis. Stat. § 757.19(2)(g), whether he could not or it appeared he could not act impartially.

¶ 17. On January 15, 2010, Justice Gableman filed a supplement to his September 10 order, this time providing a 10–paragraph explanation for his decision to deny the recusal motion directed individually to him. This supplemental order discusses the merits of Allen's allegations and concludes: "The allegations in Allen's motion are simply wrong."[5]

---

305 (1995); *Jackson v. Benson,* 249 Wis. 2d 681, 639 N.W.2d 545 (2002); *Donohoo v. Action Wis., Inc.,* 2008 WI 110, 314 Wis. 2d 510, 754 N.W.2d 480.

[4] In her writing, Justice Roggensack mentions, in reference to the September 10, 2009 order, that Justice Gableman "had plenty of time to research and carefully consider the arguments made in support of and in opposition to the motion." J. Roggensack, ¶ 242.

[5] Although Justice Roggensack's writing purports to review whether Justice Gableman made the required determination about recusal under the statute, her writing fails to review Justice Gableman's January 15, 2010, supplemental order.

¶ 18. On October 16, 2009, Justices Prosser, Roggensack, and Ziegler issued a press release, complaining that the court should have responded to Allen's motion within 5 weeks after April 17, 2009, when Allen's recusal motion was filed. Their complaint about the process and their charges about delay ignore the obvious complexities and challenging nature of the issues presented. The recusal issue was not ripe until Justice Gableman denied the recusal motion on September 10, 2009; Justice Gableman filed a supplemental order explaining his participation in the case on January 15, 2010. Justice Gableman withdrew from participation in the court's consideration of Allen's recusal motions on February 4, 2010. It should be clear to everyone that this has been a difficult and time-consuming process for all the justices.

¶ 19. The writings of the three justices who do not join this opinion palpably demonstrate the difficulties they have faced in joining together with one voice to respond to Allen's recusal motions directed to the court. The three justices' writings have been a moving target, based on an ever-changing variety of rationales.

¶ 20. The State requested that if the court were to give plenary consideration to Allen's recusal motions—and Justices Prosser, Roggensack, and Ziegler would have you believe that they have given plenary consideration—"such consideration should come only after full briefing and argument by the parties on the

In the *Caperton* case, discussed below, the challenged West Virginia justice also wrote an opinion explaining why he thought he should participate in the case's decision. He, however, acknowledged that the West Virginia court had "authority under *Aetna [Life Ins. Co. v Lavoie,* 475 U.S. 813, 821–22 (1986)] to remove me from the case." *Caperton v. A.T. Massey Coal Co.,* 679 S.E.2d 223, 301 (W.Va. 2008) (Benjamin, C.J., concurring).

377

matter."[6] Responding to similar motions in several other cases, the State's briefs have recognized that "the issues are potentially broad and deep, deserving of full briefing and oral argument."[7]

¶ 21. We agree with Allen and the State about the need for full briefing and oral argument.

¶ 22. The court should have ordered briefs in April 2009 when Allen filed his first motions and the State responded. The court did not. The writings today

---

[6] Plaintiff-Respondent [State]'s Response to Second Supplement to Motion for Recusal of Justice Michael Gableman, Directed to the Court as a Whole, filed Dec. 21, 2009.

[7] *State v. Sveum,* No. 2008AP658–CR, Plaintiff-Respondent [State]'s Response to Petitioner's Motion to Disqualify Justice Michael J. Gableman, filed Jan. 4, 2010. *See also, State v. Carter,* No. 2006AP1811–CR, Plaintiff-Respondent-Petitioner [State]'s Response to Motion for Recusal of the Hon. Michael J. Gableman on Constitutional Grounds ("If the full court takes up the motion . . . a number of other issues . . . would have to be addressed by the court after full briefing by the parties."); *State v. Cross,* No. 2009AP3–CR, Plaintiff-Respondent [State]'s Response to Motion to Disqualify Justice Michael J. Gableman, filed Nov. 17, 2009 ("[T]he State respectfully identifies the following related issues: What are the proper governing legal standards? Is an evidentiary hearing necessary? . . . How would Justice Gableman's disqualification affect . . . all judicial elections in Wisconsin? As [Defendant's] motion for disqualification reflects, the issues are potentially broad and deep, deserving of full briefing and argument"); *State v. Dearborn,* No. 2007AP1894–CR, Plaintiff-Respondent [State]'s Response to Motion to Disqualify Justice Michael J. Gableman, filed Dec. 4, 2009 (similar to *Cross, supra*); *State v. Jones,* No. 2008AP2342–CR, Plaintiff-Respondent [State]'s Response to Jones' Constitutional and Statutory Motions for Recusal of Hon. Michael J. Gableman, filed Dec. 28, 2009 (similar to *Cross, supra*); *State v. Littlejohn,* No. 2007AP900–CR, Plaintiff-Respondent [State]'s Response to Motion to Disqualify Justice Michael J. Gableman, filed Dec. 4, 2009 (similar to *Cross, supra*).

show that the court's usual way of proceeding to decide matters, with briefs and oral argument, should be followed.

¶ 23. Opinions of this court should not "reach out and decide issues" without the benefit of full briefing by the parties. *See Dairyland Greyhound Park, Inc. v. Doyle,* 2006 WI 107, ¶ 335, 295 Wis. 2d 1, 719 N.W.2d 408 (Roggensack, J., concurring in part and dissenting in part).

¶ 24. "Sound judicial decision making requires 'both a vigorous prosecution and a vigorous defense' of the issues in dispute, *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 419, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978), and a constitutional rule announced *sua sponte* is entitled to less deference than one addressed on full briefing and argument. *Cf. Ladner v. United States,* 358 U.S. 169, 173, 79 S.Ct. 209, 211, 3 L.Ed.2d 199 (1958)"[8]

¶ 25. For the reasons set forth herein, we conclude that it is not too late to order briefs and schedule

---

[8] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 572 (1993) (Souter, J., concurring). Justice Souter states that in *Ladner v. United States,* 358 U.S. 169, 173 (1958), the Court declined "to address 'an important and complex' issue concerning the scope of collateral attack upon criminal sentences because it had received 'only meagre argument' from the parties, and the Court thought it 'should have the benefit of a full argument before dealing with the question'."

The United States Supreme Court has well expressed the value of briefing. *See, e.g., Penson v. Ohio,* 488 U.S. 75, 84 (1988) ("This system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful statements on both sides of the question.' " (citations omitted)); *Polk County v. Dodson,* 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness."); *Mackey v. Montrym,* 443

oral argument on Allen's motions. Indeed, key differing approaches in the writings issued today evidence the need for additional input. We conclude that the parties should be directed to file briefs in this court on the issues raised in the writings issued today, as well as the issues raised by Allen and by the State.

¶ 26. Briefs would assist on four key issues:

## I

Briefs are needed on Justices Prosser, Roggensack, and Ziegler's attempt to divide the legal questions presented into segments in a failed attempt to persuade Justice Gableman to participate on one issue (court jurisdiction) but refrain from participating on other issues in the disposition of Allen's recusal motions. (¶¶ 27–32)

## II

Briefs are needed on the substantive issue of whether this court has jurisdiction (power) to decide recusal motions challenging the participation of a justice in a particular case. Justices Prosser, Roggensack, and Ziegler's arguments do not analyze jurisdiction. Rather, they are directed at policy. (¶¶ 33–71)

## III

Briefs are needed on the question of how to protect the rights of litigants to a fair, impartial Wisconsin Su-

U.S. 1, 13 (1979) ("[O]ur legal tradition regards the adversary process as the best means of ascertaining truth and minimizing the risk of error . . . .").

*See also* Stephan Landsman, *Readings on Adversarial Justice: The American Approach to Adjudication* (1988); Jerold H. Israel, *Cornerstones of the Judicial Process,* Kan. J. L. & Pub. Pol'y, Spring 1993, at 5; Ellen E. Sward, *Values, Ideology and the Evolution of the Adversary System,* 64 Ind. L. J. 301, 316–19 (1989).

preme Court if the justices are not willing to decide recusal motions challenging the participation of a justice. (¶¶ 72–88)

## IV

Briefs are needed on whether the grounds upon which Allen's motions rest justify disqualifying Justice Gableman from sitting on the merits of Allen's case. (¶¶ 87–116)

\* \* \* \*

## I

¶ 27. First, briefs are needed on the three justices' attempt to divide the legal questions presented into segments to enable a challenged justice to participate in the jurisdictional issue but refrain from participating in the disposition of the recusal motions.

¶ 28. Justices Prosser, Roggensack, and Ziegler try to articulate the question of the jurisdiction of this court as an abstract legal question that *affects all justices equally,* so that a challenged justice could participate on this issue.[9] An examination is needed into whether a decision on the court's jurisdiction to review a justice's decision to participate really affects all justices equally. We are reminded of George Orwell's *Animal Farm:* "All animals are equal. But some animals are more equal than others."[10]

¶ 29. Perhaps betraying the obvious fallacy of their claim that the question whether the court has jurisdiction to review a justice's decision to participate has an "equal affect on all justices," the three, try as

[9] J. Roggensack, ¶¶ 196, 206.

[10] George Orwell, *Animal Farm,* ch. 10.

they might, have been unable to address the question without offering a characterization of the specific circumstances and allegations presented in this case.[11] The allegations relate to one justice, not to the other six.

¶ 30. The jurisdictional question raised in Allen's motions, no matter how phrased, is tied to the challenged justice's interests. The law relating to recusal affects Justice Gableman personally and immediately. The recusal motion challenges his participation in the present case and perhaps similar cases and rests on facts similar to those forming the basis of a Judicial Commission complaint against him pending before this court. At some time, every justice (as well as every appellate, circuit court, and municipal court judge in the state) may have a recusal motion directed to him or her. All those who hold judicial office are therefore potentially affected by a decision about recusal. But we are not affected by or interested in the jurisdictional issue and in the outcome of Allen's recusal motions in the same immediate way as Justice Gableman. Justice Gableman was correct in withdrawing from participation in the court's decision on the recusal motions.

¶ 31. It certainly appears that any challenged justice has a personal interest in the disposition of a recusal motion directed to him or her. How can Justices Prosser, Roggensack, and Ziegler get around this fact? Shouldn't the parties brief this issue? Is there any case law on the issue?

¶ 32. Furthermore, Justice Roggensack cites no authority for dividing the legal questions presented in a recusal motion into segments so that a challenged justice may cast a vote on one issue (court jurisdiction),

---

[11] J. Roggensack, ¶¶ 202–205.

while being barred from casting a vote on other issues. As best we can tell, the court has never subdivided a single matter before the court to accommodate an interested justice who wishes to cast a vote on a legal issue. Briefs are needed on this aspect of judicial disqualification.

## II

¶ 33. Second, briefs are needed on the substantive issue of whether this court has jurisdiction (power) to decide recusal motions challenging a member of the court. This jurisdictional (power) issue was posed by Justice Roggensack. It was not raised by the parties. Allen and the State assumed the court has jurisdiction (power).[12] Why shouldn't they?

¶ 34. This court has jurisdiction over the *Allen* case and therefore has jurisdiction over all issues properly presented. It is well established that all Wisconsin courts, including municipal courts, have jurisdiction over federal constitutional claims.[13]

¶ 35. Justice Roggensack's writing argues that "a majority of the justices on this court do not have the power to disqualify a fellow justice from participation in a proceeding before this court." J. Roggensack, ¶ 207. This statement appears to answer a jurisdictional question—"does the court have power to disqualify a justice?" Yet the question is then analyzed not as a matter of the court's jurisdiction (or power) but as a

---

[12] J. Roggensack, ¶ 195.

[13] In *Milwaukee v. Wroten*, 160 Wis. 2d 207, 222, 466 N.W.2d 861 (1991), declaring that a municipal court has the power to declare a municipal ordinance unconstitutional, this court stated: "[O]nce a court, including a municipal court, appropriately invokes its jurisdiction, it has the power to exercise all of its constitutional powers within the framework of that conferred jurisdiction."

question of judicial policy, that is, "should the court, as a matter of judicial policy, disqualify a justice?"

¶ 36. Justice Roggensack in fact acknowledges that the court has jurisdiction, at least for the limited review required by Wis. Stat. § 757.19(2)(g). Beyond that, the reasons offered for a lack of jurisdiction are policy reasons, including the inability to substitute a justice of this court, the differences between justices of this court and the elected judges of the circuit courts and court of appeals, and the "deeply divided" nature of the court's current membership. J. Roggensack, ¶¶ 217–218 & nn.9 & 10, ¶¶ 226–227.

¶ 37. These arguments implicate judicial policy, or at most offer reasons why review of individual recusal decisions by this court might have negative consequences, and why Justices Prosser, Roggensack and Ziegler therefore choose not to provide such review. *See also* J. Prosser, ¶¶ 248, 255–257. But such analysis does not affect the jurisdiction, or power, of the court as an institution.

¶ 38. We discuss whether such policy concerns can outweigh a litigant's right to a fair tribunal at ¶¶ 72 to ¶ 86, after we discuss the jurisdictional (power) question below.

¶ 39. This court has exercised its jurisdiction to decide disqualification motions directed against individual justices at least since 1898, when it decided *Case v. Hoffman,* 100 Wis. 314, 72 N.W. 390 (1897), *reh'g granted,* 74 N.W. 220 (1898). In *Case,* the court had already rendered a decision. After the decision was rendered, the court was asked to decide whether the author of the opinion (who died after the decision was released) had been disqualified from participating under what is now Wis. Stat. § 757.19(2)(e), because he had previously decided the matter as a trial judge.

384

¶ 40. The *Case* court declared that the deceased justice had individually decided before authoring the opinion that he could participate in the case: "[C]ertain we are that he concluded that he was not disqualified . . . ."[14] Nevertheless the *Case* court then reviewed the deceased justice's decision regarding his ability to sit on the case and overturned the deceased justice's decision to participate, holding he had previously decided the matter as a trial judge. The result was that the judgment in which the deceased justice participated was vacated and the cause reargued. Thus in 1898 a majority of the court exercised power to disqualify a fellow justice by vacating the decision in which the justice had unlawfully participated.

¶ 41. The court explained *Case v. Hoffman,* just as we have, in *State v. American TV & Appliance of Madison, Inc.,* 151 Wis. 2d 175, 180, 443 N.W.2d 662 (1989), as follows: "Acknowledging the certainty that Judge Newman [the deceased justice] had concluded he was not disqualified and that it was his duty to participate in the decision, the court nevertheless held that Justice Newman was legally disqualified . . . ."[15]

¶ 42. In *Donohoo v. Action Wisconsin, Inc.,* 2008 WI 110, 314 Wis. 2d 510, 754 N.W.2d 480, Donohoo "assert[ed] that Justice Butler was disqualified by law pursuant to Wis. Stat. § 757.19(2)(f) because of his substantial financial and personal interest in the outcome of the case . . . ." *Donohoo,* 314 Wis. 2d 510, ¶ 14.

---

[14] *Case v. Hoffman,* 100 Wis. 314, 355, 72 N.W. 390 (1897), *reh'g granted,* 74 N.W. 220 (1898).

[15] Furthermore, in *Jackson v. Benson,* 2002 WI 14, ¶ 2, 249 Wis. 2d 681, 639 N.W.2d 545, the court exercised its jurisdiction over a motion challenging Justice Wilcox's participation in a case and decided that the motion was not timely filed. The court did not dismiss the motion for lack of jurisdiction.

This court applied an objective standard to the recusal motion based on § 757.19(2)(f) and after reviewing the facts concluded "that the facts alleged by Donohoo do not support a finding that Justice Butler was disqualified by law from participating in this matter." *Donohoo,* 314 Wis. 2d 510, ¶ 3. Once again the court reviewed the merits of an allegation that a justice was statutorily disqualified.

¶ 43. These cases demonstrate that our past review of individual justices' disqualification decisions has not been confined to a limited review of "whether that individual justice made the determination that the motion required," as Justice Roggensack asserts.[16] The reference to the determination of an individual justice applies only to Wis. Stat. § 757.19(2)(g), which is only one of the bases for disqualification and the only statutory disqualification provision that requires a judge to make a subjective determination.[17]

---

[16] J. Roggensack, ¶ 208.

[17] Wisconsin Stat. § 757.19 creates a mandatory duty for judges to disqualify themselves in certain circumstances. The full text of Wis. Stat. § 757.19(1)-(2) reads:

757.19 Disqualification of judge.

(1) In this section, "judge" includes the supreme court justices, court of appeals judges, circuit court judges and municipal judges.

(2) Any judge shall disqualify himself or herself from any civil or criminal action or proceeding when one of the following situations occurs:

(a) When a judge is related to any party or counsel thereto or their spouses within the 3rd degree of kinship.

(b) When a judge is a party or a material witness, except that a judge need not disqualify himself or herself if the judge determines that any pleading purporting to make him or her a party is false, sham or frivolous.

¶ 44. Furthermore, even in disqualification motions involving the subjective determination of a justice under Wis. Stat. § 757.19(2)(g),[18] the court reviews the judge's subjective determination using *objective* standards.[19] *State v. Harrell,* 199 Wis. 2d 654, 663–64, 546 N.W.2d 115 (1996).[20]

> (c) When a judge previously acted as counsel to any party in the same action or proceeding.
>
> (d) When a judge prepared as counsel any legal instrument or paper whose validity or construction is at issue.
>
> (e) When a judge of an appellate court previously handled the action or proceeding while judge of an inferior court.
>
> (f) When a judge has a significant financial or personal interest in the outcome of the matter. Such interest does not occur solely by the judge being a member of a political or taxing body that is a party.
>
> (g) When a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner.

This court has drawn a distinction between the "objective" and "subjective" criteria for mandatory disqualification based on the statutory language of Wis. Stat. § 757.19(2)(a)-(g). Our past cases have held that the first six criteria for disqualification, Wis. Stat. § 757.19(a)-(f), "are susceptible of objective determination, that is, without recourse to the judge's state of mind." *Am. TV,* 151 Wis. 2d at 175, 182.

[18] Section 757.19(2)(g) requires disqualification only "*when a judge determines* that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner" (emphasis added).

[19] *See State v. Am. TV,* 151 Wis. 2d 175, 443 N.W.2d 662 (1989); *City of Edgerton v. Gen. Cas. Co.,* 190 Wis. 2d 510, 527 N.W.2d 305 (1995); *Donohoo v. Action Wis., Inc.,* 2008 WI 110, 314 Wis. 2d 510, 754 N.W.2d 480.

[20] Justice Roggensack, ¶ 240, recognizes that an objective standard is used to determine whether Justice Gableman in fact

¶ 45. Thus, this court has provided a forum to determine whether a justice has violated an objective or subjective statutory ground of disqualification.

¶ 46. Inasmuch as this court provides review of a justice's recusal decision on state statutory grounds, this court cannot discriminate against a due process disqualification challenge to a justice by refusing to review the federal constitutional issue. "[T]he Federal Constitution prohibits state courts of general jurisdiction from refusing [to enforce a federal right] solely because the suit is brought under a federal law. . . . A state may not discriminate against rights arising under federal laws."[21]

made a subjective decision about his impartiality and his ability to participate in the present case under § 757.19(2)(g).

[21] *McKnett v. St. Louis & S.F. Ry. Co.,* 292 U.S. 230, 233–34 (1934); *see also Howlett v. Rose,* 496 U.S. 356, 371 (1990) ("The Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source."); *Mondou v. New York, New Haven & Hartford R.R. Co.,* 223 U.S. 1, 57 (1912).

"Since shortly after the founding of the Republic, it has been well established that state courts are obliged to enforce applicable principles of federal law when they adjudicate state causes of action." Martin H. Redish & John E. Muench, *Adjudication of Federal Causes of Action in State Courts,* 75 Mich. L. Rev. 311, 311 (1977) (citing *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304 (1816)).

This court declared in *Terry v. Kolski,* 78 Wis. 2d 475, 482, 254 N.W.2d 704 (1977), that the federal constitution "not only permits state courts to exercise jurisdiction in enforcement of federal laws, to the extent permitted by Congress, but mandates that federal causes of action and federal rights, unless exclusively reserved to the federal courts, must be enforced by state courts." *Terry v. Kolski,* 78 Wis. 2d at 482 (quoting *The Feder-*

¶ 47. Is there any guiding principle that differentiates between this court's power or jurisdiction when the disqualification challenge is based on statutory disqualification standards, whether objective or subjective, and when the challenge is based on the objective standard of the due process clauses of the federal and state constitutions? Should a litigant challenging a justice's participation on constitutional grounds be due *less* process from this court when he alleges that the constitution has been violated than when he alleges that our statutes have?[22]

---

alist Papers* and *Charles Dowd Box Co., Inc. v. Courtney,* 368 U.S. 502, 507–08 (1962): "We start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule.").

The doctrine that state courts must enforce federal claims has generally arisen not in cases involving constitutional claims, but in cases involving the authority and obligation of state courts to enforce federal statutes. The general rule emanating from these cases is that unless Congress prohibits adjudication in a state court, "a state court cannot 'refuse to enforce the right arising from the law of the United States because of conceptions of impolicy . . . . ' " *Testa v. Katt,* 330 U.S. 386, 393 (1947) (quoting *Minneapolis & St. Louis R.R. Co. v. Bombolis,* 241 U.S. 211, 222 (1916)). This doctrine, developed with regard to state court implementation of federal statutes, clearly applies to the obligation of state courts to enforce federal constitutional rights.

[22] In addition, Article I, Section 9 of the Wisconsin Constitution guarantees that every person shall be afforded a remedy for wrongs committed against his or her person, property, or liberty. "The court has long held that the 'certain remedy' clause of this provision, while not guaranteeing to litigants the exact

¶ 48. Furthermore, in discussing the court's power over recusal motions, we should examine the court's judicial powers. The court has inherent authority to ensure "that the court functions efficiently and effectively to provide the fair administration of justice."[23] The court has stated that it "has express, inherent, implied and incidental judicial power. Judicial power extends beyond the power to adjudicate a particular controversy and encompasses the power to regulate matters related to adjudication."[24] With regard to the explicit constitutional powers of this court, our court has stated that "the judiciary's 'superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state.' "[25] Moreover, the court has stated that "it was unsound jurisprudence to refuse to exercise judicial power where there was an established need for it and no explicit constitutional barrier to its exercise."[26] Don't recusal motions addressed to the court establish a need

remedy they desire, entitles Wisconsin residents 'to their day in court.' " A litigant challenging a justice on due process grounds is entitled to a day in a Wisconsin court on the claim presented. *Estate of Makos v. Wis. Masons Health Care Fund,* 211 Wis. 2d 41, 552, 564 N.W.2d 662 (1997) (citing *Metzger v. Dep't of Taxation,* 35 Wis. 2d 119, 129, 150 N.W.2d 431 (1967). For a lengthy discussion of Article I, Section 9, see Justice Crooks' concurrence in *Estate of Makos,* 211 Wis. 2d at 61–68.

[23] *City of Sun Prairie v. Davis,* 226 Wis. 2d 738, 749–50, 595 N.W.2d 635 (1999).

[24] *State v. Holmes,* 106 Wis. 2d 31, 44, 315 N.W.2d 703 (1982).

[25] *Flynn v. Dep't of Admin.,* 216 Wis. 2d 521, 548, 576 N.W.2d 245 (1998) (quoting *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 520, 235 N.W.2d 409 (1975)).

[26] *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 523, 235 N.W.2d 409 (1975).

for the court to exercise its judicial power? Our colleagues are silent about the court's judicial powers.

¶ 49. Because this court has express, implied, incidental, and inherent powers; because the court has supervisory and administrative authority over all courts in Wisconsin, including the supreme court;[27] because this court is obligated to support the United States Constitution as the supreme law of the land;[28] because each justice is required to and does take an oath to support the federal and state constitutions;[29] because this court has inherent competency to adjudicate federal constitutional claims; because both the federal and state constitutions guarantee due process;[30] and because this court decides motions to disqualify justices and other decision makers on objective and subjective statutory grounds and due process grounds, doesn't this court have not only the power (jurisdiction) to hear a due process recusal motion but also a constitutional obligation to hear Allen's motions and to decide whether a justice of this court is disqualified on due process grounds from sitting on a case? It appears to us that the court does have such authority. Briefs would help.

¶ 50. Justices Prosser, Roggensack, and Ziegler want us to believe that this court does not have the power to disqualify a justice, regardless of the nature of the allegations. Yet they cite no statutory or constitutional provisions or case law, either in Wisconsin or in any other state or in the federal system, to support their assertion that the court lacks jurisdiction.

[27] Wis. Const. art. VII, § 3(1).

[28] U.S. Const. art. VI, § 2 (supremacy clause).

[29] U.S. Const. art. VI, § 3; Wis. Const. art. IV, § 28.

[30] U.S. Const. amend. XIV; Wis. Const. art. I, § 8.

¶ 51. They seem to imply that litigants seeking to disqualify an allegedly partial justice on the Wisconsin Supreme Court must look only to the Wisconsin Constitution, which provides for impeachment, the next election, disciplinary proceedings, address of the legislature, or a mandatory retirement age.[31] Thus our colleagues confuse disqualifying a justice from participating in a case or a number of cases with removing a justice totally from office. Allen has not sought Justice Gableman's removal from office; he asks removal only from the present case.

¶ 52. Removal of a justice from office is a rare and extreme measure and is not a serious option for a litigant who has a pending case in the Wisconsin Supreme Court and seeks to be heard before a court composed only of impartial justices.[32]

¶ 53. Are our three colleagues concluding that the constitutional means for removing a justice are the

---

[31] J. Roggensack, ¶ 224 & n.15.

[32] Constitutional grounds for impeachment are limited and are unlike the grounds for recusal. The next elections for a member of this court are in April 2011, April 2013, and April 2015. The next election for Justice Gableman is about eight years away. Our three colleagues forget (or deliberately ignore) that "[t]he Code of Judicial Ethics . . . has no effect on [a judge's] legal qualification or disqualification to act . . . ." *Am. TV,* 151 Wis. 2d at 185. Thus the Judicial Code route does not benefit a litigant like Allen who seeks an impartial tribunal. *Am. TV,* 151 Wis. 2d at 185. "Address of the legislature" dates back to English law and to the original 1848 Wisconsin constitution. It allows removal of a judge from office by a vote of two-thirds of all the members elected to each house. It has never been done. William R. Moser, *Populism, A Wisconsin Heritage: Its Effect on Judicial Accountability in the State,* 66 Marq. L. Rev. 1, 12–19 (1982). The legislature has not enacted a mandatory retirement age for judges.

exclusive ways of excluding a justice from participation in a case on disqualification grounds? If so, they cite no authority. Indeed, the court has summarized the cases as stating that "when a judge is *removed,* he must be removed by the constitutional method. [Prior cases] do not say that sanctions short of removal are constitutionally defective."[33]

¶ 54. Briefs are needed on whether the court has jurisdiction (power) over Allen's recusal motions under the court's express, inherent, implied, and incidental powers, and superintending and administrative authority, or whether the constitutional provisions on removal from office are exclusive, preempting the court's power to review a challenged justice's decision to participate in a case.

¶ 55. Our three colleagues support their stunning, counter-intuitive legal conclusion that this court lacks jurisdiction "by the past practices of this court and by the past, and current, practices of the United States Supreme Court."[34] Yet they acknowledge that "practices do not establish precedent."[35]

¶ 56. We have discussed the court's past practices in recusal. *See* ¶¶ 39–45. They do not support the position of the three justices.

¶ 57. With regard to the practices of the United States Supreme Court, Justice Roggensack offers no reasons why the practice at the United States Supreme Court, whose rules, practices, jurisdiction, and powers

The Wisconsin constitution and statutes also provide for removal by recall elections, another method unavailable to an individual litigant.

[33] *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 522–23, 238 N.W.2d 409 (1975).

[34] J. Roggensack, ¶ 207.

[35] J. Roggensack, ¶ 208.

are different from our own, should control the practice or jurisdiction of this court.

¶ 58.　In any event, the United States Supreme Court has not been consistent in handling motions addressed to the Court for recusal of a justice. Sometimes the Court has a docket entry statement simply denying the motion seeking recusal of a justice, with the challenged justice apparently participating in the denial.[36]

¶ 59.　Other times the Court has a docket entry statement merely stating a denial of the motion by the challenged justice, with or without an explanation or statement by the challenged justice.[37]

¶ 60.　A different docket entry statement was used in *Cheney v. United States District Court for the District of Columbia,* 541 U.S. 913 (2004). The first docket entry statement referred the motion addressed to the Court requesting Justice Scalia's recusal to Justice Scalia.[38]

---

[36] *See, e.g., Ernest v. U.S. Attorney for the S. Dist. of Alabama,* 474 U.S. 1016, (1985) (J. Powell); *Kerpelman v. Attorney Grievance Comm'n of Maryland,* 450 U.S. 970 (1981) (C.J. Burger); *Serzysko v. Chase Manhattan Bank,* 409 U.S. 1029 (1972) (J. Powell & J. Rehnquist).

Because the Court's denial of the recusal motion offers no explanation and does not show the reasoning of the justices in deciding the recusal motion, the assumption is that the individual justice's decision has not been subject to court review. The failure of the Court to review an individual justice's decision on recusal motions has been criticized in the legal literature.

[37] *See, e.g., Hanrahan v. Hampton,* 446 U.S. 1301 (1980) (J. Rehnquist); *Laird v. Tatum,* 409 U.S. 901 (1972) (J. Rehnquist); *Gravel v. United States,* 409 U.S. 902 (1972) (J. Rehnquist); *Guy v. United States,* 409 U.S. 896 (1972) (J. Blackmum & J. Rehnquist).

[38] *Cheney v. U.S. Dist. Court for the Dist. of Columbia,* 540 U.S. 1217 (2004).

This seems to make clear that the court as a whole took jurisdiction over the motion in the first instance. Justice Scalia then individually denied the motion, publishing a memorandum opinion.[39] No court order was issued by the Court denying the motion.

¶ 61. The citation by Justices Prosser, Roggensack, and Ziegler, ¶ 220, to Justice Jackson's concurring statement in *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 897 (1945), is misguided. A concurrence by two justices lacks the authority of the Court. In fact, when the Court decided *Jewell Ridge*, a majority of the justices refused to adopt an order which stated that the Court was "without the authority" to disqualify an individual justice. *See* Appendix B, ¶¶ 138, 144 (citing William H. Rehnquist, *The Supreme Court: How It Was, How It Is* 65–67 (1987)). We examine this incident in detail in Appendix B, ¶¶ 140 to 148. The *Jewell Ridge* concurrence is of historic interest, but has no legal significance or impact on this court.

¶ 62. An examination of recusal practice at the United States Supreme Court reveals that even while the Court has, as a matter of tradition or general practice, left recusal decisions to individual justices, the Court appears always to have retained jurisdiction over recusal motions and maintained the authority to guarantee a fully qualified panel of justices. At least once, the members of the Court have, by majority vote, curtailed another sitting justice (Justice William O. Douglas) from participation in the court's decisions. *See* Appendix B, ¶¶ 161–162.

¶ 63. The parties should be invited to bring forth more information about the United States Supreme

---

[39] *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 541 U.S. 913 (2004) (Scalia, J.).

Court that may be helpful in informing this court about issues of jurisdiction and recusal practice. It would be helpful for briefs to address whether, even if the United States Supreme Court were to disavow its authority to disqualify a justice, such a pronouncement would have a controlling effect on this court's jurisdiction, which rests on Wisconsin law.[40]

¶ 64. Without briefs, Justices Prosser, Roggensack, and Ziegler have reached the extraordinary conclusion that this court never has power to guarantee that all members are impartial. If they truly believe this, why would they not just dismiss or deny Allen's motions, explaining the court's lack of jurisdiction?[41] But the justices do not take this course of action.

¶ 65. Rather, they base their decision to deny Allen's recusal motions on the substance of Allen's allegations. The three conclude that Allen's motions are "legally insufficient to state a claim cognizable under

---

[40] Looking beyond our own country's borders to other common law systems confirms that courts of ultimate jurisdiction will review recusal or disqualification motions relating to one of their own members. "Courts of last resort in Australia, South Africa, and the United Kingdom all recognize the right of a petitioner to seek review of a negative recusal decision by a single high court judge." R. Matthew Pearson, Note, *Duck Duck Recuse? Foreign Common Law Guidance & Improving Recusal of Supreme Court Justices*, 62 Wash. & Lee L. Rev. 1799, 1828 (2005).

[41] A dismissal of a recusal motion and a denial of a recusal motion have different meanings. In our appellate practice, denial of a motion, a petition for review, or an appeal addresses the merits of the issue presented. In contrast, a dismissal of a motion, a petition for review, or an appeal ordinarily signifies that there is a defect in the filing or that the court lacks jurisdiction to reach the merits of the issue presented. For a discussion of dismissal of an appeal, see 6A *Callaghan's Wisconsin Pleading and Practice (With Forms)* §§ 53.7–53.24 (Rev. 2005).

the . . . federal and state constitutions,"[42] and that "[n]o potential constitutional due process violation has been alleged here based on Justice Gableman's participation in Allen's case."[43]

¶ 66. Thus, Justices Prosser, Roggensack, and Ziegler have gone to extreme lengths to write on the court's jurisdiction over Allen's recusal motions addressed to the court, and then would not dispose of the motions on this basis.

¶ 67. We have also explored the disqualification experience of other states. Around the country and over the years, some state high courts have reviewed recusal decisions of their individual members; others have not. *See* Appendix C, ¶¶ 172–184. Recusal practice and procedure has been a matter of tradition or prudential considerations, not an espousal of a lack of jurisdiction or power. *See* Appendix C, ¶ 171 & n.39.[44]

¶ 68. Justices Prosser, Roggensack, and Ziegler have made no attempt to distinguish this court's supposed lack of jurisdiction (power) from the views of state supreme courts that have acknowledged that they have such jurisdiction and have exercised it. Rather than addressing or distinguishing the considerable authority that undermines their position, they simply ignore it.

¶ 69. Nothing we have learned thus far about the recusal practices of other state supreme courts provides

---

[42] J. Roggensack, ¶ 199; *see also id.,* ¶ 238.

[43] J. Roggensack, ¶ 237.

[44] For surveys of various recusal standards and practices in the states (focused mainly on the trial courts), see, *e.g.,* Richard E. Flamm, *Judicial Disqualification* ch. 28 (2d ed. 2007); Leslie W. Abramson, *Deciding Recusal Motions: Who Judges the Judges?,* 28 Val. U. L. Rev. 543 (1993–94).

a reason for this court to divest itself of an important aspect of its established jurisdiction or to depart from its established practice of providing review of an individual justice's decision not to disqualify himself or herself, especially when a constitutional claim is argued. In the wake of continuing concern about whether elected judges can be impartial, now is hardly the time to lessen our protections for impartial tribunals.

¶ 70. In sum, the writings of Justice Prosser, Justice Roggensack, and Justice Ziegler on the court's jurisdiction over recusal motions appear to have three major flaws (among others): They assert that a challenged justice has no personal interest in deciding the issue of the court's jurisdiction. Their writings have no support in the law. Their writings on the court's jurisdiction (power) are not determinative of the issues presented by Allen's recusal motions.

¶ 71. Briefs from adversarial parties are needed on the issue of the court's jurisdiction to review a challenged individual justice's decision to participate in a case.

### III

¶ 72. Third, we turn to the implications of a decision that the court must not exercise jurisdiction over recusal motions addressed to it. Briefs are needed on how to protect the rights of litigants to a fair, impartial Wisconsin Supreme Court when the justices are not willing, as a matter of policy, to decide recusal motions challenging the participation of a justice in a particular case. Allen and the State have assumed that the rights of litigants to an impartial tribunal trump the court's discomfort or anxiety about the consequences of judging one of its own.

¶ 73. A motion challenging a justice's disqualification is disquieting to the challenged justice and to the other justices. Any question related personally to a fellow justice, whether recusal or violation of the Code of Judicial Conduct, "is not only a serious one, but is also an unwelcome and a delicate one to his associates. . . . But, unwelcome as the question is, it must be met, and it must be met squarely, and with a single desire to ascertain and administer the law as it is."[45]

¶ 74. Recusal motions against a colleague and proposed rules about recusal pose significant personal and legal difficulties for all the justices. These difficulties are exacerbated in the present case by the Judicial Commission's pending action against Justice Gableman for violation of the Code of Judicial Conduct. The allegations in that matter share some factual basis with Allen's allegations for disqualification in the present order.

¶ 75. Words cannot and do not fully capture our feelings of disquiet when we are asked to sit in judgment of a peer, knowing that we have worked with that justice and will continue to work with that justice for years to come. We shall see the justice at every oral argument, court opinion decision conference, petition for review conference, ceremony to admit lawyers, rules hearing, open administrative conference, judicial conference, educational seminar, and other court and non-court functions.

¶ 76. Despite the disquiet that a motion challenging a justice's disqualification causes, this court has stated that when a "movant has questioned the integrity of a justice of this court and hence the integrity of

---

[45] *Case v. Hoffman,* 100 Wis. 314, 354, 72 N.W. 390 (1897), *reh'g granted,* 74 N.W. 220 (1898).

a decision of the court . . . [i]t behooves the court in the defense of its own legitimacy and of its integrity to consider such claims."[46]

¶ 77. Yet Justices Prosser, Roggensack, and Ziegler appear to conclude that policy reasons such as collegiality and public perception justify the court's not deciding recusal motions challenging a member of the court.[47] The three justices seem to believe that independent review by the court of an individual justice's recusal decision might exacerbate the public perception that members of the court are biased or result in an increased volume of recusal motions. *See* J. Prosser, ¶ 255.[48]

¶ 78. Justice Prosser suggests at ¶ 256 that the court should have denied Allen's motion "quickly, without comment," to avoid "exposing controversy within the court." We think otherwise. We believe that a hallmark of our courts in Anglo-American jurisprudence is that a court explains its decision. A court should be transparent and accountable by giving reasons for its decisions, reasons that can be evaluated and used to inform future decisions by the litigants, reviewing courts, and the public.

¶ 79. "An unreasoned decision has very little claim to acceptance by the defeated party, and is difficult or impossible to accept as an act reflecting systematic application of legal principles. Moreover, the necessity of stating reasons not infrequently changes the

---

[46] *City of Edgerton v. Gen. Cas. Co.,* 190 Wis. 2d 510, 513–14, 527 N.W.2d 305 (1995).

[47] J. Roggensack, ¶¶ 217–218, 226–227.

[48] There is no indication that the states that routinely and rationally provide such review are either beset with excessive recusal motions or suffer any lessened public confidence.

results by forcing the judges to come to grips with nettlesome facts or issues which their normal instincts would otherwise cause them to avoid."[49]

¶ 80. Do Justices Prosser, Roggensack, and Ziegler truly believe that any public perception of this court will be improved if this court places any challenged justice's individual decision of impartiality beyond any form of meaningful review?

¶ 81. In the *Kading* case upholding the court's power to impose a Code of Judicial Conduct for judges, the court explained that the Code was "a response to the compelling need to maintain public confidence in the judiciary. . . .' [N]othing tends to bring courts or the administration of justice into disrespect more than the spectacle of a prejudiced judge sitting in judgment upon the rights of litigants. A lack of confidence in the integrity of courts rocks the very foundations of organized society, promotes unrest and dissatisfaction, and even encourages revolution.' "[50]

¶ 82. Would it not command greater public respect and confidence if the court read briefs and heard arguments on Allen's recusal motions, analyzed the facts and applied the law in a full opinion, as we would in review of allegations asserted against any judge of any another court in the state?

¶ 83. If the court itself is not willing to decide due process issues of disqualification of a justice because of judicial policy reasons, then is it not incumbent on the court to establish a procedure for an impartial state tribunal to decide recusal motions challenging a justice

---

[49] Paul D. Carrington et al., *Justice on Appeal,* 10 (1976).

[50] *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 524, 235 N.W.2d 409 (1975) (quoting *In re Stolen,* 193 Wis. 602, 620, 214 N.W. 379, 216 N.W. 127 (1927)).

of this court? The court can do it. The court has inherent power "to promulgate rules . . . and the power to provide process where none exists."[51] Briefs and full consideration of alternative processes available to this court for deciding recusal motions challenging a justice are needed.

¶ 84. As a practical matter, Justices Prosser, Roggensack, and Ziegler are implicitly telling all litigants in Wisconsin that they need to go to the federal courts to seek relief from a Wisconsin justice who they believe is biased. If Justices Prosser, Roggensack, and Ziegler believe that the court should not review an individual justice's decision to participate in a case on policy grounds, is it good judicial policy to close the Wisconsin courthouse doors and force litigants into the federal courts?

¶ 85. Federal review is not easy for a litigant. It involves more costs and more delay. Litigants challenging state court recusal decisions may go to federal district court using an application for a writ of habeas corpus, or bringing a suit under 42 U.S.C. § 1983.[52] Or they can seek review in the United States Supreme

---

[51] *State v. Cannon,* 196 Wis. 534, 536, 221 N.W. 603 (1928). *See also State v. Cannon,* 199 Wis. 401, 402, 226 N.W. 385 (1929).

[52] *See, e.g., Caperton,* 129 S. Ct. at 2271 (Roberts, C.J., dissenting); *Walberg v. Israel,* 766 F.2d 1071 (7th Cir. 1985); *Fieger v. Ferry,* 471 F.3d 637 (6th Cir. 2006); *Bradbury v. Eismann,* 2009 U.S. Dist. LEXIS 81289 (D. Idaho Sept. 8, 2009); *Massey Energy Co. v. Supreme Court of Appeals of West Virginia,* 2007 U.S. Dist. LEXIS 70330 (S.D. W. Va. 2007).

Allen's most recent recusal filing, dated December 11, 2009, states that he is attempting to perfect the record here should the matter have to go to federal court. See Justice Crooks' concurrence, ¶ 189 n.5.

Court by way of a petition for certiorari. There is only a 1.1% chance of the United States Supreme Court granting such a petition.[53]

¶ 86. Justices Prosser, Roggensack, and Ziegler appear fixated on the recusal motions from their perspective as members of the court and from the perspective of a challenged justice.[54] They appear totally insen-

---

[53] Chief Justice John Roberts wrote in dissent in *Caperton v. A.T. Massey Coal Co. Inc.*, 129 S. Ct. 2252, 2272 (2009), that the United States Supreme Court grants certiorari for only 1.1% of all petitions filed.

For petitioners proceeding *in forma pauperis*, as indigent prisoners like Allen often must, the percentage of petitions granted is even lower, perhaps as low as 0.3%. *See, e.g.,* Saul Brenner, *Granting Certiorari by the United States Supreme Court: An Overview of the Social Science Studies,* 92 Law Library J. 193, 195 (2000) (analyzing data from the Court's 1995 term), available at http://www.aallnet.org/products/pub_llj_v92n02/2000–17.pdf.

[54] Our three colleagues express concern, ¶ 224, that a challenged justice's due process rights will be violated if the court acts on the recusal motions. J. Prosser, ¶ 250. Their writings do not, however, spell out just what rights a challenged justice has that are protected by due process guarantees or what liberty interest is at stake. Also, they forget that if the court were to review a justice's decision to participate, the justice would be afforded the same rights and processes afforded judges of the circuit courts and other decision makers when this court reviews recusal motions on appeal.

For this court reviewing on appeal recusal motions directed to trial court judges, see, *e.g., State v. Walberg,* 109 Wis. 2d 96, 105–09, 325 N.W.2d 687 (1982) (the court held that a circuit court judge's refusal to disqualify himself violated due process); *State v. Harrell,* 199 Wis. 2d 654, 546 N.W.2d 115 (1996) (reviewing and affirming the circuit court judge's denial of a recusal motion; addressing the merits objectively under Wis. Stat. § 757.19(2)(a) and addressing whether the judge made the

403

sitive to the due process rights of litigants and the interests of the people of Wisconsin in a fair, impartial Wisconsin Supreme Court.[55]

## IV

¶ 87. Fourth, briefs are needed on whether the grounds upon which Allen's motions rest justify disqualifying Justice Gableman.

¶ 88. One of the grounds upon which Allen's motions challenging Justice Gableman's participation rest is due process—the guarantee of a fair trial in a fair tribunal—as most recently addressed by the United States Supreme Court in *Caperton v. A.T. Massey Coal Co., Inc.,* ___ U.S. ___, 129 S. Ct. 2252 (2009). According to *Caperton,* 129 S. Ct. at 2263, "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias." A litigant may be denied due process when "there is a serious risk of

---

required subjective determination under Wis. Stat. § 757.19(2)(g)); *State v. Carprue,* 2004 WI 111, ¶¶ 1, 69, 274 Wis. 2d 656, 683 N.W.2d 31 (the court of appeals reversed the conviction "because Carprue was denied due process by a circuit court judge who appeared partial to the prosecution"; the supreme court reinstated the conviction, concluding that the judge's conduct "did not deprive Carprue of his right to a fair trial"); *State v. Hollingsworth,* 160 Wis. 2d 883, 894–95, 467 N.W.2d 555 (Ct. App. 1991) (the court of appeals considered a federal due process challenge against a circuit court judge).

[55] Justices Roggensack, Prosser, and Ziegler suggest that Allen gets due process, that is, gets a fair tribunal, when he relies solely on a challenged justice to determine whether the justice can be fair and impartial. J. Roggensack, ¶ 223. It is not much comfort to Allen or any litigant to have the challenged Justice be judge of his or her own impartiality. *See* J. Crooks, ¶ 188 (quoting Justice Kennedy's decision in *Caperton,* 129 S. Ct. at 2263, about the weakness of subjective determinations).

actual bias—based on objective and reasonable perceptions . . . ." *Caperton,* 129 S. Ct. at 2263; *See* J. Crooks, ¶ 188.

¶ 89. Our three colleagues give *Caperton* short shrift—two brief paragraphs. They announce at ¶ 222 that "*Caperton* has no relevance here." They devote a single brief paragraph to *Caperton* at ¶ 238. Our colleagues just don't seem to get it.[56] All state courts are bound by the teachings of *Caperton,* and *Caperton* is generally viewed as a major case involving more than campaign contributions and affecting court practice across the country.[57] Without significant analysis, our

[56] Justice Ziegler's writing more fully addresses *Caperton.* Justice Ziegler concludes that briefs would not be helpful. She has apparently determined by herself the nature of "a *Caperton* analysis" and established a threshold "level" below which this analysis is not required. Justice Ziegler's opinion, ¶ 261. No one argues that Allen's allegations are just like the basis for disqualification addressed in *Caperton.* But as the majority in *Caperton* recognized, by applying previous due process cases in the context of judicial elections "as new problems have emerged," 129 S. Ct. at 2259, the due process standard must be applied to factual situations "not presented in the precedents." *Caperton,* 129 S. Ct. at 2262.

[57] For different views on the effect of *Caperton,* see, *e.g, Caperton,* 129 S. Ct. at 2269 (Roberts, C.J., dissenting) ("[I]t is unclear whether the new probability of bias standard is somehow limited to financial support in judicial elections, or applies to judicial recusal questions more generally"); *Examining the State of Judicial Recusals after Caperton v. A.T. Massey: Hearings Before the House Committee on the Judiciary, Subcommittee on Courts and Competition Policy,* 111th Cong. (2009) (available at http://judiciary.house.gov/hearings/hear_091210 _2.html (last visited Dec. 12, 2009); *U.S. Fidelity Ins. & Guar. Co. v. Mich. Catastrophic Claims Ass'n,* 773 N.W.2d 243 (Mich. 2009); *Comments: Caperton v. A.T. Massey Coal Co.: Due Process Limitations on the Appearance of Judicial Bias,* 123

colleagues seem to treat *Caperton* as merely an outlier rather than an important statement about the constitutional requirement of fair tribunals. How should the principles articulated in *Caperton* be applied in different factual settings? Answering this question is no easy task, but briefs, argument, and serious deliberation would greatly assist us in interpreting and applying *Caperton.*

¶ 90. State supreme courts, other than Michigan, have not yet begun to address the ramifications of *Caperton.*

---

Harv. L. Rev. 73 et seq. (2009); Pamela S. Karlan, *Electing Judges, Judging Elections, and the Lessons of Caperton,* 123 Harv. L. Rev. 80 (2009); Lawrence Lessig, *What Everybody Knows and Too Few Accept,* 123 Harv. L. Rev. 104; Penny J. White, *Relinquished Responsibilities,* 123 Harv. L. Rev. 120 (2009); Terri R. Day, *Buying Justice: Caperton v. A.T. Massey: Campaign Dollars, Mandatory Recusal and Due Process,* 28 Miss. C. L. Rev. 359, 363 (2008–09); John Gibeaut, *Caperton Capers: Court's Recusal Ruling Sparks States to Mull Judicial Contribution Laws,* A.B.A. J., Aug. 2009, at 21, available at http://www.abajournal.com/magazine/article/ caperton_capers; James L. Gibson & Gregory A. Caldeira, *Campaign Support, Conflicts of Interest, and Judicial Impartiality: Can the Legitimacy of Courts Be Rescued by Recusals?,* CELS 2009 4th Annual Conference on Empirical Legal Studies Paper, available at http://ssrn.com/abstract=1428723; Stephen M. Hoersting & Bradley A. Smith, *Speech and Elections: The Caperton Caper and the Kennedy Conundrum,* 2009 Cato Sup. Ct. Rev. 319; Kevin C. Newsom & Marc James Ayers, *A Brave New World of Judicial Recusal? The United States Supreme Court Enters the Fray,* Ala. Lawyer, Sept. 2009, at 5; *Judicial Disqualification After Caperton,* Judicature, July-Aug. 2009, at 4; *Statement of H. Thomas Wells Jr., President, American Bar Association Re: Ruling of The Supreme Court of The United States in Caperton Et Al. v. A.T. Massey Coal Co., Inc., Et Al.* (June 8, 2009), available at http://www.abanet.org/abanet/media/ statement/statement.cfm?releaseid=671 (last visited Jan. 5, 2010).

¶ 91. Recently, the Michigan Supreme Court abandoned its past practice that individual justices alone respond to motions to recuse, without review.[58] In November 2009, the Michigan court adopted a rule stating that if a justice's participation in a case is challenged, the challenged justice shall decide the issue and publish his or her reasoning for the decision. If the challenged justice denies the motion for disqualification, then upon a party's motion to the court the entire court shall decide the motion for disqualification and explain the reasons for its grant or denial of the motion for disqualification.[59]

¶ 92. Adoption of this rule followed years of acrimonious dispute among the justices. Following the *Caperton* decision, former Michigan Chief Justice Clifford Taylor declared that "*Caperton* has to mean that the challenged justice can't make the recusal decision alone."[60]

---

[58] *See U.S. Fidelity Ins. & Guar. Co. v. Mich. Catastrophic Claims Ass'n,* 773 N.W.2d 243 (Mich. 2009); *Adair v. State Dep't of Ed.,* 709 N.W. 2d 567 (Mich. 2006).

[59] *See* Michigan Supreme Court, Amendment of Rule 2.003, ADM File No. 2009–04, effective Nov. 25, 2009, available at http://courts.michigan.gov/SUPREMECOURT/Resources/Administrative/2009–04–112509.pdf. Although the newly adopted rule itself is not long, the order adopting it includes many pages of concurring and dissenting opinions, with attachments, sharply debating the merits of the change.

A pre-*Caperton* 42 U.S.C. § 1983 constitutional challenge to Michigan's recusal practice allowing recusal in the sole discretion of the challenged justice was dismissed by a federal court for failure to state a claim upon which relief may be granted. *Fieger v. Ferry,* 2007 WL 2827801 (E.D. Mich. 2007).

[60] *U.S. Fidelity Ins. & Guar. Co. v. Mich. Catastrophic Claims Ass'n,* 773 N.W.2d 243, 246 n.12 (Mich. 2009).

¶ 93. *Caperton* explicitly announced the need for objective review to recusal challenges to a judge. A judge's own inquiry into actual bias is not adequate for due process purposes. *Caperton,* 129 S. Ct. at 2265, declares that "[t]he failure to consider objective standards requiring recusal is not consistent with the imperatives of due process." Protection is needed, according to *Caperton,* against a judge making his own recusal decision because an appellate court cannot easily superintend or review a judge's subjective determination. *Caperton,* 129 S. Ct. at 2263.[61] Indeed, when the challenged justice in the Caperton case explained his individual decision not to recuse himself, he acknowledged that the court retained "authority under *Aetna [Life Ins. Co. v Lavoie,* 475 U.S. 813, 821–22 (1986)] to remove me from the case," but that the court had not exercised this authority. *Caperton v. A.T.*

---

[61] *Caperton* originated in West Virginia where, unlike in Wisconsin, the justices do not review a challenged justice's decision to participate in a case. *See State ex rel. Cohen v. Manchin,* 336 S.E.2d 171, 175–76 (W. Va. 1984) ("[W]here a motion is made to disqualify or recuse an individual justice of this Court, that question is to be decided by the challenged justice and not by the other members of this Court."); West Virginia Rules of Appellate Procedure, Rule 29.

No issue appears to have been raised in either the West Virginia court of appeals or the United States Supreme Court regarding whether the West Virginia court of appeals must or should decide the disqualification issue.

A collateral lawsuit in federal district court challenged the constitutionality of this West Virginia practice. After the U.S. Supreme Court decision, this suit was dismissed without prejudice by stipulation of the parties. *See Massey Energy Co. v. Supreme Court of Appeals of West Virginia,* No. 2:06–cv-00614, 2007 U.S. Dist. LEXIS 70330 (S.D. W. Va. 2007) (stipulation of dismissal without prejudice filed July 24, 2009).

*Massey Coal Co.,* 679 S.E.2d 223, 301 (W. Va. 2008) (Benjamin, C.J., concurring). Presumably if the West Virginia court had been willing to keep its own house in order, no due process violation would have occurred and review by the United States Supreme Court would not have been necessary.

¶ 94. So how do the three justices, Justices Prosser, Roggensack, and Ziegler, review Justice Gableman's individual decision to participate in the present case? They act contrary to the dictates of *Caperton* that a judge's own inquiry is not adequate for due process. Our three colleagues expressly limit their review to "establishing whether the judge made a determination requiring disqualification."[62] They state that they will not "address whether [Justice Gableman] correctly or incorrectly decided the [disqualification] issues presented [to him]."[63]

¶ 95. Asking the justice whose impartiality has been challenged to provide the only and final word as to whether he or she is in fact impartial makes little sense. That an independent judge is to decide matters presented to a tribunal is central to our normal concepts of due process.[64] *See* J. Crooks, ¶ 190.

¶ 96. Commentators have variously described a lack of independent review of a judge's decision on a recusal challenge as "one of the most heavily criticized

***

[62] J. Roggensack, ¶ 240 (quoting *Donohoo v. Action Wis., Inc.,* 2008 WI 110, ¶ 24, 314 Wis. 2d 510, 754 N.W.2d 480. *See also* J. Roggensack, ¶ 208.

[63] J. Roggensack, ¶ 240.

[64] Martin H. Redish & Lawrence C. Marshall, *Adjudicatory Independence and the Values of Procedural Due Process,* 95 Yale L. J. 455, 457 (1986) ("[T]he participation of an independent adjudicator is at least a necessary condition . . . for satisfying the requirements of due process").

features of U.S. disqualification law,"[65] a "Catch-22"[66] and akin to having a student "grade his own paper."[67]

¶ 97.　All the justices agree that a recusal motion should go to the individual justice in the first instance. The only cases at issue here are those in which a justice determines that he or she is unbiased, but a litigant believes otherwise and seeks court review. The judge's own self-affirmations provide no serious reassurance to the litigant, and little protection for the values of uniformity, public confidence, and error-correction.

¶ 98.　Nevertheless, Justices Prosser, Roggensack, and Ziegler ignore these values and *Caperton*. Does their reasoning demonstrate a disconnect between this court's interpretation of § 757.19(2)(g) as a subjective standard and the objective standard recognized in *Caperton?* Justice Crooks' concurrence explains, ¶ 192, that we cannot ignore the ramifications of *Caperton* on our interpretation of Wis. Stat. § 757.19 and on recusal law in Wisconsin. A proper interpretation of the statute could avoid the need to reach constitutional questions.[68] Briefs are needed on the interplay of *Caperton* and § 757.19, the statute mandating disqualification.

---

[65] James Sample, David Pozen, *Making Judicial Recusal More Rigorous,* 46 Judges' J. 17, 21 (2007).

[66] Amanda Frost, *Keeping Up Appearances: A Process-Oriented Approach to Judicial Recusal,* 53 U. Kan. L. Rev. 531, 571 (2005).

[67] *Examining the State of Judicial Recusals after Caperton v. A.T. Massey: Hearing Before the House Judiciary Comm's Subcomm. On Courts and Competition,* 111th Cong. 5 (2009) (testimony of Charles G. Geyh), available at http://judiciary. house.gov/hearings/pdf/Geyh091210.pdf.

[68] In *State v. Harrell,* then-Justice Abrahamson argued that Wis. Stat. § 757.19(2)(g) should be applied using an objective test: "[W]hether a reasonable, well-informed observer familiar with judicial ethical standards, the judicial system, and the facts

¶ 99. In the views of Justices Prosser, Roggensack, and Ziegler, the procedural guarantee of independent review of a judge's impartiality applies to all decision makers except the seven justices of this court, where the legal issues may be most challenging and the stakes the highest.

¶ 100. Turning to the need for briefs on the merits of Allen's allegations, three justices, Justices Prosser, Roggensack, and Ziegler, conclude at ¶ 231 that "Allen's allegations do not even begin to approach a due process violation."[69] We do not decide whether Allen's allegations would be successful. This issue should be briefed and argued.

¶ 101. On the basis of the parties' motions and memoranda, we can only conclude that the allegations are sufficient to justify briefs, oral argument, and full consideration.

and circumstances of the case would harbor reasonable doubts about a judge's ability to be impartial under the circumstances." *State v. Harrell,* 199 Wis. 2d 654, 666, 645 N.W.2d 115 (1996) (Abrahamson, J., concurring).

Justice Kennedy in the *Caperton* majority opinion recognized that in order "to maintain the integrity of the judiciary and the rule of law[,] . . . States may choose to 'adopt recusal standards more rigorous than due process requires.' " *Caperton,* 129 S. Ct. at 2266–67 (quoting *Republican Party of Minn. v. White,* 536 U.S. 765, 794 (2002) (Kennedy, J., concurring)).

[69] Justice Roggensack's opinion, ¶ 234, cites a pre-*Caperton* case, *Bracy v. Gramley,* 520 U.S. 899, 904–05 (1997) for the proposition that "the preclusion of bias that is guaranteed by due process to every party is bias against the specific party who is then before the court or bias due to the judge's having a financial interest in the outcome of the particular case then pending." The case states only that "the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy,* 520 U.S. at 904–05.

¶ 102. Allegations of bias in favor of prosecutors and against criminal defense counsel and against criminal defendants are cognizable grounds for a motion to the court to disqualify a judge. Cases have so held.[70]

[70] *See, e.g., State v. Walberg,* 109 Wis. 2d 96, 106–07, 325 N.W.2d 687 (1982) (holding that recusal is required when a defendant can show that bias of circuit court against counsel affected the defendant's interests); *State v. Hollingsworth,* 160 Wis. 2d 883, 467 N.W.2d 555 (Ct. App. 1991) (holding that circuit court's "dressing down" defense counsel did not translate into prejudice against the client in that case).

*See also* James J. Alfini et al., *Judicial Conduct and Ethics* § 4.05D (4th ed. 2007) (a judge's antipathy toward a party's attorney should be examined as an aspect of bias or prejudice); Thomas R. Phillips & Karlene Dunn Poll, *Free Speech for Judges and Fair Appeals for Litigants: Judicial Recusal in a Post-White World,* 55 Drake L. Rev. 692 (2007) (asserting that adequate remedy needed for litigants whose due process rights to an impartial forum may be compromised by overenthusiastic judicial campaign speech); Randall T. Shepard, *Campaign Speech: Restraint and Liberty in Judicial Ethics,* 9 Geo. J. Legal Ethics 1059, 1089 (1996) ("[w]hether due process requires recusal based on a campaign promise about adjudication is a question likely to turn on the fairly specific facts of the case: the nature of the promise and the nature of the case in which the promise might arguably drive the decision."); Keith Swisher, *Pro-Prosecution Judges: 'Tough on Crime,' Soft on Strategy, Ripe for Disqualification,* forthcoming, 52 Ariz. L. Rev. ___, *1 (2010), draft available at http://papers.ssrn.com/abstract_id=1513186 (advancing "the following slightly scandalous claim: Particularly in our post-Caperton, political-realist world, 'tough on crime' elective judges should recuse themselves from all criminal cases"); Carol Schultz Vento, *Disqualification of Judge for Bias Against Counsel for Indigent,* 54 A.L.R. 5th 575 (2009) (collecting cases); Joanna Cohn Weiss, Note, *Tough on Crime: How Campaigns For State Judiciary Violate Criminal Defendants' Due Process Rights,* 81 N.Y.U. L. Rev. 1101, 1127 (2006) (declaring "a recusal remedy is the best way to balance the need for free, open campaigns with

¶ 103. United States Supreme Court Justice John Paul Stevens has written that "[a] campaign promise to 'be tough on crime,' or 'to enforce the death penalty,' is evidence of bias that should disqualify a candidate from sitting in criminal cases."[71]

¶ 104. Chief Justice Roberts in dissent in *Caperton,* 129 S. Ct. at 2269, queried: "If the supporter wants to help elect judges who are 'tough on crime,' must the judge recuse in all criminal cases?"[72]

¶ 105. Judge Posner, writing for the United States Court of Appeals for the Seventh Circuit, ruled on whether a trial in Milwaukee County Circuit Court, with Judge Christ T. Seraphim presiding, was a trial by a biased tribunal violating the defendant's federal con-

---

the dangers that arise when judges win votes by declaring their intent to be tough on crime and then hear alleged criminals' cases").

The State objects to Allen's motion on the grounds, *inter alia,* that it raises First Amendment issues and raises questions related to the independence of judicial candidates. Although *Caperton* refers to *Republican Party of Minnesota v. White,* 536 U.S. 765 (2002), *Caperton* is silent about the relationship of a candidate's free speech rights and recusal. This is another topic on which briefs would be helpful.

[71] John Paul Stevens, *Opening Assembly Address, American Bar Association Annual Meeting, Orlando, Florida, August 3, 1996,* 12 St John's J. Legal Comment. 21, 30–31 (1996).

[72] Indeed the well-funded campaign defeating West Virginia Justice Warren McGraw, which was the subject of the *Caperton* lawsuit, was waged with TV ads accusing Justice McGraw of "[l]etting a child rapist go free" and labelling him "too soft on crime. Too dangerous for our kids." Deborah Goldberg et al., *The New Politics of Judicial Education 2004* 4–5 (2005), available at http://brennan.3cdn.net/dd00e9b682e3ca2f17_xdm6io68k.pdf (collecting campaign advertisements).

413

stitutional rights.[73] The issue was whether Judge Seraphim's antipathy towards defense counsel for raising legal issues on behalf of his client constituted bias or the appearance of bias against the defendant.

¶ 106. The federal court described Judge Seraphim's attitude toward the role of the defense counsel in that case as follows: Judge Seraphim "indicated that good behavior [by the defendant's counsel] meant not just avoiding unethical conduct but also not pressing too hard, even well within ethical boundaries, in favor of an obviously guilty defendant."[74]

¶ 107. Judge Posner explained that he was not sure that Judge Seraphim was actually biased against the defendant but that "[i]n judging the fairness of a trial it is sometimes helpful to adopt the vantage point of the defendant and ask whether a rational albeit criminal individual could be persuaded that he had had a fair trial . . . ."[75] From the vantage point of the defendant, according to the court of appeals, "[t]he appearance was of a judge who had made up his mind at the start that the defendant was guilty . . . ."[76]

¶ 108. The federal court of appeals ordered the defendant released unless the State brought the defendant to trial within 120 days.

¶ 109. Broadly speaking, Allen's allegations against Justice Gableman are that the Justice believes

---

[73] *Walberg v. Israel,* 766 F.2d 1071 (7th Cir. 1985) (in effect overturning *State v. Walberg,* 109 Wis. 2d 96, 325 N.W.2d 687 (1982), in which this court held that the apparent bias had been harmless error although "Judge Seraphim's impartiality toward the defendant can reasonably be questioned based on his conduct toward defense counsel." 109 Wis. 2d at 107.).

[74] *Walberg,* 766 F.2d at 1074.

[75] *Walberg,* 766 F.2d at 1077.

[76] *Walberg,* 766 F.2d at 1077–78.

defense counsel should not claim statutory or constitutional rights for a guilty client or perhaps a certain type of guilty client.[77] This allegation is similar to Judge Seraphim's implying he was angry at the lawyer "because the client was unworthy of the protracted efforts that the lawyer was making on his behalf."[78]

¶ 110. The recusal motions in the present case are not, as Justices Prosser, Roggensack, and Ziegler would have us believe, merely limited "at [their] heart . . . [to a] judicial candidate's announced concerns for issues bearing on law enforcement." J. Roggensack, ¶ 231. The grounds for the recusal motions in the present case, it can be argued, may be characterized in the same way that Judge Posner characterized Judge Seraphim's conduct in the *Walberg* case, namely as a judge's view towards the function of defense counsel constituting bias or the appearance of bias against a defendant.[79]

---

[77] The allegation that Justice Gableman looks askance at zealous advocacy on behalf of at least some criminal defendants is arguably related to the merits of Allen's case. The issues we are reviewing in Allen's case implicate the right to effective assistance of counsel on appeal. Allen's supplemental petition for review formulates an issue as follows: "Whether requiring a defendant to respond to a no-merit report with arguable claims that were overlooked by appointed counsel, and barring the defendant from ever raising any claim not so raised, conflicts with the right to counsel on direct appeal."

[78] *Walberg,* 766 F.2d at 1077.

[79] For another way of presenting this argument, see *State v. Sveum,* No. 2008AP658, now pending before this court. The *Sveum* motion for recusal against Justice Gableman relies on Wis. Stat. § 757.19(2)(f) (disqualification mandated when a judge has a significant financial or personal interest) and due process, asserting:

> Justice Gableman has a disqualifying "personal interest" in this, and perhaps every, criminal appeal because his statements, direct

¶ 111. Justices Prosser, Roggensack, and Ziegler (¶¶ 199, 238) conclude that Allen's factual allegations cannot support a cognizable due process claim. They criticize Allen's motion for not offering documentation of "the manner in which Justice Gableman has treated defendants who have appeared in criminal proceedings in courts over which Justice Gableman has presided." They themselves supplement the record, ¶¶ 245–246. If we had briefs, the parties might bring forth documentation and argue whether the proof the three justices offer relates to matters at issue here.

¶ 112. In *State v. Sveum,* defense counsel argues that Justice Gableman has an unbroken record of siding with the State in criminal cases in this court.[80] Briefs and arguments might debate the accuracy and relevance of this argument.

¶ 113. The question for this court may ultimately revolve around determining when "tough on crime" judicial electioneering risks depriving a criminal defendant of the constitutional right to an unbiased judge. Not an easy question, but an important one. The role of

and through his lawyer-agent establish that he first judges the defendant himself in a criminal case, by an inherently subjective and personal moral scale, and only then is willing to judge the merits of the defendant's case, assuming that the defendant does not fall below a threshold of evilness, heinousness, or despicable character. As to criminal defendants who fall below that threshold, Justice Gableman believes that meritorious arguments rightly cannot be made. . . . If the defendant does not pass muster on the moral scale at the first step, he ought not have benefit of legal rules that otherwise favor him.

Petitioner's [Sveum's] Motion to Disqualify Justice Michael J. Gableman at 2.

[80] Petitioner's [Sveum's] Motion to Disqualify Justice Michael J. Gableman at 31–34, Exhibit F. *State v. Sveum,* No. 2008AP658.

416

this court should be to face and decide this challenging and recurring issue, not to avoid it. Briefs would help.

¶ 114. Furthermore, the grounds for the recusal motions in the present case can also be characterized as stating "extreme facts," *see* J. Ziegler, passim, although there is a question whether "extreme facts" is the appropriate standard. We need briefs and oral argument to explore the correct due process standard and to then demonstrate how that standard should be applied to the facts of the case.

¶ 115. Justice Crooks at ¶¶ 189 and 191 highlights the highly unusual allegations and circumstances in the instant case. We comment, as did the United States Supreme Court in Caperton, that we know of no other case in Wisconsin or elsewhere that presents similar facts:

A. A campaign television ad by Justice Gableman's campaign characterizing a "loophole" his opponent found as a public defender in a criminal case. The ad is the subject of a pending charge by the Wisconsin Judicial Commission against Justice Gableman as a violation of the Code of Judicial Conduct, SCR 60.06(3)(c).[81]

B. The Report of the Judicial Conduct Panel (three judges) on the Judicial Commission's complaint against Justice Gableman, in which the majority of the panel found no violation. One judge on the panel criticizes the television ad as having a misleading implication and as showing disdain for the role of criminal defense counsel. Another judge

---

[81] A video copy of the television ad is attached with similar recusal motions filed in *State v. Carter,* No. 2006AP1811–CR, Defendant's Motion for Recusal of Hon. Michael Gableman on Constitutional Grounds (Attachment E-8).

concludes that the ad was a statement that misrepresented a fact in violation of SCR 60.06(3)(c).[82]

C. The comments of Justice Gableman's counsel at the hearing before the Judicial Conduct Panel and at a meeting with media, demeaning the role of criminal defense attorneys.[83]

D. The Board of Governors of the State Bar of Wisconsin's unanimous Public Policy Position regarding the constitutional right of criminal defendants to effective legal assistance, apparently in response to the campaign ad at issue and comments by Justice Gableman's counsel.[84]

---

[82] *See In Re Judicial Disciplinary Proceedings against the Honorable Michael J. Gableman,* No. 2008AP2458–J, at *17–19, 20–36 (Deininger, J., concurring; Fine, J., concurring), available at http://wicourts.gov/news/archives/2009/docs/gableman.pdf.

[83] Justice Gableman's counsel defended the ad as putting the "focus on Butler's willingness to find loopholes. He is willing to find a loophole for a person so evil that he raped an 11–year-old girl with learning disabilities. And that he's so evil, that once he got out of jail, he went on to molest another child. So the focus is on Butler's willingness to find loopholes for even people that are despicable as this person is . . . ." Hearing Transcript at 14.

*See also* Justice Gableman's counsel's comments at an interview with media on September 16, 2009, available on Wisconsin Eye, www.wiseye.org/wisEYE_programming/ARCHIVES-courts. html): The ad has "to do with his [Justice Butler's] judgment and his willingness to subvert the criminal—our system of criminal —bringing criminals into account. . . . Mitchell raped an 11–year-old girl with learning disabilities. He [Justice Butler] didn't have to take that—represent that criminal. He could have walked. I mean don't you have standards?"

[84] *See* Tom Solberg, *[State Bar of Wisconsin] Board of Governors adopts policy position reaffirming the essential role of defense attorneys in the criminal justice system* (Dec. 4, 2009),

¶ 116. Even if this were an easy case on the merits of the allegations, and it is not, and even if one supposes that Allen's motions would fail to move the court in the final analysis, the court should still take up and decide the matter in a manner that provides guidance for judges and litigants in future cases. This case presents an opportunity for this court to begin to develop a sorely needed jurisprudence of judicial disqualification. We are persuaded that the court needs briefs and oral argument to help the court decide as the State puts it, the potentially "broad and deep" issues presented.

\* \* \* \*

¶ 117. Justices Prosser, Roggensack, and Ziegler conclude that Justice Gableman need not have withdrawn from participating in deciding whether the court lacks jurisdiction to consider Allen's recusal motions directed at Justice Gableman. *See* J. Roggensack, ¶¶ 196–197.

¶ 118. Justices Prosser, Roggensack, and Ziegler further determine (1) that this court cannot independently review a justice's decision to deny a recusal motion except to decide whether the individual justice made the determination that the motion required, although this court can and should independently review denials of recusal motions by elected judges of the circuit court and court of appeals; and (2) that Allen's recusal motions have no merit.

¶ 119. The writings by Justices Prosser, Roggensack, and Ziegler make false accusations and stretch,

http://www.wisbar.org/AM/Template.cfm?Section=News&Tempplate=/CM/ContentDisplay.cfm&ContentId=88343 (last visited Dec. 13, 2009) ("In response to recent statements made in connection with a dispute over Supreme Court campaign ads, the State Bar of Wisconsin reaffirms its commitment to the right to counsel.").

misconstrue, or omit relevant law. Even with such an effort, the writings are inconsistent and incoherent. It is evident that the three justices joining have had to cobble together their disparate views on three questions: (1) whether the court has jurisdiction (power) to disqualify a justice for any reason at all; (2) whether as a matter of policy the court should ever exercise such jurisdiction (or power) to disqualify a justice for any reason; and (3) whether the grounds stated in these recusal motions have merit justifying recusal. Because the justices fuse and obfuscate distinctions between jurisdiction, policy, and the merits of Allen's allegations, their writings do not cogently or convincingly answer any of these three issues. Either they miss these distinctions or hope that the reader will miss them.

¶ 120. Allen's recusal motions have spawned a cottage industry that has occupied the court,[85] not

---

[85] Similar recusal motions have been filed in seven other criminal cases. *See State v. Carter,* No. 2006AP1811–CR (motion filed Oct 2, 2009; J. Gableman issued order individually denying the motion on Oct. 21, 2009); *State v. Cross,* No. 2009AP3–CR (motion filed Nov. 11, 2009; J. Gableman issued order individually denying the motion on Nov. 20, 2009); *State v. Dearborn,* No. 2007AP1894–CR. (motion filed Nov. 20, 2009; J. Gableman issued order individually denying the motion on Dec. 17, 2009); *State v. Jones,* No. 2008AP2342–CR (motion filed Dec. 16, 2009; J. Gableman issued order individually denying the motion on Jan. 22, 2010); *State v. Littlejohn,* No. 2007AP900–CR (motion filed Nov. 19, 2009; J. Gableman issued order individually denying the motion on Nov. 20, 2009); *State v. McGuire,* No. 2007AP2711–CR (motion filed Oct 2, 2009; J. Gableman issued order individually denying the motion on Nov. 20, 2009; supplemental motion filed Nov. 30, 2009); *State v. Sveum,* No. 2008AP0658–CR (motion filed Dec. 21, 2009; J. Gableman issued order individually denying the motion on Jan. 22, 2010).

always constructively.[86] We are concerned that because the issues raised by Allen's recusal motions have not been handled in an open, transparent, comprehensive

In another criminal case, the defendant asserts that Justice Roggensack should be disqualified under Wis. Stat. § 757.19(2)(e) (setting forth an objective standard) because she "previously handled the action or proceeding while judge of an inferior court." *See State v. Henley*, No. 2008AP697–CR (motion directed to Justice Roggensack, filed on Oct. 31, 2009; Justice Roggensack issued a memorandum decision denying the motion on Nov. 25, 2009; defendant filed motion asking for court review and oral argument on the motion, filed on Jan. 11, 2010).

In a civil case, a motion for recusal of Justices Annette K. Ziegler and Michael J. Gableman was filed on June 19, 2009, on due process grounds relating to contributions in their election campaigns. *See Krier v. Villione*, Nos. 2006AP1573 & 2006AP2290 (motion filed on June 30, 2009; Justices Ziegler and Gableman each individually denied the motion on July 23, 2009).

[86] Here are some repercussions of the recusal motions. Counsel with other pending recusal motions have moved to delay oral argument on the merits of the cases until the recusal motions have been decided. The court did not respond to defense counsels' motions to postpone oral argument. Yet in *State v. Allen* the court has not ordered briefs on the merits of the case or scheduled oral argument. Chief Justice Abrahamson and Justices Ann Walsh Bradley and N. Patrick Crooks filed a statement with the clerk of court on October 15, 2009, objecting to treating *State v. Carter*, No. 2006AP1811–CR, differently from other cases. The statement asked that orders on the recusal motions be issued simultaneously and that the *Carter* case be removed from the oral argument schedule. In response to this filing, Justices Prosser, Roggensack, and Ziegler issued a press release on October 16, 2009, complaining that the court should have responded to Allen's motion within five weeks after the motion was filed on April 17, 2009. Oral argument in these other cases has proceeded or is proceeding, except for *Allen,* with defense counsel guarding against the possibility that they may have forfeited or waived their recusal motions; the State has not offered its position on waiver and forfeiture.

421

manner, today's numerous writings will generate a new series of unintended consequences.

¶ 121. We have described some of the subject areas upon which briefs are needed. There are other areas too.[87]

¶ 122. We have had to explore many of these subjects in the legal literature without the assistance of briefs and fully focused arguments. We offer the results

---

Public and private displays of acrimony (sometimes unfortunately personal) among the justices flared. Public discussion of internal conference matters ensued.

In the interim, the court adopted a recusal rule addressing a collaterally related issue regarding campaign contributions. Justice Roggensack wrote an op-ed piece for publication in newspapers defending her vote to adopt that rule, a writing that some may view as tangentially related to the issues at hand. The rule was later rescinded when Justice Prosser, in the majority, withdrew his vote, dissatisfied with the wording of the rule. An amended version of the rule was adopted on January 21, 2010 by a 4–3 vote.

Each of these events is perhaps understandable and explainable under the circumstances at the time each occurred, even if in hindsight and reflection not always praiseworthy.

[87] The State's replies to recusal motions in pending cases have identified related issues to be briefed and considered by this court:

What are the First Amendment implications? Is an evidentiary hearing necessary? Are the Judicial Conduct Panel's findings and conclusions relevant and, if so, are they sufficient for resolving the constitutional issues? Are statements or positions of third parties relevant? Are a judicial candidate's statements about potential legal issues or judicial philosophy relevant? If judicial disqualification were found, can it be purged, and if so, how? What would be the scope of disqualification? Every criminal-related case? Every case involving an attorney who has moved for Justice Gableman's disqualification? Every State Public Defender case? How would Justice Gableman's disqualification affect this Court's operations in every criminal-related case for which review is sought? How would it affect all judicial elections in Wisconsin?

of our research in the Appendices, as set forth in the margin.[88]

¶ 123. In sum, disqualification of judges is an issue of immediate significance and law development, especially as a result of the United States Supreme Court's decision in *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252 (2009). United States Supreme Court Chief Justice Roberts identified in dissent at least forty "fundamental questions" that "courts will now have to determine."[89] This court's recently rescinded and re-adopted amendment to the rules for judicial disqualification based solely on campaign contributions further highlights the need for our sound deliberation and guidance on the challenging and emotionally fraught issues surrounding judicial disqualification.

¶ 124. Unwarranted recusal motions, like any unwarranted court proceeding, should not be condoned. "A tension exists between the public's right to a judge who is impartial and has the appearance of impartiality on the one hand and the need to ensure that the law of disqualification is not abused by litigants and attorneys for purposes of delay or judge shopping. The law of disqualification attempts to ensure that a balance between these policy considerations is achieved."[90]

---

[88] Appendix A. Unresolved Recusal Issues: The *National Union Fire Insurance* and *Crosetto* Cases. ¶¶ 128 to 136

Appendix B. The United States Supreme Court Retains Jurisdiction to Disqualify One of Its Own Members. ¶¶ 137 to 166

Appendix C. The Recusal Practice of Our Sister State Supreme Courts Is Instructive. ¶¶ 167 to 185

[89] *Caperton,* 129 S. Ct. at 2269 (Roberts, C.J., dissenting).

[90] *State ex rel. Nat'l Union Fire Ins. Co. v. Cir. Court for St. Croix County,* No. 90–0935–W, unpublished order (Wis. S. Ct. May 29, 1990) (Abrahamson, J., dissenting).

¶ 125. Our decisions on recusal motions should strike such a balance and provide workable guidance for future cases and should assure the public that the court is committed to providing a fair, impartial Wisconsin supreme court. Briefing and argument will help assure that we meet these goals.

¶ 126. Our proposed order, which garners only three votes, would read as follows:

> IT IS ORDERED that within 30 days after the date of this decision Allen must file a brief in this court addressing the issues raised herein and in his motions; that within 20 days of filing the State must file either a brief or a statement that no brief will be filed; and that if a brief is filed by the State, within 10 days of the State's filing Allen must file either a reply brief or a statement that no reply brief will be filed.

¶ 127. For the reasons set forth, we would order briefs and oral argument on Allen's recusal motions against Justice Gableman addressed to the court.

APPENDIX A. Unresolved Recusal Issues: The *National Union Fire Insurance* and *Crosetto* Cases

¶ 128. Two writings from 1990 and 1991 relate to recusal issues which have not been resolved and which still trouble the court.

¶ 129. In *National Union Fire Insurance Co. v. Circuit Court for St. Croix County*, No. 90–0935–W, unpublished order (Wis. S. Ct. May 29, 1990), the circuit court judge granted the opposing party's motion for a new trial. The insurance company moved for recusal under Wis. Stat. § 757.19(2)(g), arguing that the judge had shown bias and prejudice against the insurance company's insured and its counsel. When the judge

declined to recuse himself, the insurance company petitioned for a supervisory writ from this court as a remedy. The court denied the petition, offering no rationale. Then-Justice Abrahamson dissented. The reasons stated in the dissent are hauntingly relevant now.

¶ 130. The full text of Justice Abrahamson's dissent follows:

*The petition in this case goes to the heart of the judicial system—the right to a fair trial before an impartial judge. The National Union Fire Insurance Company alleges, rightly or wrongly, that the circuit court judge's self-declaration of impartiality is not supported by the record and that the judge's recusal is required by law. I believe that this court owes the petitioner, the legal community and the public more than a cryptic order denying the petition without any explanation. I believe that the court ought to decide the merits of the Insurance Company's petition in this case and should provide guidance to the circuit judges on the issue of disqualification. I would therefore order a response.*

*I.*

*The facts giving rise to this petition are undisputed. After a jury verdict in favor of National Union Fire Insurance Company (here the Insurance Company), the circuit court granted the opposing party's motion for a new trial. The Insurance Company then requested, pursuant to sec. 757.19(2)(g), Stats. 1987–88, that the circuit judge recuse himself from any further proceedings in the case because he had evinced bias and prejudice against the Insurance Company's insured and its counsel. The circuit judge reviewed the record and determined that he was able to be impartial at the new trial.*

*On April 17, 1990, the Insurance Company petitioned the court of appeals for a supervisory writ prohibiting*

*the circuit judge from presiding over the new trial. On April 18, 1990, the court of appeals denied the order apparently on the ground that a petition for a supervisory writ was not the proper procedure; rather, the Insurance Company would have to challenge the circuit judge's denial of the recusal motion on appeal from the judgment entered after the new trial. Pursuant to sec. 809.71, the Insurance Company now petitions this court for a supervisory writ prohibiting the circuit judge from presiding at the new trial.*

## II.

*The first issue is whether the Insurance Company may seek review of a denial of a recusal motion by supervisory writ. Commentators and courts who have considered the procedure for review of a judge's denial of a recusal motion have concluded that a petition for a supervisory writ of prohibition or mandamus, rather than appeal, is the recommended procedure.*[N1]

> [N1] *Several federal courts of appeals have recommended this procedure. "The less technical, more modern, and probably more widely held view is that mandamus is available. . . . " Stempel, Rehnquist, Recusal, and Reform, 52 Bklyn. L. Rev. 589, 637 (1987). See also Moore, Appellate Review of Judicial Disqualification Decisions in the Federal Courts, 35 Hastings L.J. 829 (1984); Hjemfelt, Statutory Disqualification of Federal Judges, 30 Kansas L. Rev. 255, 262–63 (1982); Leubsdorf, Theories of Judging and Judge Disqualification, 62 N.Y.U. L. Rev. 237, 275–76 (19787) [sic]; Fall, Liljeberg v. Health Services Acquisition Corp.: The Supreme Court Encourages Disqualification of Federal Judges Under Section 455(a), 1989 Wis. L. Rev. 1033, 1041; Comment, Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a), 60 Temple L. Q. 697, 730–35 (1987); Note, Judicial Disqualification*

*in the Federal Courts: A Proposal to Conform Provisions to Underlying Policies*, 67 Iowa L. Rev. 525, 543–44 (1982).

In any event, as an alternative procedure the Insurance Company also sought leave to appeal a non-final order as an alternative procedure in the court of appeals.

The United States Supreme Court has declared review by appeal after trial inadequate. In *Berger v. United States*, 255 U.S. 22, 36 (1921), the Court stated:

"*The remedy by appeal is inadequate. It comes after the trial, and if prejudice exists, it has worked its evil, and a judgement of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or a decision than a disposition of mind in which there is a personal judgment.*"

Because the judge deciding judicial disqualification in the first instance is the very judge who is charged with being partial, prompt review by an appellate court before trial when possible is especially important to preserve the integrity of the trial, to foster public confidence in the judicial system, and to avoid the subtle, subconscious pressure on an appellate court to uphold a judgment rendered after trial.

I conclude that the Insurance Company's petition for a writ of prohibition is the proper procedure to seek review in the court of appeals and in this court of a circuit court judge's denial of a motion to recuse.

## III.

The law of judicial recusal cannot be found in a single statute, court rule or case. It is found in several places. The judge and the reviewing court must consider whether judicial disqualification is required by statute.

427

*Sec. 751.19, Stats. 1987–88, is, however, only the beginning. [footnote to text of Wis. Stat. § 757.19 omitted] Other statutes may come into play. Furthermore our case law dictates that judges and reviewing courts must also consider the Code of Judicial Ethics, the Fourteenth Amendment's due process clause, and the common law doctrine of fair trial. And this court might also review a judge's denial of a recusal motion under its superintending power. Each of these sources of the law of disqualification—and the listing is probably not complete—may have a significant impact on resolution of the case at bar.*

*A tension exists between the public's right to a judge who is impartial and has the appearance of impartiality on the one hand and the need to ensure that the law of disqualification is not abused by litigants and attorneys for purposes of delay or judge shopping. The law of disqualification attempts to ensure that a balance between these policy considerations is achieved.*

*Statutory Grounds for Judicial Disqualification. When a motion for recusal is made, both the judge and the reviewing court should look to the statutes to determine whether the motion should be granted. Sec. 751.19, Stats. 1987–88, provides, inter alia, that "any judge shall disqualify himself or herself . . . when a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner." Sec. 751.19(2)(g). In State v. American TV & Appliance, 151 Wis. 2d 175, 183, 443 N.W.2d 662 (1989) (Abrahamson, J. not participating), this court interpreted sec. 751.19(2)(g) as adopting a subjective test for impartiality and appearance of impartiality: a justice's (or judge's) determination that he or she is impartial or that there is no appearance of partiality cannot be challenged by the parties or a reviewing court. In this case the circuit judge has decided he is not biased against the Insurance Company. I cannot determine from the order*

428

*of either the court of appeals or this court whether the denial of the petition in the instant case is based on the reasoning of <u>American TV.</u>*

*Congress and the commentators are critical of the subjective test. It does not protect litigants adequately. In 1874 Congress adopted an objective test for disqualification of federal judges "to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case." H.R. Rep. No 1453, 93d Cong., 2d Sess. 2, <u>reprinted</u> in 1974 U.S. Code Cong. & Ad. News 6351, 6355.*

*The court's adoption of the subjective test in <u>American TV</u> has significantly reduced the effectiveness of sec. 751.19(2)(g). The legislature or the court (under its rule-making power) [footnote to Wis. Stat. § 751.12 (1987–88) omitted] should amend sec. 751.19(2)(g) to establish, in addition to the subjective test, an objective test: A judge or justice should also disqualify himself or herself in any proceeding in which his or her impartiality or appearance of impartiality might reasonably be questioned. With the hope that a change will be proposed, I call this matter to the attention of the Revisor of Statutes and the Law Revision Committee, secs. 13.83(1)(c), 13.93(2)(d), Stats. 1987–88, the Judicial Council, the State Bar of Wisconsin and other interested persons.*

*<u>Code of Judicial Ethics.</u> The Code of Judicial Ethics sets forth a subjective and an objective test to determine a judge's impartiality. <u>Code of Judicial Ethics,</u> 36 Wis. 2d 252, 256, Standard 3 (1967). The subjective test is based on the judge's own determination of his or her impartiality. Under the objective test the judge or reviewing court must determine whether a reasonable person on these facts would conclude that the judge is partial or that there is an appearance of partiality.*

*In State v. Walberg, 109 Wis. 2d 96, 105–06, 325 N.W.2d 687 (1982), and State v. Asfoor, 75 Wis. 2d 411, 436, 249 N.W.2d 529 (1977), the court applied the Code and concluded that the subjective and objective tests are to be used to determine whether a circuit judge should be disqualified from sitting.*

*The American TV decision may cast doubt on the applicability of the two tests and of the applicability of Standard 3 of the Code of Judicial Ethics in cases where a litigant challenges the judge's denial of the recusal motion in an appellate court. The court wrote in American TV that "the Code of Judicial Ethics governs the ethical conduct of judges; it has no effect on their qualification or disqualification to act and a judge may be disciplined for conduct that would not have required disqualification under sec. 757.19, Stats." 151 Wis. 2d at 185.*

*Any conflict or confusion in our cases might be clarified in this case or by legislative amendment to the statutes or by court amendment to the Supreme Court Rules. SCR ch. 60 sets forth the Code of Judicial Ethics.*

*Due Process. A third source of law that must be considered on any challenge of judicial partiality is the federal and state constitutions. The due process clause guarantees the right to a neutral and detached judge. See Aetna Life Insurance Co. v. LaVoie, 475 U.S. 813 (1986); Liljeberg v. Health Services Acquisition Corp., [486 U.S. 847], 108 S. Ct. 2194 (1988); State v. Walberg, supra, 109 Wis. 2d at 105; Guthrie v. W.E.R.C., 111 Wis. 2d 447, 454, 331 N.W.2d 331 (1983). The United States Supreme Court has stressed that fairness requires not only "an absence of actual bias in the trial of cases" but also " 'the appearance of justice.' " In re Murchison, 349 U.S. 133, 136 (1955). See also Guthrie, supra.*

*Common Law. A fourth source of law that has bearing on judicial disqualification is the common law. This court has recognized the existence of a common law*

430

*philosophy or position with respect to disqualification that applies along with the statutory provisions for disqualification. Guthrie v. W.E.R.C., supra, 111 Wis. 2d at 456.*

*Superintending Power. The fifth basis this court may use for disqualifying a judge is its "superintending authority over all courts." Wis. Const. art. VII, sec. 3(1). The constitutional grant of superintending control over all courts and judges vests in this court an independent and separate jurisdiction to adopt measures necessary for the due administration of justice in the state, including assuring litigants a fair trial. See Wickhem, The Power of Superintending Control of the Wisconsin Supreme Court, 1941 Wis. L. Rev. 153 (1941); State v. Holmes, 106 Wis. 2d 31, 44, 315 N.W.2d 703 (1982); In re Hon. Charles E. Kading, 70 Wis. 2d 508, 520, 235 N.W.2d 409, 238 N.W.2d 63, 239 N.W.2d 297 (1975).*

*This list of laws applicable to disqualification is not all inclusive. Litigants may be able to cite other sources of law which the judge and a reviewing court should consider.[N4]*

> [N4] *For discussion of judicial disqualification in addition to those cited elsewhere herein, see also J. Shaman, S. Lubet, and J. Alfini, Judicial Conduct and Ethics ch. 5 (1990); L. Abramson, Judicial Disqualification under Canon 3C of the Code of Judicial Conduct (American Judicature Society 1986); Bloom, Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges, 35 Case W. Res. L. Rev. 662, (1985); Rieger, The Judicial Councils Reform and Judicial Conduct and Disability Act: Will Judges Judge Judges?, 37 Emory L. J. 45 (1988); Weinstein, The Limited Power of the Federal Courts of Appeals to Order a Case Reassigned to Another District Judge, 120 Fed. Rules Dec. 267 (1988); Symposium, Judicial Ethics, 35 L. & Contemp. Prob. 1 (1970); Kilgarlin and Bruch, Disqualification and Recusal of*

*Judges*, 17 St. Mary's L.J. 599 (1986); Sparks, *Judicial Recusal: Rule 18 a*, 12 St. Mary's L.J. 723 (1981); Lewis, *Systematic [sic] Due Process: Procedural Concepts and the Problem of Recusal*, 38 U. Kansas L. Rev. 381 (1990); Burbank, *Procedural Rulemaking under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980*, 131 U. Pa. L. Rev. 283 (1982); Frank, *Disqualification of Judges*, 56 Yale L. J. 605 (1947); Note, *Disqualification of Judges for Bias in the Federal Courts*, 79 Harv. L. Rev. 1435 (1966); Note, *State v. Fie: Determining the Proper Standard for Recusal of Judges in North Carolina*, 65 N.C. L. Rev. 1138 (1987); Note, *A District Judge Must Request a Visiting Judge to Hear any Motion to Disqualify Him*, 20 S. Tex. L. J. 395 (1980); Note, *Disqualification of Federal Judges for Bias or Prejudice*, 46 U. Chi. L. Rev. 236 (1978).

See also *State v. Carviou*, [154 Wis. 2d 641, 454 N.W.2d 562] (Ct. App. 1990).

*I conclude that the court ought to order a response to the petition in this case. The court should then decide the petition, providing guidance on the proper procedure for invoking appellate review of a circuit judge's denial of a recusal motion and on the laws applicable to disqualification under the circumstances of this case.*

\* \* \* \*

¶ 131. The recusal motion in *Matter of Disciplinary Proceedings Against Crosetto*, 160 Wis. 2d 581, 466 N.W.2d 879 (1991) rested on statutory grounds of Wis. Stat. § 757.19(2)(f) and (2)(g) and on "federal and state constitutional provisions," which was a secondary and not very well developed argument. The essence of the motion was that Crosetto had sued the justices in federal

court and although the federal case had been dismissed, Attorney Crosetto alleged that each justice was biased.[1]

¶ 132. In *Crosetto,* the recusal motion asked each justice individually to recuse himself or herself. The per curiam decision, which then-Justice Abrahamson did not join, reports that each justice individually responded. No motion sought court review of these individual decisions. Accordingly, because the question was not raised, neither the per curiam nor Justice Abrahamson's dissent addressed the issue of what a court should do when a motion asks the entire court to review an individual justice's recusal decision. Justice Abrahamson's dissent proposed what actions the court should take for handling recusal motions.

¶ 133. The court sanctioned Attorney Crosetto. Justice Abrahamson dissented. The *Crosetto* dissent went beyond the case, outlining some key questions the court should address relating to recusal, questions that were then troublesome and unanswered and are still troublesome and unanswered. One significant issue raised in the dissent is that due process requires the application of an objective fairness standard, in contrast to the subjective standard the court was using under Wis. Stat. § 757.19(2)(g).

---

[1] In other states some justices have recused themselves when so challenged. Others have not. *See, e.g., Grievance Administrator v. Fieger,* 179 N.W.2d 123, 149–150 (Mich. 2006) (statement of four challenged justices, rejecting, *inter alia,* the argument that lawsuits filed by an attorney against justices of the court disqualified them from presiding over his attorney disciplinary case); *Bradbury v. Idaho Judicial Council,* No. 36175, ___ P.3d ___, 2009 WL 2882874, *3–4 (Idaho Sept. 10, 2009) (chief justice recusing on basis of federal lawsuit filed by district court judge against the justices; other justices continued to hear the matter).

¶ 134. This "subjective standard" interpretation of Wis. Stat. § 757.19(2)(g) underlies Justice Roggensack's writing today, and it is problematic.

¶ 135. Justice Abrahamson also urged the court to accept the offer of the Judicial Council to assist the court in adopting a rule of procedure relating to a justice's recusal. The court did not accept the Judicial Council's offer of assistance on this subject before or after *Crosetto*.

¶ 136. Here is the full text of the part of Justice Abrahamson's dissent in *Crosetto* addressing generally recusal of justices of this court:

> *Attorney Crosetto moved that the seven justices recuse themselves. The motion papers assert that the risk of bias is "impermissibly high" because Attorney Crosetto and other plaintiffs in a federal suit against the justices relating to the integrated bar "levelled direct, personal, and substantial criticism against the justices in pleadings and in a brief filed in the federal lawsuit."[N15] Memorandum in Support of Motion, p. 3.*
>
> > *N15. Attorney Crosetto reasons that the justices have a personal interest in this disciplinary proceeding as follows: (1) allegations in the lawsuit— e.g., accusing the justices of violating Attorney Crosetto's civil rights for more than a decade, of reneging on a promise given under oath, and of possibly giving inconsistent answers under oath to interrogatories—may seriously damage the justices' reputations; (2) an elected justice's interest in reputation is greater than almost any financial interest he or she may have; (3) this proceeding gives the justices an opportunity to diffuse and diminish the allegations against them by reprimanding Attorney Crosetto and thus tarnishing Attorney Crosetto's reputation. Some lawyers apparently believe that voicing a complaint against a judge jeopardizes the*

434

attorney or the clients. *See* lawyers' comments reported in the Wisconsin Equal Justice Task Force, Final Report, p. 244 (1990).

*Recusal is a serious matter. Court statistics show that circuit court judges recused themselves in more than 4,000 cases in 1990. The issue of recusal of a justice has arisen at least three times in this court in the last 18 months.*

*The majority opinion suggests that Attorney Crosetto's motion for recusal was untimely. When and how should a litigant move for recusal of a justice? Does the court's hearing the matter on oral argument or on briefs affect the timing or procedure? Ordinarily parties do not know whether justices have recused themselves until the opinion is released.*

*Is the subjective standard set forth in* American TV and Appliance of Madison, Inc., *151 Wis. 2d 175, 182–83, 443 N.W.2d 662 (1989) (Abrahamson, J., not participating), the correct standard? Compare* State ex rel. National Union Fire Ins. Co. v. Cir. Court for St. Croix County, *Case No. 90–0935–W, Order filed May 29, 1990 (Abrahamson, J., dissenting); and* Liljeberg v. Health Services Acquisition Corp., *486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), adopting the objective standard.*

*Is it appropriate for the court to prohibit justices from explaining, either in a published opinion or in a document in the case file, why they recuse themselves, while justices may explain in an opinion why they are not recusing themselves?*[N16]

> *N16. On September 6, 1990, this court adopted the following interpretation of Procedure L.1. of the Court's Internal Operating Procedures: ["]A justice who recuses himself or herself may file with the court or as part of a published opinion only the statement that: A. The justice took no part. B. The*

435

*justice did not participate. C. The justice withdrew from participation.["] Compare American Bar Association Code of Judicial Conduct (1990), Canon 3 E and F which state: "E. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . . F. A judge disqualified by the terms of Section 3E may disclose on the record the basis of the judge's disqualification. If following the disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties and lawyers, without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding. The agreement shall be incorporated in the record of the proceeding."*

*What action should the court take when all or a majority of justices have to recuse themselves? BAPR responded to Attorney Crosetto's recusal motion in part by pointing out that the Supreme Court must hear the matter because it is the only entity with jurisdiction to decide attorney disciplinary proceedings. The Judicial Council has raised similar issues concerning disciplinary action against a justice of the Supreme Court. See Judicial Council Report dated April 26, 1990. The Judicial Council reviewed the problems, asked the court to consider the adoption of a rule or procedure relating to the handling of such matters, and offered to assist the court with drafting a rule. The court has not responded to the Council's report.*

*This case demonstrates the need for this court to address promptly issues relating to recusal.*

*Matter of Disciplinary Proceedings Against Crosetto,* 160 Wis. 2d 581, 601–604, 466 N.W.2d 879, (1991) (Abrahamson, J., dissenting).

\* \* \* \*

## APPENDIX B. The United States Supreme Court Retains Jurisdiction to Disqualify One of Its Own Members

¶ 137. Multiple lessons are learned from a review of the disqualification practices of the United States Supreme Court to inform the court of its powers and jurisdiction to review a justice's refusal to recuse himself or herself.[2]

¶ 138. Over the years, numerous challenges have been made to United States Supreme Court justices. The Court has never held that it lacks the power to exclude a judicial peer from participation in a case. Most importantly, for our purposes, seven justices of the United States Supreme Court refused to adopt an order in 1945 stating that the Court was "without the authority" to rule on the participation of a justice in a case. A recounting of this incident appears in William H. Rehnquist, *The Supreme Court: How It Was, How It Is*

---

[2] For discussions of judicial disqualification and the United States Supreme Court, see, *e.g.,* Richard E. Flamm, *Judicial Disqualification* § 29.4 (2d ed. 2007); Debra Lyn Bassett, *Recusal and the Supreme Court,* 56 Hastings L. J. 657 (2005); Amanda Frost, *Keeping Up Appearances: A Process-Oriented Approach to Judicial Recusal,* 53 Kan. L. Rev. 531 (2005); John Leubsdorf, *Theories of Judging and Judicial Disqualification,* 62 N.Y.U. L. Rev. 237 (1987); Paul B. Lewis, *Systemic Due Process: Procedural Concepts and the Problem of Recusal,* 38 U. Kan. L. Rev. 381 (1990); William H. Rehnquist, *Sense and Nonsense About Judicial Ethics,* 28 The Record of the Ass'n of the Bar of the City of N.Y. 694 (1973); Caprice L. Roberts, *The Fox Guarding the Henhouse?: Recusal and the Procedural Void in the Court of Last Resort,* 57 Rutgers L. Rev. 107 (2004); Jeffrey W. Stempel, *Rehnquist, Recusal, and Reform,* 53 Brook. L. Rev. 589 (1987).

65–67 (1987). The Court has not adopted such an order since 1945. Indeed, as we shall explain, the Court has retained its power to rule on motions for a justice's disqualification and has exercised its authority over the disqualification of a justice.[3]

¶ 139. The general practice of the United States Supreme Court has been not. to review the recusal decision of an individual justice.[4] In contrast, the Wis-

---

[3] The United States Supreme Court has not explicitly confronted a motion by a litigant arguing that the Court should disqualify one of its justices from participating as a matter of constitutional due process. All the recusal motions have been decided before *Caperton v. A.T. Massey Coal Co., Inc.,* 129 S. Ct. 2252 (2009).

[4] The practice of federal district courts and federal courts of appeal regarding recusal seems to vary.

For discussions of judicial disqualification in the federal district courts, see, *e.g.,* Leslie W. Abramson, *Specifying Grounds for Judicial Disqualification in Federal Courts,* 72 Neb. L. Rev. 1046 (1993); Edward G. Burg, *Meeting the Challenge: Rethinking Judicial Disqualification,* 69 Cal. L. Rev. 1445 (1981).

For a brief discussion of the procedure for disqualifying appellate judges, see Richard E. Flamm, *Judicial Disqualification* ch. 29 (2d ed. 2007).

For further discussions of judicial disqualification in the federal courts of appeal, see, *e.g.,* Debra Lyn Bassett, *Judicial Disqualification in the Federal Appellate Courts,* 87 Iowa L. Rev. 1213 (2002); Jason Hutt, Note, *A Wrong Without A Remedy: Proposing a Recusal Procedure for Circuit Court Judges,* 22 Vt. L. Rev. 627 (1998) (noting the absence of a procedure to recuse federal circuit court judges whose objectivity can reasonably be questioned).

In *Aronson v. Brown,* 14 F.3d 1578, 1582 (Fed. Cir. 1994), the court described recusal practice in federal appellate courts as follows:

consin Supreme Court's practice has been to review the decision of an individual justice to participate.[5]

¶ 140. In discussing disqualification in the United States Supreme Court we start by examining *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 897 (1945), one of the early notorious cases seeking disqualification of a justice. We begin here because the case demonstrates that the Court does not have a consistent practice in coping with disqualification challenges, that the Court's disqualification practices have been subject

[A]ppellate courts have reviewed charges that a member of the same appellate court should have recused or be disqualified in a particular case. Such reviews have been conducted in a variety of ways, adapting the procedure to the circumstances. In *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985) a panel of the Federal Circuit that did not include the challenged judge decided whether that judge should have recused in terms of [28 U.S.C.] § 455, in response to a party's motion made after the party received an adverse decision authored by the challenged judge. In *Hepperle v. Johnston*, 590 F.2d 609 (5th Cir. 1979) the court considered the appellant's request that eight judges who sat on prior appeals be disqualified for personal bias or prejudice; a three-judge panel of that circuit, one member of which was one of the eight challenged judges, decided the issue. *In Scarrella v. Midwest Federal Savings & Loan*, 536 F.2d 1207, 1209 (8th Cir.), *cert. denied*, 429 U.S. 885, 97 S. Ct. 237, 50 L. Ed. 2d 166 (1976), a motion that all the judges of the court of appeals recuse themselves was decided by a three-judge panel of the court. In *In re Charge of Judicial Misconduct*, 691 F.2d 923 (9th Cir. 1982) a complaint alleging misconduct under 28 U.S.C. § 372(c)(1) was filed against three judges of the court of appeals; it was decided by a single judge of that court, who was not one of the accused judges.

[5] *See Case v. Hoffman*, 100 Wis. 314, 72 N.W. 390, *reh'g granted*, 74 N.W. 220 (1898); *State v. Am. TV & Appliance of Madison, Inc.*, 151 Wis. 2d 175, 443 N.W.2d 662 (1989); *City of Edgerton v. Gen. Cas. Co.*, 190 Wis. 2d 510, 527 N.W.2d 305 (1995); *Jackson v. Benson*, 249 Wis. 2d 681, 639 N.W.2d 545 (2002); *Donohoo v. Action Wis., Inc.*, 2008 WI 110, 314 Wis. 2d 510, 754 N.W.2d 480.

to criticism, and that the Court has refused to hold that it lacks the power to exclude the participation of a judicial peer. We examine the *Jewell Ridge* concurrence at length because it is often cited by judges in recusal cases, as Justice Roggensack has, without any explanation, and without any understanding of its historic context and meaning as a concurrence. *See* J. Roggensack, ¶ 220.

¶ 141. In a motion for a rehearing in *Jewell Ridge*, Justice Black's participation in the case was challenged on the ground that one of the litigants was represented by a lawyer who had been Justice Black's personal attorney and former law partner.[6] The entire Court, with Justice Black participating, issued a docket entry statement as follows: "Petition for rehearing denied."[7]

¶ 142. Justice Jackson, joined only by Justice Frankfurter, filed a four-paragraph concurrence without a citation to any legal authority, objecting to the Court's issuing an order deciding the motion. Justice Jackson concluded that Justice Black alone should respond to the motion for disqualification.

¶ 143. Justice Jackson observed that the "[p]ractice of the Justices over the years [about motions to disqualify] has not been uniform, and the diversity of attitudes to the question doubtless leads to some confusion as to what the bar may expect and as to whether the action in any case is a matter of individual or collective responsibility."[8] Justice Jackson also opined that the complaint was "one that cannot properly be

---

[6] *See, e.g.,* Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 208.

[7] *Jewell Ridge Coal Corp. v. Local No. 6167,* 325 U.S. 897 (1945).

[8] *Jewell Ridge,* 325 U.S. 897, 897 (1945) (Jackson, J., concurring).

addressed to the Court as a whole and for that reason I concur in denying it."[9]

¶ 144. Seven members of the Court disagreed with Justices Jackson and Frankfurter; the seven treated the disqualification motion as one addressed to the Court, and they answered it for the Court. Indeed a majority refused to adopt an order proposed by Chief Justice Stone stating that the Court was "without the authority" to rule on Justice Black's participation.[10]

¶ 145. The late John P. Frank, in what remains one of the seminal dissertations on judicial disqualification, concluded that although "Jackson's views on the subject are not at all points clear, his statement shows an enormous difference of opinion in the Supreme Court on the subject of disqualification of its members."[11]

¶ 146. Justice Black's participation in *Jewell Ridge* and Justice Jackson's concurrence have generated substantial commentary, and the case is best understood in its historical context. The *Jewell Ridge* concurrence was authored amidst a sharp rivalry among members of the Court over both judicial principles and the question of who might be appointed the next Chief Justice.[12] As a generalization, "the Court of the 1941–54 era featured human rather than institutional dimensions of judg-

[9] *Jewell Ridge,* 325 U.S. 897, 897 (Jackson, J., concurring).

[10] *See* William H. Rehnquist, *The Supreme Court: How It Was, How It Is* 65–67 (1987).

[11] John P. Frank, *Disqualification of Judges,* 56 Yale L.J. 605, 605–06 (1947). Professor Frank was first a law clerk to Justice Black and later a sympathetic biographer of Justice Black. *See* Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 223.

[12] *See generally* Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 204–07. Like several of President Franklin D. Roosevelt's appointees to the United States Supreme Court, Justices Black and Jackson were appointed to the

ing . . . in contrast to the Court of today."[13] More particularly, Justices Jackson and Black had a personal and jurisprudential rivalry that one contemporary journalist characterized as a "blood feud."[14]

¶ 147. Justice Jackson's concurrence was widely understood then (and now) to have been authored primarily as a public criticism of Justice Black's participation in the case, rather than as a finely reasoned legal argument.[15] Furthermore, *Jewell Ridge* was decided when no federal disqualification statute applied to

Court from high political offices, without prior judicial experience, and both had ambitions of becoming Chief Justice, if not President. *See* Hutchinson at 207; William Domnarski, *The Great Justices, 1941–54: Black, Douglas, Frankfurter & Jackson in Chambers* 2–4, 22–23, 101 (2006).

[13] William Domnarski, *The Great Justices, 1941–54: Black, Douglas, Frankfurter & Jackson in Chambers* 166 (2006).

[14] Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 216 (citing, *inter alia,* Doris Fleeson, *Supreme Court Feud: Inside Story of Jackson-Black Battle Laid Before a Harassed President,* Washington Evening Star, May 16, 1946, at 15). Justice William Douglas, another ambitious rival of Jackson's, later recounted that "it was very evident . . . that Bob Jackson thoroughly disliked Hugo Black and was out to destroy him. I mean destroy him in the sense of discrediting him." *See* William Domnarski, *The Great Justices, 1941–54: Black, Douglas, Frankfurter & Jackson in Chambers* 40–41 (2006).

[15] *See* John P. Frank, *Disqualification of Judges,* 56 Yale L. J. 605, 605–06, 607 n.5 (1947) (summarizing contemporaneous editorials); Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 208 (1988).

The year after *Jewell Ridge,* when President Truman named then-Treasury Secretary Vinson as the next Chief Justice, and with public rumors that Justice Black had threatened to resign if Justice Jackson got the center seat (and vice versa), Justice Jackson sent a then-scandalous public cable to Congress while still serving as lead prosecutor in the Nuremburg trial of Nazi war criminals. Justice Jackson openly criticized the han-

Supreme Court Justices.[16] Today, 28 U.S.C. § 455, as amended in 1974, sets out objective standards and grounds for disqualification, and they apply to Justices of the Court.[17]

dling of the conflict of interest he perceived in *Jewell Ridge* and warned that "if it is ever repeated while I am on the bench I will make my *Jewell Ridge* opinion look like a letter of recommendation by comparison." Dennis J. Hutchinson, *The Black-Jackson Feud,* 1988 Sup. Ct. Rev. 203, 220–21.

While *Jewell Ridge* has received intense scrutiny as an historical incident, the case is not cited in reference to recusal in Eugene Gressman et al., *Supreme Court Practice* (9th ed. 2007), a leading treatise on Supreme Court practice.

[16] *See Laird v. Tatum,* 409 U.S. 824, 830 (1972) (Rehnquist, J.).

[17] Before 1974, 28 U.S.C. § 455(a) required "any justice or judge . . . to disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or proceeding therein." This section was amended in 1974 to omit the phrase "in his opinion," in order to eliminate the subjective standard and to adopt an objective standard. *See* H.R. Rep. No. 93–1453 (S. Rep. No. 93–419), 93d Cong., 2d Sess. 5 (1974).

The current version of 28 U.S.C. § 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

The purpose of the 1974 amendment was explained in *Roberts v. Bailar,* 625 F.2d 125, 129 (6th Cir. 1980), as setting forth an objective standard so that a judge's subjective decision regarding his or her impartiality was no longer determinative of disqualification under § 455. *See also Liteky v. United States,* 510 U.S. 540, 546–48 (1994) ("The 1974 revision made massive changes . . . . Subsection (a) . . . was an entirely new 'catchall' recusal provision, covering both 'interest or relationship' and 'bias or prejudice' grounds . . . *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance" (emphasis in original).).

¶ 148. In sum, Justice Jackson's concurrence is just that—a concurrence, not an opinion of the Court. Justice Jackson's concurrence was not adopted by the Court in *Jewell Ridge* and has not been expressly adopted thereafter.

¶ 149. Despite Justice Jackson's *Jewell Ridge* concurrence, the rules of the United States Supreme Court treat motions for recusal the same as any other motion. Motions for recusal, like all motions, are addressed to the entire Court.[18]

---

Another effect of the 1974 amendments to 28 U.S.C. § 455 was to challenge the traditional "duty to sit" rationale for resolving close questions of disqualification in favor of sitting on a case. *See* Richard E. Flamm, *Judicial Disqualification* § 20.8 at 605 (2007) (the duty to sit rule was displaced); Jeffrey W. Stempel, *Chief Williams' Ghost: The Problematic Persistence of the Duty to Sit,* 57 Buff. L. Rev. 813, 865 (2009) (the legislative intent was to abolish the duty to sit rule).

[18] *See* S. Ct. Rule 21.

These motions are in contrast to the more limited and specific category of Applications to Specific Justices, governed by S. Ct. Rule 22. *See* Eugene Gressman et al., *Supreme Court Practice* § 16.1, 833–35 (9th ed. 2007).

Sometimes a party may use a less formal method than a motion, such as a letter to the clerk's office, to suggest recusal to an individual justice. *See, e.g.,* Debra Lyn Bassett, *Judicial Disqualification in the Federal Appellate Courts,* 87 Iowa L. Rev. 1213, 1215–16 (describing the recusal of three justices from considering the request for a stay of the execution of Napoleon Beazley in 2001).

In some circumstances a justice, without a recusal motion, voluntarily recuses himself or herself. *See, e.g., Pfizer, Inc. v. Abdullahi,* No. 09–34, 130 S.Ct. 534, 2009 WL 3517904 (Nov. 2, 2009) ("The Chief Justice and Justice Sotomayor took no part in the consideration or decision of this petition.").

Other times a justice, without a recusal motion, may explain his decision not to recuse. *See Microsoft Corp. v. United*

¶ 150. The Court has not been consistent in handling motions addressed to the Court for recusal of a justice. Sometimes the Court has a docket entry statement simply denying the motion seeking recusal of a justice, with the challenged justice apparently participating in the denial.[19]

¶ 151. Other times the Court has a docket entry statement merely stating a denial of the motion by the challenged justice, with or without an explanation or statement by the challenged justice.[20]

¶ 152. A different docket entry statement was used in *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913 (2004). The first docket entry statement referred the motion addressed

*States*, 530 U.S. 1301–03 (Justice Rehnquist's statement explaining his decision not to disqualify himself when his son was a partner in a law firm representing a party, Microsoft, on other related matters); *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 466–67 (1952) (Frankfurter, J., recusing himself without motion because of his strong feelings about the issue in the case).

[19] *See, e.g., Ernest v. U.S. Attorney for the S. Dist. of Alabama*, 474 U.S. 1016, (1985) (J. Powell); *Kerpelman v. Attorney Grievance Comm'n of Maryland*, 450 U.S. 970 (1981) (C.J. Burger); *Serzysko v. Chase Manhattan Bank*, 409 U.S. 1029 (1972) (J. Powell & J. Rehnquist).

Because the Court's denial of the motion to recuse offers no explanation and does not show the reasoning of the justices in deciding the recusal motion, the assumption is that the individual justice's decision has not been subject to court review. The failure of the Court to review an individual justice's decision on recusal motions has been criticized in the legal literature.

[20] *See, e.g., Hanrahan v. Hampton*, 446 U.S. 1301 (1980) (J. Rehnquist); *Laird v. Tatum*, 409 U.S. 901 (1972) (J. Rehnquist); *Gravel v. United States*, 409 U.S. 902 (1972) (J. Rehnquist); *Guy v. United States*, 409 U.S. 896 (1972) (J. Blackmum & J. Rehnquist).

445

to the Court requesting Justice Scalia's recusal to Justice Scalia.[21] This seems to make clear that the court as a whole took jurisdiction over the motion in the first instance. Justice Scalia then individually denied the motion, publishing a memorandum opinion.[22] No court order was issued by the Court denying the motion.

¶ 153. Justice Rehnquist wrote in 1972 that "under the existing *practice* of the Court disqualification has been a matter of individual decision . . . ."[23] Later, in *Hanrahan,* Justice Rehnquist wrote: "Since *generally* the Court as an institution leaves such motions [of recusal], even though they be addressed to it, to the decision of the individual Justices to whom they refer, . . . I shall treat the motion as addressed to me individually."[24]

¶ 154. In the *Cheney* case, the Court's docket entry statement referring the recusal motion to Justice Scalia simply stated: "In accordance with its *historic practice,* the Court refers the motion to recuse in this case to Justice Scalia."[25]

---

[21] *Cheney v. U.S. Dist. Court for the Dist. of Columbia,* 540 U.S. 1217 (2004).

[22] *Cheney v. U.S. Dist. Court for the Dist. of Columbia,* 541 U.S. 913 (2004) (Scalia, J.).

[23] *Laird v. Tatum,* 409 U.S. 824, 833 (1972) (emphasis added).

[24] *Hanrahan v. Hampton,* 446 U.S. 1301, 1301 (1980) (emphasis added).

[25] *Cheney v. U.S. Dist. Court for the Dist. of Columbia,* 540 U.S. 1217, 1217 (2004) (emphasis added). Indeed the movant in the *Cheney* case asked the Court as a whole to address the motion. *See* Amanda Frost, *Keeping Up Appearances: A Process-Oriented Approach to Judicial Recusal,* 53 U. Kan. L. Rev. 531, 575 (2005) (documenting public statements of the Sierra Club at the time the motion was filed).

¶ 155. The operative words are "practice," "generally," and "historic practice." Stating that the "historic practice" and "practice" of the Court leave disqualification to the individual justice is not the same thing as stating that the Court does not have the power or jurisdiction to determine or review an individual justice's alleged disqualification. To those who write and read opinions carefully, the word "generally" leaves open the possibility of a different practice or result at a later date or in a different circumstance. As one commentator describing the practice at the United States Supreme Court phrased it, "[A]lthough the standard for recusal has received significant judicial attention, the actual procedure by which the decision is made is truly a creature of tradition."[26]

¶ 156. Finally, the docket records of the Court and the "historic practice" of the Court do not tell the complete story about how the Court treats recusal of justices as a collective decision.

¶ 157. The Justices benefit from deliberate consultation with their colleagues about disqualification. Justice Ruth Bader Ginsburg has stated that "[i]n the end [recusal] is a decision the individual Justice makes, but always with consultation among the rest of us."[27]

¶ 158. Common judgment about recusal is not only used on an ad hoc basis but is also used to memorialize recusal policies in anticipation of recurring situations. In 1993, seven sitting justices publicly issued a "Statement of Recusal Policy" relating to relatives who

[26] R. Matthew Pearson, Note, *Duck Duck Recuse? Foreign Common Law Guidance & Improving Recusal of Supreme Court Justices,* 62 Wash. & Lee L. Rev. 1799, 1813–14 (2005).

[27] *An Open Discussion with Justice Ruth Bader Ginsburg,* 36 Conn. L. Rev. 1033, 1039 (2004) (emphasis added)).

practice law and whose law firms may appear before the Court.[28] Chief Justice Roberts, who took his seat on September 29, 2005, adopted this written policy on September 30, 2005.[29]

¶ 159. A comparable recognition of the Court's collective responsibility was also invoked when Justice Thurgood Marshall sent his October 4, 1984, memorandum to the other Justices, "describing a new policy on recusals he proposed to adopt in cases involving the NAACP."[30] Justice Marshall received "crisp blessings" in writing from all eight other Justices.[31]

¶ 160. These actions evidence a clear and sensible willingness on the part of the Justices to exercise their collective supervisory power over both the possibility of actual bias and the appearance of fairness at the Court.

¶ 161. An even clearer exercise of the Court's inherent institutional responsibility to provide a qualified group of justices was evidenced on October 17, 1975, when eight of the court's nine members met and voted (7 to 1, with Justice White in opposition), to effectively strip the voting and writing power of Asso-

[28] *See* Richard E. Flamm, *Judicial Disqualification,* Appendix D at 1101 (2007) (reproducing the policy as issued by press release). *See also* Ginsburg, 36 Conn. L. Rev. at 1039 (describing the shared policy as a "written agreement—anyone can read it").

[29] *See* Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 91–92 (2006). Justice Alito has also agreed to this existing policy.

[30] *See* Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 81–82 (2006).

[31] *See* Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 81–82 (2006).

ciate Justice William O. Douglas.[32] Specifically, the other justices agreed that Justice Douglas would not be assigned to write any opinions and that the court would not mandate any 5–4 decisions in which Justice Douglas was in the majority.[33] Justice Douglas had suffered a serious stroke and "[h]is disturbingly uneven behavior inside the Court and in public showed that he was not well enough to serve as a judge."[34]

¶ 162. In other words, "when Douglas failed to recuse himself . . . the rest of the Court took over and made the decision for him."[35] The method and reasons for such action are different than the present case, but the invocation of the Court's institutional power over its individual members is clear.

¶ 163. The conclusion to be drawn from the disqualification practice of the United States Supreme

[32] *See* Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 88–89 (2006) (citing Justice Byron White, Letter of Oct. 20, 1975, reprinted in Dennis J. Hutchinson, *The Man Who Once Was Whizzer White* 463–65 (1998)).

[33] *See* Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 88–89 (2006) (citing Justice Byron White, Letter of Oct. 20, 1975, reprinted in Dennis J. Hutchinson, *The Man Who Once Was Whizzer White* 463–65 (1998)).

[34] Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 88 (2006) (citing David J. Garrow, *Mental Decrepitude on the U.S. Supreme Court,* 67 U. Chi. L. Rev. 995, 1052–56 (2000)).

[35] Ross E. Davies, *The Reluctant Recusants: Two Parables of Supreme Judicial Disqualification,* 10 Green Bag 2d 79, 89 (2006). For another example of the justices joining to force the removal of an incapacitated justice in 1924–25, namely Justice Joseph McKenna, *see* David J. Garrow, *Mental Decrepitude on the U.S. Supreme Court,* 67 U. Chi. L. Rev. 995, 1015–16 (2000).

449

Court is that the public practice has not been consistent. Justices apparently informally confer and agree on disqualification practices. Most importantly, the Court has never denied its power to decide the disqualification of one of its members or its obligation to provide a legally qualified forum to all litigants. Indeed the Court has exercised its power to disqualify one of its own members, Justice William O. Douglas, and forced the retirement of another, Justice Joseph McKenna.

¶ 164. What is clear from examining the disqualification practice of the United States Supreme Court is that it generally has not reviewed the individual decision of a Justice in response to a recusal motion, but has not ceded its power to disqualify one of its own members.[36]

¶ 165. Thus the practice of the United States Supreme Court is very different from the practice of the Wisconsin Supreme Court. The Wisconsin Supreme Court has repeatedly reviewed an individual justice's decision to participate in a case. *See* ¶¶ 39–45. The practice in this state has been to exercise, rather than to reserve, our jurisdiction to decide the merits of a justice's response to a disqualification motion, "in the defense of [the court's] own legitimacy and of its integrity . . . ."[37]

¶ 166. Numerous proposals have been floated to change the disqualification practice at the United States Supreme Court. No one has suggested that the Court lacks the power to change its disqualification

---

[36] The United States Supreme Court has, however, reviewed the decisions of state court judges to participate in cases and has held that a failure to recuse may constitute a violation of due process. *See Caperton* and cases cited therein.

[37] *City of Edgerton v. Gen. Cas. Co. of Wis.,* 190 Wis. 2d 510, 513, 527 N.W.2d 305 (1995).

practice to provide for Court review of an individual justice's decision not to recuse himself or herself.

\* \* \* \*

## APPENDIX C. The Recusal Practice of Our Sister State Supreme Courts Is Instructive

¶ 167. This year's decision in *Caperton* has spurred increasing commentary and a certain amount of hand-wringing among lawyers and judges. With good reason. One need not understand the furthest implications of the decision to know that these implications will be significant.

¶ 168. Dissenting from the decision, Chief Justice Roberts observed that "Judges and litigants will surely encounter other[] [uncertainties] when they are forced to . . . apply the majority's decision in different circumstances." 129 S. Ct. at 2272 (Roberts, C.J., dissenting). Justice Scalia proclaimed: "[T]he principal consequence of today's decision is to create vast uncertainty with respect to a point of law that can be raised in all litigated cases in (at least) those 39 States that elect their judges." 129 S. Ct. at 2274 (Scalia, J., dissenting).

¶ 169. An outpouring of literature and commentary discussing a "post-Caperton" landscape has already begun.[38] State courts, and most immediately our own, are on the front lines of resolving the boiling and at times contentious uncertainty.

---

[38] *See, e.g., Comments: Caperton v. A.T. Massey Coal Co.: Due Process Limitations on the Appearance of Judicial Bias,* 123 Harv. L. Rev. 73 et seq. (2009); Pamela S. Karlan, *Electing Judges, Judging Elections, and the Lessons of Caperton,* 123 Harv. L. Rev. 80 (2009); Lawrence Lessig, *What Everybody Knows and Too Few Accept,* 123 Harv. L. Rev. 104 (1990); Penny J. White, *Relinquished Responsibilities,* 123 Harv. L. Rev. 120 (2009); Terri R. Day, *Buying Justice: Caperton v. A.T. Massey:*

¶ 170. In addressing "where we go from here," understanding the current recusal practices of state supreme courts and assessing "how we got here" will be invaluable. We have therefore looked around the country at the history and practice of recusal decisions, particularly in the other states' courts of last resort.

¶ 171. Three core observations:

1. *Caperton* raises problems that most state high courts have not yet begun to address. One recent exception is the Michigan Supreme Court.

2. Some state high courts have reviewed recusal decisions of their individual members; others have not. Courts have altered their practice at different points in their history.

*Campaign Dollars, Mandatory Recusal and Due Process,* 28 Miss. C. L. Rev. 359, 363 (2008–09); John Gibeaut, *Caperton capers: court's recusal ruling sparks states to mull judicial contribution laws,* A.B.A. J., Aug. 2009, at 21; James L. Gibson & Gregory A. Caldeira, *Campaign Support, Conflicts of Interest, and Judicial Impartiality: Can the Legitimacy of Courts Be Rescued by Recusals?,* CELS 2009 4th Annual Conference on Empirical Legal Studies Paper, available at SSRN: http://ssrn.com/abstract=1428723; Stephen M. Hoersting & Bradley A. Smith, *Speech and Elections: The Caperton Caper and the Kennedy Conundrum,* 2008–09 Cato Sup. Ct. Rev. 319; Kevin C. Newsom & Marc James Ayers, *A brave new world of judicial recusal? The United States Supreme Court enters the fray,* 70 The Alabama Lawyer 5 (2009); *Judicial Disqualification After Caperton,* Judicature, July-Aug. 2009, at 4; *Statement of H. Thomas Wells Jr., President, American Bar Association Re: Ruling of The Supreme Court of The United States in Caperton Et Al. v. A.T. Massey Coal Co., Inc., Et Al., June 8, 2009,* available at http://www.abanet.org/abanet/media/statement/ statement. cfm?releaseid=671 (last visited Jan. 5, 2010) ("[T]he standards laid out by the court must not be viewed as the final word on this issue.").

3. State supreme courts' recusal practice, at least before *Caperton,* has been a matter of tradition or prudential considerations, not an espousal of a lack of power or jurisdiction.[39]

¶ 172. Several states' supreme courts have explicitly exercised or reserved the authority of the state's highest court to disqualify one or more of its own members.[40]

---

[39] *See, e.g., Fidelity Ins. & Guar. Co. v. Mich. Catastrophic Claims Ass'n,* 773 N.W.2d 243, 254 (2009) (Young, J.) (noting "170—year-old disqualification practice"); *In re modification of Canon 3A(7) of the Minnesota Code of Judicial Conduct,* 438 N.W.2d 95, 95 (Minn. 1989) ("It has long been the practice of this court to honor decisions of its individual members as to whether to participate in a pending proceeding."); *Goodheart v. Casey,* 565 A.2d 757, 762 (Pa. 1989) ("[U]nder our law, a strong tradition has been established which recognizes that each judge has the primary responsibility for determining the validity of a challenge to his or her participation . . . ."); *Noriega Rodriguez v. Rafael Hernandez Colon,* 120 D.P.R. 267, 20 P.R. Offic. Trans. 285, 289, 296 (P.R. 1988) (noting one past instance of "collegially pass[ing] on the tenability of the disqualification of one of the justices . . . "; discussing "[d]ifferent factors, traditions, legal circumstances and principles of judicial organization," comparing other jurisdictions, and ultimately adopting the "practice" that the Court not decide recusal motions en banc).

[40] *See, e.g., Mosk v. Superior Court of Los Angeles County,* 601 P.2d 1030 (Cal. 1979) (court lawfully composed of pro tempore justices disqualified a justice from participation after all other justices had recused themselves); *Mitchell v. Sage Stores,* 143 P. 2d 652 (Kan. 1943) (court denied the motion to recuse a justice; the challenged justice did not participate in deciding the motion); *State ex rel. Hall v. Niewoehner,* 155 P.2d 205, (Mont. 1944) (court reviewed and denied motion to recuse four of five justices on its merits); *State ex rel. Dep't of Transp. v. Barsy,* 941 P.2d 969 (Nev. 1997) (court denied motion to disqualify justice) (overruled on other grounds by *GES, Inc. v.*

¶ 173. *Board of Justices of Burlington v. Fennimore*, 1 N.J.L. 190, 1793 WL 176 (N.J. 1793), is cited as an early example of a court sitting in judgment of one of its own.[41] In *Fennimore* the Chief Justice of the Supreme Court of Judicature of New Jersey had an interest in the case. The court published a declaration by the other two judges that "the interest was too remote and indefinite," and that it was therefore appropriate for him to sit and preside.

¶ 174. In another early case, in 1863, the Supreme Court of Florida, faced with the question whether stock-holder and trustee relationships of two of its members were sufficient to disqualify them under the state statute, concluded that when there is any question about the qualification of a judge "the safest and legal way of determining the same is by a decision of the Court . . . ."[42]

¶ 175. The Florida Supreme Court recognized in 1979 that its procedural treatment of requests for disqualification of a justice had not always been consis-

*Corbitt*, 21 P.3d 11 (Nev. 2001)); *Goodheart v. Casey*, 565 A.2d 757, 764 (Pa. 1989) ("Where disqualification is raised before the Court and the merit of the motion obvious, the remaining Justices have the duty to request that Justice to accede to the recusal request."); *In re Inquiry Concerning a Judge*, 81 P.3d 758, 761 (Utah 2003) (per curiam) (court denied motion to disqualify a justice from judicial disciplinary proceedings because the facts "do not create a reasonable basis for questioning [his] impartiality . . . ;" challenged justice did not participate in reviewing the motion).

[41] *See, e.g.*, John P. Frank, *Disqualification of Judges*, Yale L.J. 605, 612 (1947).

[42] *Trustees Internal Improvement Fund v. Bailey*, 10 Fla. 213, 1863 WL 1012, *5 (1863).

tent.[43] In *In re Estate of Carlton*, 378 So. 2d 1212, 1216–17 (Fla. 1979), the Court "receded" from earlier cases and adopted what it called the "modern" view that each justice must determine for himself both the legal sufficiency of a request seeking his disqualification and the propriety of withdrawing in any particular circumstances. The selection of different practices at different times makes clear that it is a choice made by the court for prudential reasons, not for lack of jurisdiction.

¶ 176. In 1927, the Supreme Court of Oklahoma disqualified two of its own justices from participating in a contempt proceeding in which the lawyer argued the justices were biased against him. The Oklahoma Supreme Court flatly rejected the argument of the two challenged justices that they should be "the sole and only judges of their own qualifications, and that, if they abuse this discretion . . . the only remedy is by a proceeding for impeachment."[44]

¶ 177. The Oklahoma Supreme Court concluded that under the state constitution and laws (which are substantially similar to those in Wisconsin), the court had the power and authority, when the question was properly presented, to disqualify any one or more of its members. When "it was provided what constitutes disqualification for justices of the Supreme Court, but no provision was made under the law as to how or in what manner the question of disqualification was to be determined . . . the question should be determined by the court the same way as any other question properly before it . . . ."[45]

---

[43] *In re Estate of Carlton*, 378 So. 2d 1212, 1216 (Fla. 1979)

[44] *State ex rel. Short v. Martin*, 256 P. 681, 685 (Okla. 1927).

[45] *State ex rel. Short v. Martin*, 256 P. 681, 687 (Okla. 1927) (reviewing numerous cases; the two challenged justices participated and dissented).

¶ 178. Some state supreme courts have promulgated rules of procedure for supreme court review of the disqualification of a justice by the court.

¶ 179. Most recently, in November 2009, the Michigan Supreme Court discarded its past practice that individual justices alone respond to motions to recuse,[46] without review. The Michigan Supreme Court has now adopted a rule stating that if a justice's participation in a case is challenged, the challenged justice shall decide the issue and publish his or her reasoning for the decision. If the challenged justice denies the motion for disqualification, then upon a party's motion to the court the entire court shall decide the motion for disqualification and explain the reasons for its grant or denial of the motion for disqualification.[47]

¶ 180. Texas Rule of Appellate Procedure 16.3, promulgated by the Supreme Court of Texas, requires that an appellate judge or justice faced with a motion to recuse must either individually grant the motion or

[46] *See Fidelity Ins. & Guar. Co. v. Mich. Catastrophic Claims Ass'n,* 773 N.W.2d 243 (Mich. 2009); *Adair v. State Dep't of Ed.,* 709 N.W.2d 567 (Mich. 2006).

A pre-*Caperton* 42 U.S.C. § 1983 constitutional challenge to Michigan's recusal practice allowing recusal in the sole discretion of the challenged justice was dismissed by a federal court for failure to state a claim upon which relief may be granted. *Fieger v. Ferry,* 2007 WL 2827801 (E.D. Mich. 2007).

[47] *See* Michigan Supreme Court, Amendment of Rule 2.003, ADM File No. 2009–04, effective Nov. 25, 2009, available at http://courts.michigan.gov/SUPREMECOURT/Resources/Administrative/2009–04–112509.pdf. Although the newly adopted rule itself is not long, the order adopting it includes many pages of concurring and dissenting opinions, with attachments, sharply debating the merits of the change.

certify the matter to the entire court for en banc consideration. The challenged judge or justice must not participate in the court's decision on the motion. Tex. Rules App. Proc. Rule 16.3.

¶ 181. The Vermont Supreme Court adopted Rules of Appellate Procedure modeled on the Texas rule to provide that a justice faced with a disqualification motion must either disqualify himself or herself or certify the matter to the other members of the Court for decision. The challenged justice may not sit to consider the motion. Vt. Rules of App. Proc. Rule 31(e)(2). This rule supersedes the prior practice that an individual justice rules on a motion to recuse.[48]

¶ 182. The Vermont court promulgated its rule on an emergency basis in 1987 without resort to the customary procedures for notice and comment because of the large number of pending motions to disqualify and the fact that the "existing appellate rules and Code [did] not provide suitable and adequate procedures for ruling upon motions to disqualify." Reporter's Notes to Vt. Rules of App. Proc. Rule 31(e)(2)—1987 Emergency Amendment.

¶ 183. In other states, statutes set forth a procedure for the supreme court to review a justice's disqualification. For example, a Nevada statute provides that the Supreme Court of Nevada sits—without the participation of the challenged justice—to determine whether alleged bias or other grounds require the disqualification of one of its members. Nev. Rev. Stat. Ann. § 1.225(4) (2009).

---

[48] *See State v. Hunt,* 527 A.2d 223, 224 (Vt. 1987) ("For 200 years our law has dictated that each individual judge decide according to the dictates of conscience the issue of his or her ability to sit impartially in judgment.").

¶ 184. In several states, the historic practice appears to be for an individual justice of the supreme court to decide a motion for his or her recusal without decision or formal review by the other members of the court.[49]

---

[49] *See, e.g., Stilley v. James,* 53 S.W.3d 524 (Ark. 2001) (motion to disqualify all justices; "each justice individually declines to disqualify"); *In re Estate of Carlton,* 378 So. 2d 1212, 1216–1217 (Fla. 1979) (each justice must determine for himself both the legal sufficiency of a request seeking his disqualification and the propriety of withdrawing in any particular circumstances); *People v. Wilson,* 497 N.E.2d 302, 303–04 (Ill. 1986) (Simon, J.) (Justice Simon individually recusing himself "to avoid the appearance of impropriety"; "I reject the suggestion advanced by the State's Attorney . . . that my colleagues have the authority to disqualify me. . . . I also reject the suggestion that my colleagues have the authority to order me to participate."); *Peterson v. Borst,* 784 N.E.2d 934 (Ind. 2003) (Boehm, J.) (individually denying recusal motion; explaining nonrecusal, applying "reasonable objective person" analysis); *Dean v. Bondurant,* 193 S.W.3d 744, 746 (Ky. 2006) (Roach, J.) (individually granting recusal motion; "the decision to recuse should not be made lightly by a Kentucky Supreme Court Justice."); *In re modification of Canon 3A(7) of the Minnesota Code of Judicial Conduct,* 438 N.W.2d 95 (Minn. 1989) (motion addressed to court to remove the chief justice from participation; court memorandum states: "[W]e have declined to rule on this motion and instead we refer the matter to Chief Justice Popovich individually for decision."); *In re Waltemade,* 1974 N.Y. LEXIS 1851 (N.Y. Ct. on the Judiciary 1974) (court dismisses motion to recuse chief judge of court of appeals; "the practice of the Court is for the individual Judge to decide the question; Chief Judge denied the motion); *Noriega Rodriguez v. Rafael Hernandez Colon,* 120 D.P.R. 267, 20 P.R. Offic. Trans. 285, 296 (P.R. 1988) (considering different approaches and adopting individual decision of a justice as a prudential matter); *Cohen v. Manchin,* 336 S.E.2d 171, 175–76 (W. Va. 1984) (challenged justice declined to recuse himself; court concluded that "where

¶ 185. None of these observations regarding the history and the recusal practices of the state supreme courts provides a reason for this court to depart from its established practice of reviewing an individual justice's decision not to disqualify himself or herself. Those high courts which have, in the past, chosen not to review the

a motion is made to disqualify or recuse an individual justice of this Court, that question is to be decided by the challenged justice and not by the other members of this Court.").

In *Bradbury v. Idaho Judicial Council,* No. 36175, ___ P. 3d ___, 2009 WL 2882874 (Idaho Sept. 10, 2009), a trial court judge moved to disqualify four of the five justices of the Idaho Supreme Court, presiding over a disciplinary case. The Chief Justice recused himself, and the remaining four justices denied the disqualification motions filed against them; they held against the trial court judge on the merits. Although observing that disqualification is left "to the sound discretion of the judicial officer himself," *id.* at *5, the opinion issued by all four justices reviewed the disqualification claims. This opinion can be interpreted to mean that the four justices were joining individually in collectively denying the motion to recuse. (Kidwell, J., dissenting on grounds other than disqualification).

For justices' various viewpoints regarding the question whether the Mississippi Supreme Court may remove a sitting justice over his objection from considering a case, see *Tighe v. Crosthwait,* 665 So. 2d 1341 (Miss. 1995). Because the justice eventually recused himself, the issue became moot. In a later case, on a motion to disqualify five of the nine justices (including the chief justice), because of the "importance of the issue," the challenged "justices have submitted the motion and those filed in other cases to the en banc conference for consideration by the full Court." *See Washington Mut. Finance Group v. Blackmon,* 925 So. 2d 780, 783, 797 (Miss. 2004), in which the Chief Justice wrote "for the court" holding that the motion is without merit and should be denied as to each of the justices. The other four challenged justices concurred in the decision. The *Tighe* decision is not mentioned.

recusal decisions of individual justices must now contend with how they will guarantee due process in the wake of *Caperton.* In Wisconsin we should stay the course.

¶ 186. N. PATRICK CROOKS, J. *(concurring).* I have not voted to deny or to grant these motions, nor has Chief Justice Abrahamson or Justice Bradley. I agree with them that a denial is clearly inappropriate now. These motions deserve full briefing and oral arguments.[1] Applying law to facts, after briefing and argument, is the job that Wisconsin Supreme Court justices were elected to do, and this court should do it.

¶ 187. The circumstances surrounding this matter have changed in significant ways. After reviewing the allegations and the relevant case law, I was initially ready, in the early stages of the matter, to deny the motion directed to the court to require Justice Gableman's recusal. My initial position was based on my understanding at that time that the reasoning of the majority of the court would address the petitioner's arguments concerning *Caperton,* and that the reasoning would be set forth in a denial order. I expected that the court would take the position that we had jurisdiction or power to consider the matter fully. My initial position was also based on the allegations in the initial motion having to do with campaign statements. I expected I would be voting with the majority of the justices in denying the motion. As it turns out, my expectation could not be realized.

¶ 188. I write separately to express my consternation, first, that three justices refuse to address adequately the very serious issues raised by these motions. Because they take the position that the court has

---

[1] Chief Justice Abrahamson's writing, ¶¶ 116, 125–127.

no power to do what Allen asks, their writings dodge the analysis that could be undertaken to distinguish Allen's due process claim from that of the litigant in *Caperton*[2]—analysis that is essential to the disposition of this matter.[3] The writings by Justices Roggensack and Prosser, thus, essentially treat the due process claim as nonjusticiable. That was the approach of Justice Scalia's dissent[4] regarding the due process claim presented in *Caperton*. On matters of United States constitutional law, this court is bound by the holding of the majority of the United States Supreme Court. Further, whatever *Caperton* may or may not mean, it at least is clear that a justice's subjective determination that he or she can be impartial is no longer enough:

> The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real mo-

---

[2] *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2265 (2009) (reversing a judgment of the Supreme Court of Appeals of West Virginia on the grounds that the Due Process Clause of the Fourteenth Amendment to the United States Constitution was violated when a justice in the majority participated in the case when objective standards required recusal).

[3] Like Justice Ziegler, I would have this court interpret and examine the applicability of the *Caperton* decision, though I would have this court order briefing and oral argument before doing so, and Justice Ziegler would not. See Justice Ziegler's writing, ¶ 271.

[4] *Caperton*, 129 S. Ct. at 2275 (Scalia, J., dissenting) ("The Court today continues its quixotic quest to right all wrongs and repair all imperfections through the Constitution. Alas, the quest cannot succeed—which is why some wrongs and imperfections have been called nonjusticiable.").

tives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review . . . .

*Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2263 (2009). Thus, "[i]n lieu of exclusive reliance on that personal inquiry," an analysis of a claimed Due Process Clause violation considers "objective standards that do not require proof of actual bias." *Id.* It is highly significant that in reaching the decision that recusal was required in the *Caperton* case, the United States Supreme Court stated directly, "We do not question [Justice Benjamin's] subjective findings of impartiality and propriety." Nor do we determine whether there was actual bias." *Id.* It is therefore abundantly clear that a determination that a subjective finding was made by a justice—a determination that Justices Prosser, Roggensack, and Ziegler make in Part II.B.—simply cannot be dispositive.

¶ 189. Second, without briefing and without discussion of the supplemental filings, which have not been taken up by the court, this motion has been disposed of without a thorough airing of most of the issues.[5] The supporting material in the supplemental

---

[5] A supplemental filing providing additional authorities was filed August 13, 2009. A supplemental motion filed September 21, 2009, directed to the court as a whole, seeks review of Justice Gableman's individual denial of the motion for recusal on statutory and ethical grounds, and alleges that he did not make the determination required by Wis. Stat. § 757.19(2)(g), which mandates a justice's disqualification when in fact or in appearance, the justice cannot act in an impartial manner. A second supplement to the motion was filed December 11, 2009, and it summarizes the reasons for the new filing thus:

This supplement is necessary because (1) the Court has not ruled on the parties' joint position that full briefing is necessary to

462

filing of September 21, 2009, is particularly troubling. It details public statements made by Justice Gableman's attorney before a three-judge panel of the court of appeals, and at a press conference thereafter.[6] These statements, made on Justice Gableman's behalf to explain his campaign strategy against an opponent, startled and appalled many in the legal community. The statements have changed this case drastically for several reasons. While Justice Gableman has recently publicly pledged to treat all persons fairly, including defendants in criminal cases, he has not repudiated any of the public statements made by his attorney, even those made at the press conference. The statements made at the press conference included one attacking the opponent as a public defender for being "willing to represent" a person accused of a sex crime against a

resolve the important issues presented in Mr. Allen's motion, (2) inclusion of other recent developments following the filing of Allen's original and supplemental motions are necessary to complete the record, especially should this matter have to go to federal court, and (3) recent statements by certain members of the Court reflect a serious misunderstanding of the possible relevance of the First Amendment to the issues of recusal raised in Allen's motion.

[6] The statements made before the panel as part of a hearing on an ethics complaint brought by the Wisconsin Judicial Commission included statements that deliberately conflated the roles of a justice and a public defender. They included statements that Justice Gableman's opponent was "willing to find a loophole, whatever result that manifests," even for a defendant who was "evil," and that the message of a campaign ad was, "[T]his guy is willing to find a loophole for such an evil person, do we really want him on the State Supreme Court if that's his mindset?" In the matter of Judicial Disciplinary Proceedings Against the Honorable Michael J. Gableman, Wisconsin Judicial Commission v. Hon. Michael J. Gableman, No. 2008AP2458–J, slip op. at 18 (2009) (Deininger, J., concurring) (quoting Tr. of Oral Argument).

child and characterizing that representation as "willingness to subvert our system of . . . bringing criminals into account." Those statements dramatically misrepresent the role of attorneys in the criminal justice system and, as the most recent filing by Allen, dated December 11, 2009, indicates, the statements have drawn a response from the Wisconsin State Bar Board of Governors. The Board unanimously adopted, by a vote of 43–0, a public policy position originally proposed by the Criminal Law Section of the State Bar, composed of both prosecutors and defense counsel, as well as judges, that reiterates the necessity of "vigorous representation for all criminal defendants," in order to maintain the integrity of the justice system.[7]

¶ 190. Justice Gableman informed the members of the court, on February 4, 2010, that he was withdrawing from participation in the court's consideration of the recusal issue; his decision to do so recognizes the bedrock principle of law that predates the American justice system by more than a century—that "no man is allowed to be a judge in his own cause"—a principle recently repeated by Justice Anthony Kennedy, writing for a majority of the United States Supreme Court in the *Caperton* case.[8] I commend him for his withdrawal decision.

---

[7] The full text of the position can be found at the web site of the Wisconsin Bar Association (http://www.wisbar.org/AM/Template.cfm?Section=News&Template=/CM/ContentDisplay.cfm&ContentID=88343).

[8] *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2265 (2009) (reversing a judgment of the Supreme Court of Appeals of West Virginia on the grounds that the Due Process Clause of the Fourteenth Amendment to the United States Constitution was violated when a justice in the majority participated in the case when objective standards required recusal).

¶ 191. The record now before the court contains serious allegations, some of which go well beyond campaign speech. Given the allegations that have been presented to the court, especially the evidence detailed in the supplemental motion, I believe this court has no choice but to exercise its power to address these motions on the merits.

¶ 192. Though, as noted above, I initially expected to vote to deny Allen's motion, I cannot join any opinion that is based on the premise that the court simply has no power to entertain the motion. Further, I cannot join any disposition of Allen's motions that fails to recognize and deal with the fact that *Caperton* requires, at a minimum, a new look at our interpretation of the recusal statute. I join Chief Justice Abrahamson and Justice Bradley, and I write separately for the reasons given and because of my concern for the institution of the Wisconsin court system—an institution that exists, not for its own sake, but for the purpose of protecting the constitutional rights and liberties of Wisconsin citizens.

¶ 193. For the foregoing reasons, I concur.

¶ 194. PATIENCE DRAKE ROGGENSACK, J. Aaron Antonio Allen (Allen) moves the court for an order disqualifying Justice Michael Gableman from further participation in these proceedings after the entire court, including Justice Gableman, acted to accept Allen's petition for review. Allen bases his motion on the due process clauses of the Fourteenth Amendment of the United States Constitution and Article I, Sections 1 and 8 of the Wisconsin Constitution.

¶ 195. Allen's motion assumes that a majority of this court has the power to disqualify a fellow justice from participation in a pending matter. This assump-

tion presents a question for the entire court because each justice is equally affected by whether we conclude that a majority of the court has the power to disqualify a fellow justice.

¶ 196. Our decision on this issue does not depend on the factual context in which it arises, i.e., the issue would be the same if the motion to disqualify were directed at any justice. This is so because the vote of each justice on the scope of the court's power in regard to preventing a judicial peer from fully performing his or her elected office affects every justice on the court, in this case and in future cases as well. Therefore, if one justice were disqualified from participating in the decision on whether four justices may disqualify a fellow justice from fully performing his or her elected office, all justices would be disqualified from participating because all are equally affected by our decision on this issue.

¶ 197. For the reasons set forth in Section II.A., we conclude that a majority of the Wisconsin Supreme Court does not have the power to disqualify a fellow justice from fully performing his or her elected office as a justice of the Wisconsin Supreme Court. Justices David T. Prosser, Patience Drake Roggensack and Annette Kingsland Ziegler join the conclusions above and Section II.A. of this opinion. Justice Michael J. Gableman chose to withdraw from participation in Section II.A., even though United States Supreme Court Justices do not recuse themselves from similar motions. United States Supreme Court Justices at whom disqualification motions are directed participate in the decisions on such motions.[1]

---

[1] *See infra* ¶ 26, notes 11–12.

¶ 198. In addition, Allen moves the court, pursuant to Wis. Stat. § 757.19(2)(g) (2007–08),[2] for an order disqualifying Justice Gableman from participating in the consideration of this matter, alleging that he is disqualified by law from participation.

¶ 199. We conclude in Section II.B. that Allen's motion is legally insufficient to state a claim cognizable under the due process clauses of the federal and state constitutions and that Justice Gableman fully performed his responsibilities under Wis. Stat. § 757.19(2)(g). Accordingly, we vote to deny Allen's motion to disqualify Justice Gableman. Justices David T. Prosser, Patience Drake Roggensack and Annette Kingsland Ziegler join in this decision. Justice Michael J. Gableman has never participated in the decision set out in Section II.B.

¶ 200. Chief Justice Abrahamson, Justice Bradley and Justice Crooks decide that they have the power to disqualify another duly elected justice from participation in a pending matter if they think he or she should be removed. *See* Chief Justice Abrahamson, Justice Bradley and Justice Crooks's writing [hereinafter Abrahamson, C.J.'s writing], passim. However, they do not decide Allen's motion, preferring to have briefing and oral argument before they do so. *Id.*

## I. BACKGROUND

¶ 201. Allen has filed one motion to Justice Gableman individually and two motions to the court as a whole, seeking to disqualify Justice Gableman from further participation in this proceeding. Allen's first motion was filed on April 17, 2009. Allen claims that

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

Justice Gableman's continued participation violates his rights under the due process clauses of the Fourteenth Amendment of the United States Constitution and Article I, Sections 1 and 8 of the Wisconsin Constitution and that Justice Gableman is disqualified by law, pursuant to Wis. Stat. § 757.19(2)(g), from further participation.

¶ 202. Allen bases his disqualification motions, to the court as a whole and to Justice Gableman individually, on campaign speech by Justice Gableman, campaign speech by his campaign committee and its spokesman and campaign speech by independent third parties during the course of Justice Gableman's 2008 campaign. Allen also objects to comments Justice Gableman's defense counsel made. Allen alleges that the campaign speech and defense counsel's speech evidence bias and the appearance of bias by Justice Gableman against all defendants in criminal proceedings.

¶ 203. On September 10, 2009, Justice Gableman addressed Allen's motion that was directed to him individually. He issued a written order denying Allen's motion for his disqualification based on Allen's assertion that Justice Gableman was disqualified by law, pursuant to Wis. Stat. § 757.19(2)(g), from participating in this proceeding, and that Justice Gableman's continued participation denied him due process of law.[3] Justice Gableman's September 10, 2009, order was followed by a Supplemental Motion for Recusal in which Allen requested the entire court to "determine whether [Justice Gableman] actually made the determination required by Wis. Stat. § 757.19(2)(g)."

---

[3] Justice Gableman further explained his reasons for denying Allen's motions in a supplemental order issued January 15, 2010.

## II. DISCUSSION

### A. Whether Four Justices Have the Power to Disqualify a Fellow Justice

¶ 204. One part of this proceeding involves a motion that four justices disqualify a fellow justice from further participation. That motion is based on sweeping allegations that campaign speech, including multiple radio and television commercials by the justice's campaign committee and independent third parties, as well as statements by defense counsel,[4] are all attributable to a justice and that this "speech" evidences bias and the appearance of bias against all defendants in criminal proceedings. Allen alleges he would be denied due process of law under the Fourteenth Amendment to the United States Constitution and Article I, Sections 1 and 8 of the Wisconsin Constitution if that justice participates in this proceeding.

¶ 205. Allen makes no allegation that Justice Gableman is biased against him personally, that he has had any past involvement in or knowledge of Allen's case, or that he has any stated position toward the issues that Allen has presented in this case. In short, Allen's motion effectively seeks disqualification of a justice in all criminal cases on grounds of alleged bias against all criminal defendants.

¶ 206. Whether four justices have the power to disqualify a fellow justice from fully performing his or her elected office is a question that the entire court

---

[4] Justice Crooks finds fault with Justice Gableman's silence in regard to statements his attorney is alleged to have made. Justice Crooks's dissent, ¶ 189. However, as Justice Crooks surely knows, Justice Gableman is involved in pending litigation and it is not uncommon for a party to refrain from comment at such a time.

469

ought to address in advance of deciding Allen's motions directed at Justice Gableman. A decision on this issue is necessarily for the entire court because we have never decided this question and each justice on the court is equally affected by whether we conclude that a majority of the court has the power to disqualify a fellow justice. Our decision on this issue does not depend on the factual context in which it arises, i.e., the issue would be the same if the motion to disqualify were directed at any justice. This is so because the vote of each justice on the scope of the court's power in regard to preventing a judicial peer from fully performing his or her elected office affects every justice on the court, in this case and in all future cases as well. Therefore, if one justice were required to disqualify himself or herself from consideration of so important a question, every justice would be required to disqualify himself or herself.

¶ 207. We conclude that a majority of the justices on this court do not have the power to disqualify a fellow justice from participation in a proceeding before this court.[5] Our decision is supported by the past practices of this court and by the past, and current, practices of the United States Supreme Court.

¶ 208. While our past practices do not establish precedent, we note that in all past decisions of this court, when the justice against whom a disqualification motion was made was capable of deciding the motion, our review has been limited to whether that individual justice made the determination that the motion required. In such cases, "[t]he reviewing court [] objec-

[5] The Wisconsin Constitution establishes a Wisconsin Supreme Court consisting of seven co-equal justices. Wis. Const. art. VII, § 4(1). The Constitution does not grant any particular justice or group of justices power over a judicial peer with respect to whether he or she may hear a particular case.

tively decide[s] if the judge went through the required exercise of making a subjective determination. . . . This is all that is required." *Donohoo v. Action Wis., Inc.,* 2008 WI 110, ¶¶ 24–25, 314 Wis. 2d 510, 754 N.W.2d 480 (concluding that Justice Butler, himself, decided that he could be impartial);[6] *see also Jackson v. Benson,* 2002 WI 14, ¶ 2, 249 Wis. 2d 681, 639 N.W.2d 545 (concluding that the motion to vacate an opinion in which Justice Wilcox participated was frivolous due to the inordinate delay); *City of Edgerton v. Gen. Cas. Co. of Wis.,* 190 Wis. 2d 510, 521–22, 527 N.W.2d 305 (1995) (concluding that Justice Geske's disclosure in open court that she would be impartial despite the nature of her husband's employer showed she, herself, made the required subjective determination); *State v. Am. TV & Appliance of Madison, Inc.,* 151 Wis. 2d 175, 183, 443 N.W.2d 662 (1989) (concluding that once Justice Bablitch, himself, decided that he could be impartial, he was not disqualified by law from participating in the proceeding).

¶ 209. The rationale in those cases is consistent, but *Donohoo, Jackson, City of Edgerton* and *American TV* do not address the broader issue that affects each justice equally, with which we are concerned in Section II.A. That is, does a majority of the justices on this court have the power to prevent a sitting justice from fully participating in the work of his or her elected office.

---

[6] Abrahamson, C.J.'s writing implies that in *Donohoo v. Action Wis., Inc.,* 2008 WI 110, 314 Wis. 2d 510, 754 N.W.2d 480, the court reviewed the merits of whether a justice ought to have disqualified himself. Abrahamson, C.J.'s writing, ¶ 42. That is incorrect because the court did not decide whether Justice Butler correctly concluded that he could be impartial. The court decided *only* that "*Justice Butler clearly determined that he* could be impartial." *Donohoo,* 314 Wis. 2d 510, ¶ 25 (emphasis added).

¶ 210. In *Donohoo, Jackson, City of Edgerton* and *American TV,* the motions seeking disqualification of a justice came after the court had issued its decision in a pending case. However, as with Allen's motion, *In re Disciplinary Proceedings Against Crosetto,* 160 Wis. 2d 581, 466 N.W.2d 879 (1991), disqualification was sought before the court issued its decision. In *Crosetto,* the Wisconsin Supreme Court addressed whether all justices ought to be disqualified from participation. Crosetto's motion for disqualification alleged that each justice had a personal interest in the disciplinary proceeding because of Crosetto's personal criticisms of the justices in an ancillary proceeding. *Id.* at 584. Crosetto based his motion for disqualification on the appearance of a lack of impartiality. *Id.* He cited Wis. Stat. § 757.19(2), and he also cited the due process clauses of the federal and state constitutions as legal bases for his motion. *Id.* at 583.

¶ 211. Six justices on this court did not convene to decide whether a seventh justice could participate in the decision in *Crosetto.* Instead, each justice of the court decided Crosetto's due process motion for himself or herself.[7] As the court explained:

> The members of this court, *individually,* have determined that none has a significant personal interest in the outcome of this disciplinary proceeding such as would require our disqualification. Each is satisfied that his *or her* impartiality in this proceeding is unimpaired and, further, that our acting in this matter does not create the appearance of a lack of impartiality.

*Id.* at 584 (emphasis added).

---

[7] Chief Justice Abrahamson is the only justice now serving on the Wisconsin Supreme Court who was also a member of the Wisconsin Supreme Court when *In re Disciplinary Proceedings Against Crosetto,* 160 Wis. 2d 581, 466 N.W.2d 879 (1991), was decided.

¶ 212. Chief Justice Abrahamson, who was a member of the court that decided Crosetto's motion, did not disqualify herself or request that the other justices decide Crosetto's due process challenge for her. Instead, *she individually decided for herself* that she was not disqualified from further participation by the due process clauses of the federal and state constitutions or by Wis. Stat. § 757.19(2).[8] *Id.* She also wrote a separate opinion that dissented from the discipline imposed and addressed whether a justice should apply a subjective or an objective standard to Crosetto's motion for disqualification. *Id.* at 602–03 (Abrahamson, J., dissenting). The issue of whether someone other than then-Justice Abrahamson should decide whether she should be disqualified was never mentioned in her separate opinion.

¶ 213. However, now that the disqualification motion is not directed at her, Abrahamson, C.J.'s writing argues that four justices of this court have the power to disqualify another justice from participation. Abrahamson, C.J.'s writing, ¶ 34. This position is in direct conflict with the action that she took on her own behalf in *Crosetto*. She cites *Case v. Hoffman,* 100 Wis. 314, 74 N.W. 220 (1898), in support of her contention. Abrahamson, C.J.'s writing, ¶¶ 39–41. However, *Case* does not support the position she takes.

---

[8] Abrahamson, C.J.'s writing above attempts to divert attention from a comparison of then-Justice Abrahamson's acts in *Crosetto* with her current position by asserting that she "did not join" the per curiam opinion. Abrahamson, C.J.'s writing, ¶ 10 n.2. This is not a forthright statement to the reader. Chief Justice Abrahamson, then-Justice Abrahamson, was the only woman justice when *Crosetto* was decided. Therefore, the statement in the per curiam that "*her impartiality* in this proceeding is unimpaired" must refer to the decision of then-Justice Abrahamson.

¶ 214. *Case* arose in a very interesting context because Justice Newman, for whom disqualification was sought, was dead when the court took up the motion. *Case,* 100 Wis. at 354. Justice Newman had previously participated in the decision, but he had never ruled on the disqualification motion. *Id.* Therefore, the remaining justices had to decide it, as Justice Newman obviously could not. Accordingly, *Case* is not support for this court to determine that a majority of the justices have the power to disqualify a justice from participating in a proceeding before the court.

¶ 215. It is imperative to note that *Case* was published long before then-Justice Abrahamson's decision in *Crosetto.* Therefore, if Chief Justice Abrahamson truly understood *Case*'s holding to require the court to act in the manner that she now urges, she would have acted differently in *Crosetto.* The reader should note that despite more than 50 pages of narration and a voluminous appendix, Abrahamson, C.J.'s writing fails to mention any reason for Chief Justice Abrahamson's change of position, now that it is not she, but rather, a different justice, who is the subject of a disqualification motion.

¶ 216. Abrahamson, C.J.'s writing also cites *State v. Carprue,* 2004 WI 111, 274 Wis. 2d 656, 683 N.W.2d 31, as support for the power of four justices to disqualify another justice. Abrahamson, C.J.'s writing, ¶ 86 n.54. *Carprue* does not support their position. *Carprue* involved a claim that a circuit court judge should have disqualified herself. *Carprue* confirmed that a judge's decision about disqualification is "up to the judge's own determination. This provision 'leaves the responsibility of withdrawal to the integrity of the individual judge.' " *Carprue,* 274 Wis. 2d 656, ¶ 61 (quoting *State v. Harrell,* 199 Wis. 2d 654, 665, 546 N.W.2d 115 (1996)).

¶ 217. Furthermore, it is a vastly different matter for this court to review whether a circuit court judge

474

should have participated in a proceeding at the circuit court than it is to conclude that the majority of this court has the power to disqualify a fellow justice from participation in a pending matter. When a circuit court judge is disqualified from participating in a proceeding, another circuit court judge takes his or her place. However, when a supreme court justice is disqualified, no other person can take his or her place.[9]

¶ 218. The critical nature of a justice's decision on a motion for disqualification was explained by United States Supreme Court Justice Ruth Bader Ginsburg in the context of the question of disqualification of a Supreme Court Justice. She said, "Because there's no substitute for a Supreme Court Justice, it is important that we not lightly [disqualify] ourselves." Ruth Bader Ginsburg, *The Day, Berry & Howard Visiting Scholar: An Open Discussion with Ruth Bader Ginsburg,* 36 Conn. L. Rev. 1033, 1039 (2004).

¶ 219. The Wisconsin Supreme Court's history of requiring the justice who is the focus of a disqualification motion to decide the motion is consistent with the precedent of the United States Supreme Court.[10] When a motion is made to disqualify a justice of the United

[9] Abrahamson, C.J.'s writing extensively relies on judicial disqualification opinions regarding circuit court judges, without informing the reader that the judge who was the focus of the motion was a circuit court judge and without pointing out the difference between our disqualifying a circuit court judge as compared with disqualifying a judicial peer. *See* discussions of *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 235 N.W.2d 409 (1975); *State v. Harrell,* 199 Wis. 2d 654, 546 N.W.2d 115 (1996); *State v. Walberg,* 109 Wis. 2d 96, 325 N.W.2d 687 (1982). Abrahamson, C.J.'s writing, passim.

[10] In a 2004 interview, United States Supreme Court Justice Ruth Bader Ginsburg clearly explained that the decision about

States Supreme Court, either the justice for whom disqualification is sought addresses the motion individually, *e.g., Cheney v. United States District Court for the District of Columbia,* 541 U.S. 913 (2004)[11] (Justice Scalia sitting individually in response to the Sierra Club's motion to disqualify him), or, less frequently, the entire Supreme Court, including the justice for whom recusal is sought, issues a one sentence denial of the motion for disqualification, *e.g., Ernest v. United States Attorney for the Southern District of Alabama,* 474 U.S. 1016 (1985).[12]

¶ 220. The United States Supreme Court has *never held* that a majority of that Court has the power to disqualify a judicial peer, i.e., a duly appointed and confirmed United States Supreme Court Justice, from participating in any case to come before the Court because of an allegation that the justice at whom the

---

whether a Supreme Court Justice is disqualified from participation in a proceeding is always made by the individual justice. Ruth Bader Ginsburg, *The Day, Berry & Howard Visiting Scholar: An Open Discussion with Ruth Bader Ginsburg,* 36 Conn. L. Rev. 1033, 1039 (2004).

[11] *See also Microsoft Corp. v. United States,* 530 U.S. 1301 (2000) (wherein Justice Rehnquist responded denying a motion for his disqualification); *Hanrahan v. Hampton,* 446 U.S. 1301 (1980) (Justice Rehnquist denying a motion for his disqualification); *Laird v. Tatum,* 409 U.S. 901 (1972) (Justice Rehnquist denying a motion for his disqualification); *Gravel v. United States,* 409 U.S. 902 (1972) (Justice Rehnquist denying a motion for his disqualification); *Guy v. United States,* 409 U.S. 896 (1972) (Justice Blackmun and Justice Rehnquist individually denying motions requesting disqualification of each justice).

[12] *See also Kerpelman v. Attorney Grievance Comm'n of Md.,* 450 U.S. 970 (1981) (summary denial of motion to disqualify Chief Justice Burger); *Serzysko v. Chase Manhattan Bank,* 409 U.S. 1029 (1972) (summary denial of motions to disqualify Justice Powell and Justice Rehnquist).

motion was directed was not impartial.[13] As Justice Robert Jackson explained, "[t]here is no authority known to me under which a majority of this Court has power under any circumstances to exclude one of its duly commissioned Justices from sitting or voting in any case." *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.,* 325 U.S. 897, 897 (1945) (Jackson, J., concurring).

¶ 221. Similarly, in the more than 150 years that the Wisconsin Supreme Court has served the people of Wisconsin, it consistently has followed the practice of the United States Supreme Court in regard to disqualification of a judicial peer.

¶ 222. Allen cites *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. ___, 129 S. Ct. 2252 (2009), as support for his assertion that a majority of this court should disqualify a judicial peer. *Caperton* has no relevance here. First, the United States Supreme Court was not considering the disqualification of a judicial peer in *Caperton;* rather, it was considering the disqualification of a state court justice. Second, the state court justice did decide all motions for his disqualification; other

---

[13] In 1975, after Justice William O. Douglas suffered a serious stroke that left him severely compromised, seven of the remaining justices decided not to assign Justice Douglas any more opinions to write. However, *they did not disqualify* Justice Douglas from all further participation in Court proceedings, even in his very compromised condition. *He was not forced off any case. See* David J. Garrow, *Mental Decrepitude on the U.S. Supreme Court: The Historical Case for a 28th Amendment,* 67 U. Chi. L. Rev. 995 (2000). The action taken regarding Justice Douglas has nothing to do with whether four justices can disqualify a fully competent member of this court from a pending proceeding. Abrahamson, C.J.'s writing's description of the actions taken by the United States Supreme Court after Justice Douglas had suffered a stroke is not accurate. *See* Abrahamson, C.J.'s writing, ¶ 62, Appendix B, ¶¶ 161–62.

state court justices did not decide them, even though they voiced their opposition to his decisions.

¶ 223. Abrahamson, C.J.'s writing also asserts that a federal constitutional claim must be addressed and that a state constitutional claim must have a remedy. The writing then assumes that a majority of the court must decide those claims. Abrahamson, C.J.'s writing, ¶ 46, ¶ 47 n.22. We agree that constitutional questions properly presented should be addressed and that providing a remedy for meritorious claims is important. However, addressing claims and providing a remedy do not require that a majority of the court have the power to disqualify a fellow justice from court proceedings. Constitutional claims, both federal and state, are addressed by the individual justice against whom the allegations were made, just as they were in *Crosetto,* when then-Justice Abrahamson decided for herself whether the allegations that the due process clauses of the federal and state constitutions required her disqualification. *Crosetto,* 160 Wis. 2d at 584. As the opinion she joined stated, "Each is satisfied that his *or her impartiality* in this proceeding is unimpaired and, further, that our acting in this matter does not create the appearance of a lack of impartiality." *Id.* (emphasis added).[14]

¶ 224. Chief Justice Abrahamson, Justice Bradley and Justice Crooks contend that four justices of this court have the power to remove another justice under our superintending powers. Abrahamson, C.J.'s writing, ¶ 48. There is a process by which a justice may be removed from the court, but only with due process

---

[14] Chief Justice Abrahamson, then-Justice Abrahamson, was the only woman justice on the Wisconsin Supreme Court when *Crosetto* was decided. Therefore, she did decide, for herself, Crosetto's motion to disqualify her on the basis of the state and federal due process clauses.

accorded to the justice. All judges and justices accept the constitutional provisions for their removal and the remedies available under the judicial code upon election to the judicial branch of government.[15] However, those bases for removal are a far cry from what Abrahamson, C.J.'s writing is proposing. She asserts that four justices can disqualify a fellow justice based on the allegation that a defendant's due process rights were violated by campaign speech. She accords no substantive standards and no procedural due process. Such a suggestion is shocking.[16]

¶ 225. Finally, Chief Justice Abrahamson, Justice Bradley and Justice Crooks assume that if they have the power to force another justice off a pending case, both an impartial court and the appearance of an impartial court will result. Abrahamson, C.J.'s writing, passim. Their unspoken assumption is based on the

[15] A justice of the Wisconsin Supreme Court can be removed only through impeachment (Wis. Const. art. VII, § 1), defeat in an election (Wis. Const. art. VII, § 4(1) & § 9; Wis. Const. art. XIII, § 12), as part of a disciplinary proceeding by the supreme court for cause or disability (Wis. Const. art. VII, § 11), by address (Wis. Const. art. VII, § 13), or if the legislature were to impose a mandatory retirement age (Wis. Const. art. VII, § 24(2)).

[16] We note Abrahamson, C.J.'s writing's lengthy narration of her version of proposed decisions that she contends were presented in the private meetings of the justices. Abrahamson, C.J.'s writing, ¶¶ 14–19. In the past, we have not publicly discussed what we believed transpired in our private meetings while a case was being considered. We also have not discussed proposed decisions, considering preliminary opinions the confidential work product of the court. We are at a loss to determine why Abrahamson, C.J.'s writing has taken this tack as it adds nothing to the legal reasoning in her opinion. Perhaps it is an attempt to justify Chief Justice Abrahamson's extraordinary delay in permitting the public release of our decision on Allen's recusal motion.

faulty premise that giving four members of the court the power to disqualify a fellow justice will increase the appearance of impartiality of the court.

¶ 226. This is a deeply divided court, at a very philosophical level concerning how a state supreme court should function. The public perception of this court is also deeply divided. Therefore, four justices forcing another justice off the court is just as apt to be perceived as a biased act resulting in a biased tribunal, as is the justice remaining on the case and participating in it after he or she has considered the disqualification motion. What Chief Justice Abrahamson, Justice Bradley and Justice Crooks propose is the opening of Pandora's Box to ever-increasing attempts to manipulate the outcomes in pending matters by changing the composition of the court that will decide the issues presented.

¶ 227. Actual fairness and the appearance of an unbiased tribunal are very important to us, but impartiality will not be furthered by granting four justices the power to prevent another justice from fulfilling his judicial office.

¶ 228. In summary, as is the practice of the United States Supreme Court and has been the practice of this court for more than 150 years, we, who join in this opinion, conclude that a majority of the justices on the Wisconsin Supreme Court do not have the power to disqualify a fellow justice from participation in a proceeding before this court.

¶ 229. Justices David T. Prosser, Patience Drake Roggensack and Annette Kingsland Ziegler join in this opinion.[17]

---

[17] Abrahamson, C.J.'s writing is filled with name-calling directed at the members of the court who have joined in this opinion. Name-calling is not legal reasoning. Name-calling

480

## B. Whether Justice Gableman Made the Required Determination[18]

¶ 230. Motions such as Allen's have institutional impacts on the court as a whole. Such motions with their allegations of bias and the appearance of bias receive significant attention in the mass media and tend to undermine the public's trust and confidence in the impartiality of this court's decisions and in the integrity of all justices, not only the justice at whom the motion is directed. Accordingly, motions to disqualify a justice are never routine matters for the court.

¶ 231. At its heart, Allen's motion is based on the allegation that a judicial candidate's announced concerns for issues bearing on law enforcement is sufficient to violate Allen's constitutional right to due process of law. His motion extensively quotes campaign speech and Justice Gableman's attorney's defense of that speech. However, Allen's allegations do not even begin to approach a due process violation.

¶ 232. Not every pleading that labels itself as a due process challenge actually states such a challenge.[19] Therefore, as a foundational matter, we independently review whether a complaint states a claim upon which relief may be granted. *John Doe 1 v. Archdiocese of Milwaukee,* 2007 WI 95, ¶ 12, 303 Wis. 2d 34, 734 N.W.2d 827. In so doing, we accept the facts set forth in the pleadings as true for purposes of determining the

reflects poorly on the justices who resort to its use and reflects adversely on the dignity of this court as an institution. We have not responded in kind.

[18] Justice Gableman has never participated in the decision set out in Section II.B.

[19] Abrahamson, C.J.'s writing has ignored this basic premise of law.

sufficiency of the pleading. *Id.* However, we do not accept the pleadings' legal conclusions. *Id.*

¶ 233. The United States Supreme Court has explained that due process is violated only when a practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Aetna Life Ins. Co. v. LaVoie,* 475 U.S. 813, 821 (1986). The right to an impartial judge is so rooted in our traditions as to be fundamental, and therefore, it is guaranteed by due process. *State v. Hollingsworth,* 160 Wis. 2d 883, 893, 467 N.W.2d 555 (Ct. App. 1991).

¶ 234. However, the preclusion of bias that is guaranteed by due process to every party is *bias against the specific party who is then before the court* or bias due to the judge's having a *financial interest in the outcome of the particular case then pending. Bracy v. Gramley,* 520 U.S. 899, 904–05 (1997).

¶ 235. This bias of a constitutional nature is not a generalized displeasure with a particular group, when that group is not also a constitutionally protected class. *Aetna,* 475 U.S. at 820–21 (concluding that allegations of a judge's general hostility toward insurance companies does not support the conclusion that such a judge's participation violated due process). The bias Allen alleges is bias against every person who is a defendant in every criminal proceeding; it is not bias against Allen.

¶ 236. Bias also is not a judge's past interpretation of issues that may appear again in a party's pending case. *State v. O'Neill,* 2003 WI App 73, ¶ 16, 261 Wis. 2d 534, 663 N.W.2d 292 (concluding that a judge's use of a procedure that was earlier challenged is not evidence of bias against the defendant).

¶ 237. Allen has alleged no particularized bias by Justice Gableman against him personally, nor has he alleged that Justice Gableman had any financial inter-

482

est in the outcome of his case. Allen has not alleged that Justice Gableman has had any past contacts of any type with him or his case. Allen has not alleged that Justice Gableman even knows who he is. No potential constitutional due process violation has been alleged here based on Justice Gableman's participation in Allen's case.

¶ 238. Allen's claim is not comparable to the claim made in *Caperton*. *Caperton* was based on claims of particularized bias against a party in a pending case because of actions taken by the other party. *Caperton,* 129 S. Ct. at 2263–64. Those actions were alleged to have directly benefitted a justice who at that time was about to decide Caperton's case. *Id.* at 2265. Here, there has been no allegation of bias against Allen because of any connection between Justice Gableman and Allen. Accordingly, Allen has failed to state a claim cognizable under the due process clauses of either the federal or state constitution.

¶ 239. Allen also has sought disqualification based on statutory grounds.[20] He alleged that Wis. Stat. § 757.19(2)(g) requires Justice Gableman's disqualification. Section 757.19(2)(g) provides:

---

[20] The federal court system has established an expanded rule that satisfies various due process and other nonconstitutional concerns. *See* 28 U.S.C. § 455 (2006). Wisconsin also employs a statutory scheme to guide judges and justices in fulfilling their obligation either to participate or to disqualify themselves. *See* Wis. Stat. § 757.19. However, as we have recognized in the context of judicial disqualification, "not all questions of judicial qualification . . . involve constitutional validity." *State v. Kywanda F.,* 200 Wis. 2d 26, 35, 546 N.W.2d 440 (1996). "The adoption of [disqualification] statutes that permit disqualification for bias or prejudice is not a sufficient basis for imposing a constitutional requirement under the Due Process Clause." *Id.* at 36 (citing *Aetna Life Ins. Co. v. LaVoie,* 475 U.S. 813, 820 (1986)).

(2) Any judge shall disqualify himself or herself from any civil or criminal action or proceeding when one of the following situations occurs:

. . .

(g) When a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner.

¶ 240. Our most recent consideration of an alleged violation of Wis. Stat. § 757.19(2)(g) occurred in *Donohoo*. There, Donohoo alleged that Justice Butler contravened § 757.19(2)(g) when he accepted financial contributions from an attorney who had a case pending before the court. *Donohoo*, 314 Wis. 2d 510, ¶ 25. As we considered Donohoo's allegations, we reiterated the standards that are applied by this court to a justice's disqualification decision in regard to an alleged violation of § 757.19(2)(g). *Id.*, ¶ 24. We said:

> Appellate review of [the justice's] subjective determination is "limited to establishing whether the judge made a determination requiring disqualification." *American TV,* 151 Wis. 2d at 186 (further citations omitted). The reviewing court must objectively decide if the judge went through the required exercise of making a subjective determination.

*Id.* (citing *Harrell,* 199 Wis. 2d at 663–64). In addition, when a motion is made to disqualify a justice from past or future proceedings, we do not address whether the justice correctly or incorrectly decided the issues presented. *Am. TV,* 151 Wis. 2d at 183. As we explained,

> To the extent prior cases cited by the State suggest that a reviewing court, in determining whether a judge should have recused himself, is to independently and objectively determine whether there was an appearance

484

of []partiality, . . . or whether the judge's impartiality can reasonably be questioned . . . they are inapplicable to a determination whether a judge was disqualified by sec. 757.19(2)(g), Stats.

*Id.* at 183–84.

¶ 241. We now apply these standards to the decision made by Justice Gableman. The motion to disqualify Justice Gableman has been pending before the court since April 17, 2009.[21] Prior to addressing Allen's motion, Justice Gableman had all of Allen's submissions before him. He also had the response of the State, which was filed April 28, 2009. When he denied Allen's motion requesting him to disqualify himself, he said:

> Having considered the motion of defendant-appellant-petitioner, Aaron Antonio Allen, individually directed to Justice Michael J. Gableman for his recusal from participation in Case No. 2007AP795, and after careful consideration of the motion for recusal;
>
> IT IS ORDERED that the motion to Justice Michael J. Gableman individually is hereby denied.

¶ 242. The order denying Allen's motion was released on September 10, 2009, after "careful consideration of the motion." Justice Gableman authored the order with all of the alleged grounds for disqualification that are now before the court. He had plenty of time to research and carefully consider the arguments made in support of and in opposition to the motion. He made a subjective determination that the grounds specified in Allen's motion did not warrant his disqualification. The order that was issued is objective proof of Justice Gableman's subjective decision. Justice Gableman's or-

---

[21] On August 13, 2009, Allen filed a letter supplementing the authority he previously cited for his April 17, 2009 motion.

der satisfied the test we set out in *Donohoo*. Accordingly, we conclude that Justice Gableman made the decisions he was required to make, just as Chief Justice Abrahamson did in *Crosetto*.

¶ 243. Although we are probably pointing out the obvious, the affirmative vote of four justices is required to grant a pending motion. There are not four justices who have voted to grant Allen's motions. Therefore, his motions, that were first presented to the court on April 17, 2009, are denied.

¶ 244. Abrahamson, C.J.'s writing laments that we did not order briefing on Allen's motions to disqualify Justice Gableman.[22] The writing concludes with a proposed "ordering" of briefs on Allen's motions. The proposed "order" is unfortunate for at least two reasons. First, the "order" is without legal authority. This is so because our internal operating procedures require the affirmative vote of four justices before briefing on an issue that was not set forth in the petition for review may be ordered. IOP II.B.1. Allen did not list the disqualification of Justice Gableman either in his petition for review or in his supplemental petition for review, and there are not four justices who have voted to have additional briefing on the issues his motions raise. Second, the proposed "order" may cause unnecessary confusion, and perhaps expense, for the participating attorneys who are "ordered" to file briefs on motions that have not garnered the affirmative votes of four justices.

¶ 245. And finally, we cannot leave this decision without noting, with a degree of sadness, that in satisfying his perceived need to attack Justice Gableman's fairness, Allen did not bother to investigate

---

[22] Abrahamson, C.J.'s writing, ¶¶ 21–22, passim.

the manner in which Justice Gableman has treated defendants who have appeared in criminal proceedings in courts over which Justice Gableman has presided. Had Allen made even a cursory investigation into the person who is Justice Michael Gableman, he would have found that in 2003, while the Circuit Court Judge of Burnett County, Justice Gableman founded the Burnett County Restorative Justice Program, an alternative model to the traditional criminal court's adversary proceeding.[23] Justice Gableman remained the chairman of the Burnett County Restorative Justice Program for six years. During that time he proposed and oversaw the development of numerous special services to criminal defendants: the Inmate Community Service Program, a program under which inmates could reduce their jail time by working for charitable and municipal organizations,[24] and the Victim-Offender Mediation Program, a program that permits willing victims the opportunity to take an active part in the rehabilitation of the offender.[25] In 2006 as Judge in Burnett County, Justice Gableman founded the Burnett County Drug

[23] *Restorative Justice Receives $42,000 Bremer Grant,* Inter-County Leader, Sept. 21, 2005 (*available at* http://www.the-leader.net) (enter 9/21/05 as the issue date in the "search archives" box; then follow "Restorative Justice Receives . . ." hyperlink).

[24] Joan O. Fallon, *Judge Asks Grantsburg to Consider Inmate Work Program,* Inter-County Leader, July 20, 2005 (*available at* http://www.the-leader.net) (enter 7/20/05 as the issue date in the "search archives" box; then follow "Judge Asks Grantsburg . . ." hyperlink).

[25] Nancy Jappe, *Restorative Justice Has New Staff,* Inter-County Leader, Feb. 15, 2007 (*available at* http://www.the-leader.net) (enter 2/15/07 as the issue date in the "search archives" box; then follow "Restorative Justice Has . . ." hyperlink).

and Alcohol Court that presented an alternate way of approaching longstanding drug and alcohol addiction problems that many criminal defendants struggle to overcome.[26]

¶ 246. Accordingly, based on our discussion above, Justices Prosser, Roggensack and Ziegler vote to deny all of the motions that Allen has filed seeking the disqualification of Justice Gableman.

¶ 247. DAVID T. PROSSER, J. (*concurring*). Several justices have forced the court to address the limits of the court's power to respond to recusal motions.

¶ 248. The options before us are stark: either we approve the proposition that a majority of justices have plenary power to exclude a colleague from participating in pending cases, thereby nullifying election results and potentially changing key decisions of the court, or we conclude that we simply do not have this authority. Although one may posit a limited power that the court could employ in a truly extreme and egregious situation, that power—once recognized—could not be contained. It would grow like a cancer, and gravely damage the institution.

¶ 249. Because the preservation of the court as an institution is more important than any case or any member of the court, I believe we must reject the notion

[26] Nancy Jappe, *County Celebrates First Drug and Alcohol Court Graduation,* Inter-County Leader, July 11, 2007 (*available at* http://www.the-leader.net) (enter 7/11/07 as the issue date in the "search archives" box; then follow "County Celebrates . . ." hyperlink); Nancy Jappe, *County Board Hears Reports on Drug Court and Lakes and Rivers Association,* Inter-County Leader, Jan. 24, 2007 (*available at* http://www.the-leader.net) (enter 1/24/07 as the issue date in the "search archives" box; then follow "County Board Hears . . ." hyperlink).

that we possess the power to prevent each other from participating in individual cases.

¶ 250. Justices confronted with a truly extreme situation in which a justice ought to withdraw from a case but is unwilling to do so, may resort to personal and collective persuasion. These justices will outnumber a lone colleague who refuses to withdraw. If necessary, they may delay a case, and they may seek the involvement of the Judicial Commission. These steps are clearly preferable to overturning the will of the electorate and cutting off the procedural safeguards built into review by the Judicial Commission by barring a colleague from participating in a case.

¶ 251. If I am mistaken about this court's power to remove a justice from an individual case before it is decided, the United States Supreme Court can tell me so. The Supreme Court certainly did not do that in *Caperton v. A.T. Massey Coal Co.,* 556 U.S. ___, 129 S. Ct. 2252 (2009).

¶ 252. In *Caperton,* the Supreme Court reversed a decision and removed a West Virginia justice from a case in a fact situation that was *radically* different from the facts here. The Supreme Court did not order the West Virginia Supreme Court of Appeals to remove a fellow justice.

¶ 253. The Supreme Court was deeply divided in *Caperton,* especially about the ramifications of its decision upon lower courts. Chief Justice John Roberts wrote in his dissent that the Court had provided "no guidance to judges and litigants about when recusal will be constitutionally required. This will inevitably lead to an increase in allegations that judges are biased, however groundless those charges may be." *Id.* at 2267 (Roberts, C.J., dissenting).

489

¶ 254. Writing for the majority, Justice Anthony Kennedy came to a different conclusion. He declared that "Massey and its amici predict that various adverse consequences will follow from recognizing a constitutional violation here—ranging from a flood of recusal motions to unnecessary interference with judicial elections. We disagree." *Id.* at 2265.

¶ 255. At least with respect to Wisconsin, Justice Kennedy has been proven wrong. To date, the *Caperton* decision has had disastrous consequences for the Wisconsin Supreme Court. The *Allen* motion was filed in anticipation of *Caperton,* but it has been followed by nine additional recusal motions against members of this court. The Wisconsin State Public Defender's office has invited the entire defense bar to file recusal motions against one of the justices in criminal cases. The number and savagery of these motions is unprecedented and amounts to a frontal assault on the court.

¶ 256. The court should have denied Allen's motion quickly, without comment. This would have avoided exposing controversy within the court. Several justices rejected this course, preferring to take the controversy public.

¶ 257. In my view, the failure of the court to reject Allen's motion quickly and decisively has exacerbated our dilemma. The court must do better.

¶ 258. For the reasons stated, I join the opinion of Justice PATIENCE DRAKE ROGGENSACK.

¶ 259. ANNETTE KINGSLAND ZIEGLER, J. (*concurring*). I join the opinion of Justice Patience Drake Roggensack and write separately to emphasize that the due process standard for judicial recusal as set forth by the United States Supreme Court in *Caperton v. A.T. Massey Coal Co.,* 556 U.S. ___, 129 S. Ct. 2252

(2009), is not implicated by Allen's motion. By arguing for *Caperton*'s application, the writings of Chief Justice Abrahamson and Justice Crooks are "painting a mule to resemble a zebra, and then going zebra hunting. But paint does not change the mule into a zebra." *State ex rel. Arnold v. County Court of Rock County*, 51 Wis. 2d 434, 448, 187 N.W.2d 354 (1971) (Hansen, J., dissenting).

¶ 260. Moreover, in *Caperton,* the Supreme Court did not hold that a majority of the court has the power to disqualify a judicial peer, the question we are presented with in this case. Rather, the Supreme Court reviewed a state court justice's denial of a recusal motion, holding that in that "rare instance," *Caperton,* 129 S. Ct. at 2267, the justice's recusal was required because there was an objective risk of actual bias that rose to an unconstitutional level, *id.* at 2265. The writings of Chief Justice Abrahamson and Justice Crooks expand *Caperton* to an extent that it could include an attack on virtually any justice for nearly any reason and allow litigants to "pick their court" by filing recusal motions against certain justices and not others. Such an expansion of *Caperton* could cause gridlock in the court and delay justice being dispensed. The Supreme Court made clear that it did not intend such consequences. Unlike the Wisconsin Supreme Court, the United States Supreme Court is the highest court in the land, and no higher court can further review a U.S. Supreme Court Justice's recusal decision. Had the Supreme Court intended that justices now be endowed with the authority to second guess a judicial peer's recusal decision post-*Caperton,* it would have led the charge by changing its own operating procedures or otherwise providing for review of a judicial peer.[1] To my knowledge, it has not.

---

[1] Originally appearing in the Act of December 5, 1974, Pub. L. No. 93–512, 88 Stat. 1609 (codified as amended at 28 U.S.C.

 

 

¶ 261. Simply stated, unlike the motion for disqualification in *Caperton,* the motion to disqualify Justice Gableman is appropriately resolved without resort to the Due Process Clause of the Constitution. *Caperton* involved extreme and extraordinary facts which the Supreme Court recognized in its majority opinion no less than a dozen times. Not only are the pending recusal motions in *Allen* devoid of facts which rise to the level of a *Caperton* analysis, unlike in *Caperton,* here there is no "person with a personal stake" in *Allen* who "had a significant and disproportionate influence" in placing Justice Gableman on the case "by raising funds or directing [his] election campaign when the case was pending or imminent." *See id.* at 2263–64. Neither Allen nor the State had any influence in placing Justice Gableman on the court, and no amount of briefing can alter that fact. To be clear, I do not join in the view expressed by the writings of Chief Justice Abrahamson and Justice Crooks that a *Caperton* analysis is implicated or the view that the justices on this court have the power to disqualify a fellow justice from participation.[2] Nevertheless, even if those writings as-

§ 455 (2006)), 28 U.S.C. § 455 is entitled "Disqualification of justice, judge, or magistrate" and provides that "(a) Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ." *Id.,* § 455(b)(1).

[2] To be certain, I do not agree with the view expressed by the writings of Chief Justice Abrahamson and Justice Crooks that *Caperton v. A.T. Massey Coal Co.,* 556 U.S. ___, 129 S. Ct. 2252 (2009), should apply in this case. *See* Justice Crooks's writing, ¶ 188 n.3. Rather, I interpret *Caperton* for the purpose

492

sume that such an analysis should be undertaken, Allen's allegations fail to implicate *Caperton*. Accordingly, this court should deny Allen's motion and roll up the welcome mat to those who wish to "judge shop" in Wisconsin.

¶ 262. This court should not promote the use of *Caperton* to "judge shop." "Judge shopping" has always been taboo.[3] In *Caperton,* the Supreme Court reaffirmed that basic tenet when it concluded that a litigant's efforts to "choose[] the judge," *id.* at 2265, through directing a justice's election campaign and thus placing that justice on that contributing party's pending case did not pass constitutional muster. "Just as no man is allowed to be a judge in his own cause, similar fears of bias can arise when—without the consent of the parties—a man chooses the judge in his own cause." *Id.* I agree. In this case, by seeking to remove a justice from sitting on a case even though the allegations fail to state

of explaining why *Caperton* is not implicated, i.e. explaining just how different a due process claim under *Caperton* is from Allen's claim.

[3] Of course, a litigant may substitute a circuit court judge pursuant to Wis. Stat. § 971.20 (2007–08). However, in that scenario, as well as in *Caperton,* in which recusal was required of a justice of the Supreme Court of Appeals of West Virginia, the judge can be replaced and the case fully heard. *See* W. Va. Const. art. VIII, § 2 ("When any justice is temporarily disqualified or unable to serve, the chief justice may assign a judge of a circuit court or of an intermediate appellate court to serve from time to time in his stead."). In contrast, when a Wisconsin Supreme Court justice is absent from participation in a case, the parties and the citizens of the state are deprived of a full court to decide the issues. The issues we decide have statewide significance and consequently do not affect only the litigants before the court. Hence, justices have a duty to stay on cases and decide the issues if they can. SCR 60.04(1)(a).

a due process claim as set forth in *Caperton,* Allen's efforts effectively amount to "judge shopping." As an institution, this court should not condone such manipulation regardless of whether it is done to place a justice on a particular case or remove a justice from a particular case. Permitting such "judge shopping" damages this court as an institution, inappropriately politicizes the court, and nullifies the votes of the electorate. Accordingly, I write to clarify at least one reason why the due process standard for judicial recusal as set forth in *Caperton* is not implicated in this case.

¶ 263. It is true that the Supreme Court stated in *Caperton* that "there are objective standards that require recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' " *Id.* at 2257 (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)). The "extreme facts"[4] in *Caperton* amounted to one of the "rare instances" in which the

---

[4] Emphasizing the rarity of a case in which the Constitution requires recusal, Justice Kennedy, writing for the majority, referenced *Caperton*'s "extreme" or "extraordinary" facts no less than a dozen times:

- Justice Benjamin "received campaign contributions in an extraordinary amount from, and through the efforts of, [Don Blankenship, A.T. Massey Coal Co.'s chairman, chief executive officer, and president]." *Caperton,* 129 S. Ct. at 2256.

- "Though not a bribe or criminal influence, Justice Benjamin would nevertheless feel a debt of gratitude to Blankenship for his extraordinary efforts to get him elected." *Id.* at 2262.

- "Not every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, but this is an exceptional case." *Id.* at 2263.

- "[T]he fact remains that Blankenship's extraordinary contributions were made at a time when he had a vested stake in the outcome" of his pending case. *Id.* at 2265.

constitutional standard was implicated. *Id.* at 2267. In contrast, the allegations in this case, like "most disputes

- "On these extreme facts the probability of actual bias rises to an unconstitutional level." *Id.*

- "Our decision today addresses an extraordinary situation where the Constitution requires recusal." *Id.*

- "The facts now before us are extreme by any measure." *Id.*

- "It is true that extreme cases often test the bounds of legal principles . . . . But it is also true that extreme facts are more likely to cross constitutional limits . . . ." *Id.*

- "In each [prior recusal] case the Court dealt with extreme facts that created an unconstitutional probability of bias . . . . The Court was careful to distinguish the extreme facts of the cases before it from those interests that would not rise to a constitutional level." *Id.* at 2265–66.

- The Court was not flooded with motions after the prior recusal cases, which was "perhaps due in part to the extreme facts those standards sought to address." *Id.* at 2266.

Several commentators have emphasized the "extraordinary" or "extreme" facts that warranted recusal in *Caperton. See, e.g.,* Terri R. Day, *Buying Justice: Caperton v. A.T. Massey: Campaign Dollars, Mandatory Recusal and Due Process,* 28 Miss. C. L. Rev. 359, 373–76, 380 (2009) (noting that Justice Kennedy repeatedly emphasized the extreme and rare facts of the case and finding that the Court "articulated a vague standard based on extreme facts"); Pamela S. Karlan, *Electing Judges, Judging Elections, and the Lessons of Caperton,* 123 Harv. L. Rev. 80, 81, 97 (2009) ("[T]he Court's opinion focused explicitly only on the way that extraordinary fusions of money into a judicial election may threaten judicial impartiality"; "[T]he divide between the Justices in the *Caperton* majority and those in the dissent was over the availability of a 'judicially discernible and manageable standard' for distinguishing between the 'extreme' campaign support that requires recusal as a matter of constitutional law and the ordinary operation of an elected judiciary in which judges routinely participate in cases involving individuals who supported (or opposed) their election.").

over disqualification [can] be resolved without resort to the Constitution." *Id.*; *see also Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 702 (1948); Pamela S. Karlan, *Electing Judges, Judging Elections, and the Lessons of Caperton,* 123 Harv. L. Rev. 80, 97 (2009) ("[T]he divide between the Justices in the *Caperton* majority and those in the dissent was over the availability of a 'judicially discernible and manageable standard' for distinguishing between the 'extreme' campaign support that requires recusal as a matter of constitutional law and the ordinary operation of an elected judiciary in which judges routinely participate in cases involving individuals who supported (or opposed) their election.").

¶ 264. Far from governing disqualification disputes that do not implicate a litigant's due process rights, *Caperton* "addresse[d] an extraordinary situation where the Constitution require[d] recusal" because a party directly influenced a judge's election at a time when that party's case was pending, and it was "reasonably foreseeable . . . that the pending case would be before the newly elected justice." 129 S. Ct. at 2264–65. In *Caperton,* "a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.* at 2263–64. In such "an exceptional case," the Supreme Court concluded that "based on objective and reasonable perceptions," there was a serious risk of the judge's actual bias in sitting on that particular case between those particular parties. *Id.* at 2263.

¶ 265. *Caperton v. A.T. Massey Coal Co.* was a pending case when the campaign efforts of Don Blankenship, A.T. Massey's chairman, chief executive officer,

and president, "had a significant and disproportionate influence" in electing Justice Brent Benjamin to the Supreme Court of Appeals of West Virginia and therefore placing him on A.T. Massey's case. *Id.* at 2264. Before the appeal was actually filed, the opposing party, Caperton, moved to disqualify Justice Benjamin in that particular case between those particular parties. *Id.* at 2257. Caperton claimed that based on the conflict caused by Blankenship's involvement with Justice Benjamin's campaign, Justice Benjamin's recusal was required under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Id.* Justice Benjamin denied the motion. *Id.* A.T. Massey filed its petition for appeal, and the Supreme Court of Appeals of West Virginia granted review. *Id.* A majority of the court, joined by Justice Benjamin, ultimately reversed the $50 million jury verdict against A.T. Massey. *Id.* at 2258.

¶ 266. The United States Supreme Court granted certiorari to determine whether due process was violated when Justice Benjamin denied Caperton's recusal motion. *Id.* at 2256. The Supreme Court concluded that based "in all the circumstances of [that] case, due process require[d] recusal." *Id.* at 2257.

¶ 267. The "extreme facts" that amounted to a due process violation, *id.* at 2265, are as follows. A $50 million jury verdict had been entered in favor of Caperton against A.T. Massey before the election for the Supreme Court of Appeals of West Virginia, and it was "reasonably foreseeable . . . that the pending case would be before the newly elected justice." *Id.* at 2264–65. Blankenship made a $3 million contribution in support of Benjamin to replace the incumbent justice "at a time when [Blankenship] had a vested stake in the outcome" of a pending case that was to come before the court. *Id.* at 2265. The $3 million was comprised of the $1,000

497

statutory maximum to Benjamin's campaign committee, $2.5 million to the "And For The Sake Of The Kids" organization that supported Benjamin, and over $500,000 on mailings and advertisements to support Benjamin.[5] *Id.* at 2257. The $3 million "eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300% the amount spent by Benjamin's campaign committee." *Id.* at 2264. According to Caperton, Blankenship spent $1 million more than the total amount spent by the campaign committees of Benjamin and the incumbent justice combined. *Id.* The election was decided by fewer than 50,000 votes. *Id.* Benjamin won the election with 53.3 percent of the votes. *Id.* at 2257.

¶ 268. Based on the relative size of Blankenship's contribution in comparison to the total amount of money contributed to the campaign; the total amount spent in the election; the apparent effect such contribution had on the outcome of the election; *and the temporal relationship between the contribution, the election, and the pendency of the case,* the Supreme Court concluded that there was a serious, objective risk of Justice Benjamin's actual bias in sitting on that particular case between Caperton and A.T. Massey. *Id.* at 2263–64.

---

[5] In its recent decision in *Citizens United v. Federal Election Commission,* No. 08–205, slip op. (U.S. Jan. 21, 2010), the United States Supreme Court recognized the fundamental constitutional right to political speech, *id.* at 23, and struck down as unconstitutional federal law that prohibits corporations from making independent expenditures for speech that expressly advocates the election or defeat of a candidate, *id.* at 50. The Supreme Court "conclude[d] that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Id.* at 42.

¶ 269. However, nowhere in the *Caperton* decision does the Supreme Court state that any lesser fact situation would have required Justice Benjamin's recusal in that case, and nowhere does the Supreme Court conclude that he would be required to recuse himself from an unrelated civil case that involved different parties. To suggest that *Caperton* says otherwise is to invent new law and to invite recusal motions based upon "spin" instead of whether a justice can be fair and impartial. Such practice is destructive to the credibility of the court, as justices are always presumed to be fair and impartial.[6] To be clear, nowhere in *Caperton* does the majority state that anything less than this "perfect storm," created by those extreme and extraordinary facts coupled with the timing of the election and the parties' pending case, would be sufficient to constitute a due process violation. *See id.* at 2264, 2265 (recognizing as "critical" the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case" and likewise stating that objective standards required recusal when Blankenship's "significant and disproportionate influence" was "coupled with the temporal relationship between the election and the pending case"). In fact, the Supreme Court cautioned that "[a]pplication of the constitutional standard implicated in [*Caperton*] will [] be confined to rare instances." *Id.* at 2267.

---

[6] There is a "presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. 35, 47 (1975); *see also Bridges v. California,* 314 U.S. 252, 273 (1941) ("[T]o impute to judges a lack of firmness, wisdom, or honor" is a premise "which we cannot accept."); *Milburn v. State,* 50 Wis. 2d 53, 62, 183 N.W.2d 70 (1971) (recognizing that there is a presumption that a judge "in fidelity to his oath of office, will try each case on its merits").

¶ 270. Although referenced in Chief Justice Abrahamson's writing, *see* ¶ 104 n.72, any mention of television advertisements in support of Justice Benjamin is notably absent from the Supreme Court's decision in *Caperton*. While the Chief Justice references the content of the television advertisements as if it was part of the *Caperton* decision, in actuality, that was not even mentioned.

¶ 271. In contrast to the "extreme facts" in *Caperton* where the probability of actual bias of a justice of a lower court rose to an unconstitutional level, 129 S. Ct. at 2265, the allegations in *Allen* involve a judicial peer and fail to state a due process claim because no "person with a personal stake" in *Allen* "had a significant and disproportionate influence" in placing Justice Gableman on the case "by raising funds or directing [his] election campaign when the case was pending or imminent." *See id.* at 2263–64. Neither Allen nor the State had any influence in placing Justice Gableman on the court, and no amount of briefing can alter that fact. Allen's allegation that Justice Gableman's campaign speech evidences his bias against all criminal defendants and therefore requires his recusal in *Allen* simply does not implicate the due process standard for judicial recusal set forth in *Caperton*.

¶ 272. For these reasons, I join the opinion of Justice PATIENCE DRAKE ROGGENSACK.